**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **X CORP.**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| **WORLD FEDERATION OF** | ) | |
| **ADVERTISERS**; | ) | JURY TRIAL DEMANDED |
| **UNILEVER PLC**; | ) | |
| **UNILEVER UNITED STATES, INC.**; | ) | |
| **MARS, INCORPORATED**; | ) | |
| **CVS HEALTH CORPORATION**; and | ) | |
| **ØRSTED A/S**, | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff X Corp. ("X" or "Plaintiff"), by and through its undersigned counsel, brings this action for trebled compensatory damages and injunctive relief under the antitrust laws of the United States against the World Federation of Advertisers; Unilever PLC; Unilever United States, Inc.; Mars, Incorporated; CVS Health Corporation; and Ørsted A/S, demanding a trial by jury. For its Complaint against Defendants, X alleges the following:

### Nature of the Case

1. This is an antitrust action relating to a group boycott by competing advertisers of one of the most popular social media platforms in the United States.

2. Acting with and through a World Federation of Advertisers ("WFA") initiative called the Global Alliance for Responsible Media ("GARM"), the Defendants conspired, along with dozens of non-defendant co-conspirators, to collectively withhold billions of dollars in advertising revenue from Twitter, Inc. ("Twitter," now X Corp.). Concerned that Twitter might

1

deviate from certain brand safety standards for advertising on social media platforms set through GARM, the conspirators collectively acted to enforce Twitter's adherence to those standards through the boycott.

3.      As a condition of GARM membership, GARM's members agree to adopt, implement, and enforce GARM's brand safety standards, including by withholding advertising from social media platforms deemed by GARM to be non-compliant with the brand safety standards.  When Elon Musk and other investors acquired Twitter in November 2022, GARM members reached out to GARM to learn "[GARM's] perspectives about the Twitter situation and a possible boycott from many companies[,]" and GARM conveyed to its members its concerns about Twitter's compliance with GARM's standards, triggering the massive advertiser boycott that followed.

4.      Pursuant to the conspiracy, major brand advertisers, including the advertiser Defendants and dozens of non-defendant co-conspirators, agreed to and did, abruptly and in lockstep, boycott Twitter by discontinuing entirely or substantially reducing their previously substantial advertising purchases from Twitter.  As one of the Defendants reported to GARM months later, when appearing to seek GARM's permission to resume advertising on Twitter, its participation in the November 2022 boycott had been "[b]ased on your [GARM's] recommendation."  These actions were all against the unilateral self-interest of the advertisers; they made economic sense only in furtherance of a conspiracy performed in the confidence that competing advertisers were doing the same.  As the same Defendant raised with GARM a few months into the boycott, "Now, some time has passed, and I am curious to know what you would advise us to do.  And what are other global advertisers doing – have they come back to the [Twitter] platform, or are they still off?"

5.      Internally, GARM celebrated—and took responsibility for—the massive economic harm imposed on Twitter by the boycott, boasting within just a few months of the start of the boycott that "they [Twitter] are 80% below revenue forecasts."

6.      The boycott and its effects continue to this day, despite X applying brand safety standards comparable to those of its competitors and which meet or exceed those specified by GARM.

7.      The conduct of Defendants and their co-conspirators is a naked restraint of trade without countervailing benefits to competition or consumers.  In a competitive market, each social media platform would set the brand safety standards that are optimal for that platform and for its users, and advertisers would unilaterally select the platforms on which they advertise.  Social media platforms that select efficient brand safety standards will thrive; platforms that select inefficient standards will lag behind.  Through this competitive process, platforms will discover and adopt the brand safety practices that best promote consumer welfare.  But collective action among competing advertisers to dictate brand safety standards to be applied by social media platforms shortcuts the competitive process and allows the collective views of a group of advertisers with market power to override the interests of consumers.  The Sherman Act, 15 U.S.C. § 1, does not allow this.  The brand safety standards set by GARM should succeed or fail in the marketplace on their own merits and not through the coercive exercise of market power by advertisers acting collectively to promote their own economic interests through commercial restraints at the expense of social media platforms and their users.

8.      The unlawful conduct alleged herein is the subject of an active investigation by the Committee on the Judiciary of the House of Representatives of the Congress of the United States ("House Judiciary Committee").  After extensive investigation—including a review of documents

produced in response to subpoenas issued to WFA and to GARM and an interview of a senior GARM executive—the House Judiciary Committee issued an Interim Staff Report on July 10, 2024.

9.      That Report concluded: "The extent to which GARM has organized its trade association and coordinates actions that rob consumers of choices is likely illegal under the antitrust laws and threatens fundamental American freedoms.  The information uncovered to date of WFA and GARM's collusive conduct to demonetize disfavored content is alarming."

**Parties**

10.      X Corp. is a Nevada corporation with its principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94103.   X Corp. owns and operates the social media platform X, accessible through twitter.com, X.com, and various mobile and online applications. X Corp. merged with Twitter, Inc. in April 2023 and is the successor-in-interest to Twitter, Inc.

11.      Defendant World Federation of Advertisers ("WFA") is an international not-for-profit association organized under the laws of the Kingdom of Belgium.  WFA's headquarters are in Belgium, and it has an office in New York, New York.  GARM is a committee of WFA and reports to the WFA Executive Committee.  WFA's President, Deputy President, and the senior WFA executive who both co-founded and leads its GARM initiative live and work in the United States.  WFA and GARM have members located in this District, and WFA engages in a substantial volume of commerce throughout the United States and in this District.

12.      The WFA Executive Committee is responsible for the administration, representation, and management of WFA and its activities.   Through the WFA Executive Committee, comprising many of the world's largest advertisers, WFA is dominated and controlled

4

by competing advertisers and is dedicated to promoting their collective economic interests. According to WFA:

> WFA is the only global organisation representing the common interests of marketers.  It brings together the biggest markets and marketers worldwide, representing roughly 90% of global marketing communications spend, almost US$900 billion annually.

13.     Defendant Ørsted A/S ("Ørsted") is a Danish renewable energy company with its headquarters in Fredericia, Denmark.  Ørsted is a publicly listed company with the Kingdom of Denmark as majority shareholder with a 50.1% ownership share.  Denmark exercises its ownership interest in Ørsted in accordance with the ordinary governance practices of Danish companies, where a board of non-executive directors (the Board of Directors) and executive directors (the Executive Board) are responsible for the management of the company.  Through one or more wholly owned American subsidiaries, Ørsted holds substantial investments in the United States, including a wind farming facility located in the Wichita Falls Division of this District.  Ørsted expends substantial sums annually on the promotion of its products and services over the internet, including on social media platforms.  Ørsted became a GARM member no later than June 2022.

14.     Defendant Unilever PLC is a manufacturer of consumer products that is incorporated in the United Kingdom and headquartered in London, England.  Unilever United States, Inc. ("Unilever U.S.," and together with Unilever PLC, "Unilever") is an indirect, wholly owned subsidiary of Unilever PLC that is incorporated in Delaware and headquartered in New Jersey.  Unilever expends substantial sums annually on the promotion of its products and services over the internet, including on social media platforms.  Unilever PLC is a founding member of GARM and sits on GARM's Steer Team—the group responsible for "setting priorities for the GARM, addressing impasses and approving solutions."  Unilever PLC is also represented on

WFA's Executive Board.  Unilever U.S. engages in a substantial volume of commerce in this District.

15.     Defendant Mars, Incorporated ("Mars") is a seller of consumer products and services.  Mars is incorporated in Delaware and headquartered in Virginia.  Mars expends substantial sums annually on the promotion of its products and services over the internet, including on social media platforms.  Mars is a founding member of GARM, sits on GARM's Steer Team, and is represented on WFA's Executive Board.  Mars engages in a substantial volume of commerce in this District.

16.     Defendant CVS Health Corporation ("CVS Health") provides health services, including health insurance, pharmacy, and clinical services.  CVS Health is incorporated in Delaware and headquartered in Rhode Island.  CVS Health expends substantial sums annually on the promotion of its products and services over the internet, including on social media platforms.  CVS Health became a member of GARM no later than June 2022.  CVS Health engages in a substantial volume of commerce in this District.

## Jurisdiction, Standing, and Venue

17.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1337.

18.     Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

19.     This Court has personal jurisdiction over each Defendant.  WFA, Unilever U.S., Mars, and CVS Health each transact a substantial volume of business in this District.  Each Defendant, including Unilever PLC and Ørsted, through its participation in the conspiracy alleged in this Complaint and otherwise, has substantial contacts with the United States.  The members of

the conspiracy committed substantial acts in furtherance of that unlawful scheme within the United States, including in this District.  And their unlawful conspiracy had foreseeable effects in the United States, including in this District.

20.     Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), (d), and (f), because, among other things, each domestic Defendant transacted business, was found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

21.     Ørsted's conduct alleged herein is commercial activity carried on in the United States and/or commercial activity conducted outside the United States causing a direct, foreseeable effect in the United States under 28 U.S.C. § 1605(a)(2).  Ørsted conspired with WFA and others in the United States to boycott Twitter in the United States by withholding purchases of advertising from Twitter that would have been made in the United States and communicated with WFA employees located in the United States in furtherance of this conspiracy.

22.     The conduct of the Defendants and their co-conspirators alleged herein had and continues to have a substantial effect on interstate commerce in the United States.

**Factual Allegations**

23.     X operates a microblogging social media platform that was founded in 2006 by Twitter, Inc.  X's platform allows users to publish text, photos, and videos in posts (previously referred to as "Tweets") that other users may view and interact with.  These posts appear sequentially to users in feeds, which occasionally include paid advertisements.  X has over 500 million active users every month.

24.     X competes with other social media platforms, from which it is differentiated in the degree to which consumers use its platform to keep up to date with news, live events, issues of public policy, and other current affairs.

25.     X sells digital display advertising directly to advertisers and advertising agencies. Larger advertisers generally retain the services of advertising agencies to purchase digital advertising on their behalf.  Advertisers pay substantial sums for the services of advertising agencies and generally rely on advertising agencies for strategic advice in managing their digital advertising expenditure.

### *The Global Alliance for Responsible Media*

26.     In June 2019, WFA and some of its members, including seventeen leading advertisers, established GARM as a forum to promote the economic interests of advertisers in connection with the purchase of advertising on digital media and social media platforms.  GARM's members include advertisers, advertising agencies, and social media platforms.

27.     The Association of National Advertisers ("ANA") Growth Council, which is composed of chief marketers from the world's premier brands and has a seat on GARM's Steer Team, joined with WFA to create GARM.

28.     A former senior employee of Mars, Rob Rakowitz, co-founded GARM with WFA while still employed at Mars.  Rakowitz, who works in WFA's New York office, is the Initiative Lead for GARM and is part of every significant decision made by GARM.

29.     GARM is governed by its Steer Team, which functions as GARM's board of directors.  The Steer Team comprises representatives of Unilever PLC, Mars, Diageo, P&G, GroupM (the world's largest advertising agency), the American Association of Advertising Agencies (the 4A's, which represents advertising agencies), the Incorporated Society of British

Advertisers (ISBA, which represents brands in the United Kingdom), and ANA (which represents brands in the United States).  The Steer Team thus includes and represents the world's largest advertisers.  Rakowitz is supervised by the Steer Team, which reviews and approves his substantive communications with GARM members.  According to Rakowitz, he will consult with the Steer Team before "hav[ing] a conversation around policy and enforcement and consistency" with a GARM member.

30.    GARM also includes the so-called "Big Six" advertising agency holding companies, which together hold nearly every major advertising agency in the world.  In other words, nearly all major agencies that execute advertising campaigns for large companies around the world actively participate in GARM.  With WFA accounting for roughly 90% of brand spend on advertising and with GARM including almost every advertising agency and many of the world's biggest brands, GARM members collectively exercise market power in the advertising market.

31.    Although GARM membership is broader than advertisers and advertising agencies, the organization is (like WFA itself) dominated and controlled by advertisers, who use it to advance their collective economic interests.  In its Charter, GARM states: "The GARM is a first-of-its-kind industry-wide, but advertiser-centric community of global brands, media agencies, media owners and platforms, and industry bodies."  Another GARM document states: "GARM's governance advances an advertiser-led agenda that focuses on solutions that improve transparency, consistency, control and oversight on content monetization of content in social and digital media."

32.    GARM is an organization led by and for advertisers.  For example, in an internal email among GARM Steer Team members, Rakowitz or another participant drafted proposed talking points for an upcoming discussion with Facebook, a social media platform.  One proposed

talking point was: "We appreciate the platforms [*sic*] input but we from a governance perspective we [*sic*] must maintain true to our chartering organizations WFA and ANA in being advertiser-driven[.]"  An advertiser participant on the email chain, commenting on this talking point, wrote: "What is the point here?  If it is to make sure they know we're running this, again assumed and no need to reiterate."

33.      The avowed purpose of GARM is to leverage the collective market power of its advertiser members to advance their economic interests by forcing changes to the business operations of digital media and social media platforms that sell advertising inventory to GARM members or to their clients.  GARM's Charter recognizes the "collective power" of GARM members to achieve this goal through "uncommon collaboration."  Rakowitz has explained: "[U]ncommon collaboration needs to be understood as the industry coming together and putting aside competitive concerns in the interest of safety[.]"  In its 2019 press release announcing the formation of GARM, WFA expressly identified collective action among advertisers at the expense of digital media and social media platforms as the purpose of GARM: "Members of the Global Alliance for Responsible Media recognize the role that advertisers can play in collectively pushing to improve the safety of online environments."

34.      Acting collectively through GARM, advertisers and advertising agencies aim to realize changes to the business models of digital media and social media platforms that they would have been unable to force the adoption of while acting unilaterally and in uncoordinated rivalry with one another.  In 2019, Rakowitz explained the genesis of GARM as frustration among the advertiser members of the GARM Steer Team with their inability to achieve their desired outcomes in negotiations with social media platforms when acting unilaterally:

> Roughly a year ago, I drove a breakthrough on the WFA Media
> Board that point-to-point conversations were getting the industry

nowhere; Mars having a conversation with YouTube separate from P&G, and P&G having a conversation with Facebook, and conversations happening at a local and global levels was simply inefficient and not reaching beyond advertising sales teams.  In late spring, we started to drive moment around this idea of "uncommon collaboration" to break through the deadlock.

Uncommon collaboration has all sides of the industry together, uncommon collaboration has competitors working together.  The goals are to rise above individual commercial interest, focus on consumers and society, to drive focus that is endorsed by major customers of these platforms in a way that cannot be ignored, and finally ensure that there's access to the right decision makers who haven't been part of the demands hitherto.

35.     In another document describing the collective exercise of market power to dictate results not achievable by advertisers acting unilaterally, GARM explains: "The goal is to remove harmful content from advertiser-supported media on digital media platforms, and ensure that the industry works together to ensure that this is prioritized by executives" of digital media and social media platforms, rather than by the "advertising sales teams" that Rakowitz referenced in the 2019 explanation above as being all that was available to the advertisers when acting unilaterally.

36.     One example of GARM forcing changes to the business operations of social media platforms through the collective exercise of its members' market power that they could not have achieved unilaterally comes from 2022.  Meta, an operator of social media platforms (including Facebook and Instagram) and a member of GARM, announced changes in 2022 to the way in which it reported to advertisers and advertising agencies where advertisements were appearing on its platform.

37.     Internally, GARM celebrated this result as the outcome of the exercise of advertisers' collective market power through GARM.  Rakowitz wrote to the CEO of WFA: "This is a big first step for [Meta], and should be acknowledged as a significant win we forced."  *See* Exhibit A at HJC-WFA-GARM-000042864.  Referring to an upcoming meeting of the WFA

11

Executive Committee to be held in Greece, Rakowitz wrote: "This should be a message to the ExecCo for Athens - our demands are being met," and "We need to get the ExecCo to understand that we're operating with a Roosevelt doctrine of 'speaking softly and carrying a big stick[.]'" *Id.* at HJC-WFA-GARM-000042863.

### *The GARM Brand Safety Standards*

38.     WFA organized GARM in part to promulgate standards relating to the placement of advertising on digital media and social media platforms.  GARM's standards include so-called "brand safety" standards, which govern the display of specified types of sensitive content on advertiser-supported digital media and social media platforms.  GARM's standards also specify techniques to implement these brand safety standards and common measures of the implementation of these brand safety standards.

39.     GARM describes its standardization efforts as involving "common definition, common measures, common tools, and independent verification" of GARM's brand safety standards.  According to GARM, "GARM's core work is focused on creating industry standards and solutions in monetization, seeking to improve transparency, consistency, control, and accountability for the placement of ads on content."

40.     GARM's standardization efforts are pursued through Working Groups.  The GARM Working Groups are managed by WFA and meet biweekly for seventy minutes. Resolutions and policies of the GARM developed by the Working Groups are proposed to GARM's members and to GARM's Steer Team and are adopted based on a vote of GARM's members and approval by the Steer Team.

41.     There are four Working Groups.  GARM's efforts to achieve "common definitions" of brand safety are performed through the Standards and Definitions Working Group; its efforts to

achieve "common measures" of brand safety through the Measurement and Oversight Working Group; its efforts to achieve "common tools" through the Adjacency Standards and Controls Working Group; and "independent verification" is assigned to the Independent Verification Working Group.

42.     GARM's Standards and Definitions Working Group is focused on the development of "an industry wide common framework of definitions to drive transparency, consistency and control in the placement of ads online."   The Standards and Definitions Working Group was formed in December 2019 and went on to propose the specifications later adopted in September 2020 as the GARM Brand Safety Floor and Suitability Framework.

43.     The Brand Safety Floor and Suitability Framework identifies twelve categories of content on digital media and social media platforms.   The Brand Safety Floor provides that advertisements may not appear in connection with such content.   The Suitability Framework provides that advertisements may appear in connection with social media posts relating to the twelve identified categories only with advertiser consent.   The Brand Safety Floor and Suitability Framework was first promulgated by GARM in September 2020 and was updated in June 2022.

44.     The GARM Measurement and Oversight Working Group is tasked with agreeing upon an aggregated reporting framework for assessing the adherence of digital media and social media platforms to GARM's Brand Safety Floor and Suitability Framework and other measures of brand safety.   The Measurement and Oversight Working Group was formed in July 2020 and went on to recommend the reporting format later adopted in the GARM Aggregated Measurement Report, which has been published six times since 2021.

45.     The GARM Adjacency Standards and Controls Working Group is tasked with agreeing upon common measures to define and measure the placement of advertising on digital

media and social media platforms.  The Adjacency Standards and Controls Working Group formed in 2020 and recommended the specifications later adopted in June 2022 as the GARM Adjacency Standards Framework.

46.    The GARM Independent Verification Working Group is tasked with agreeing upon a common framework for the certification of the brand safety practices of digital media and social media platforms.  The Independent Verification Working Group recommended that GARM-member social media platforms be required to obtain verification of their brand safety processes and metrics from two third parties, the Media Ratings Council and the Trustworthy Accountability Group.

47.    This Complaint refers to the output of these four working groups, including the Brand Safety Floor and Suitability Framework, the Adjacency Standards Framework, participation in the Aggregated Measurement Report, and recommended brand safety audits, along with ancillary agreements and understandings reached through GARM, as the "GARM Brand Safety Standards."

48.    The GARM Brand Safety Standards promote the economic interests of GARM's advertiser and advertising agency members.  GARM's advertiser and advertising agency members have an economic incentive to see digital media and social media platforms adopt and adhere to the GARM Brand Safety Standards.

49.    By forcing social media platforms to adopt and adhere to the GARM Brand Safety Standards, GARM-member advertisers and advertising agencies force social media platforms to incur certain costs previously borne by advertisers.  Social media platforms host a diverse array of content, and some advertisers do not want their advertisements appearing in connection with or adjacent to some types of content.  Before the Brand Safety Standards, each advertiser negotiated

14

individually with social media platforms to customize the reach of its ads and to avoid unwanted content.   Some GARM-member advertisers found these individualized negotiations to be unsatisfying and costly and wished to reduce their costs of advertising on social media platforms by forcing the social media platforms to incur those costs instead.   Through the Brand Safety Standards, GARM-member advertisers collectively shift to social media platforms a portion of the costs previously borne by advertisers by forcing the social media platforms (i) to proactively remove certain content (that falling below the Safety Floor) and (ii) to adopt tools to allow advertisers to more easily avoid certain other content subject to the Suitability Framework.

50.    The changes to the business operations that GARM forces on social media platforms through its Brand Safety Standards are not necessarily in the best interests of those social media platforms or their users.   These changes also exceed what GARM members were able to achieve through unilateral and independent negotiations with those platforms.   Because social media advertising is an important and growing market for advertisers, GARM members acting unilaterally were unable to force social media platforms to adopt and adhere to the Brand Safety Standards by independently withholding or threatening to withhold their advertising purchases from those platforms.   Collective action through GARM using the collective market power of GARM's advertiser and advertising agency members is necessary to force social media platforms to adopt and adhere to the Brand Safety Standards.

51.    Thus, although GARM sets the Brand Safety Standards, GARM is not a mere standard-setting body.   Legitimate standard-setting bodies facilitate collective action among participants to set voluntary standards while eschewing any agreement among participants as to whether the standards will be implemented by participants or how the implementation of the

standard will be enforced.  By forcing digital media and social media platforms to adopt and adhere

to the Brand Safety Standards, GARM goes much further than setting voluntary standards.

### *GARM Members Agree to Follow and Enforce the Brand Safety Standards*

52.     In addition to agreeing upon the content of the GARM Brand Safety Standards,

GARM's advertiser and advertising agency members agree (i) to adopt and implement the GARM

Brand Safety Standards in their own business operations and (ii) to enforce the implementation of

the Brand Safety Standards by the digital media platforms and social media platforms from which

they purchase advertising.

53.     GARM-member advertisers and advertising agencies agree to adopt, implement,

and enforce the GARM Brand Safety Standards because widespread and uniform adoption and

implementation of the Brand Safety Standards promotes the economic interest of those advertisers

and advertising agencies.  As one GARM document provides: "GARM's standards rely on system-

wide adoption in order to realize its goals."  Thus, GARM-member advertisers and advertising

agencies have an economic motivation to agree to enforce the adherence of digital media and social

media platforms to the GARM Brand Safety Standards.

54.     The agreement by and among GARM-member advertisers and advertising agencies

to adopt, implement, and enforce the Brand Safety Standards is set forth in GARM's documents.

GARM articulates participation in this conspiracy as a requirement of membership on a page titled

"GARM: Frequently Asked Questions," which provides in relevant part:

> **Who can join GARM?**
>
> Any advertiser, media agency, and media platform can join GARM
> provided they are willing to align with our charter, which calls for
> uncommon collaboration in confronting this challenge.  Member
> organizations also agree to adopt GARM solutions to improve
> business operations.  Membership currently includes more than 60

of the world's biggest advertisers, all six major agency holding
companies, seven industry groups, and 10 media platforms.

55.    The GARM FAQ plainly requires GARM-member advertisers and advertising
agencies to adopt and implement the GARM Brand Safety Standards in their own business
operations.   The GARM Brand Safety Standards are "GARM solutions" that "[m]ember
organizations also agree to adopt . . . to improve business operations."

56.    The GARM FAQ also plainly requires that GARM-member advertisers and
advertising agencies adopt and implement the GARM Brand Safety Standards in their business
operations with third parties.   Specifically, another section of the FAQ specifies the "commitment"
GARM requires from its members, a "commitment" that includes an "agreement to adopt and
implement [GARM] solutions both internally and where working with partners."   Thus, by the
plain language of the FAQ document, the Brand Safety Standards are intended to, and do, govern
the commercial conduct of GARM-member advertisers and advertising agencies, who commit to
implementing those Standards in their purchases of advertising from digital media and social
media platforms.

57.    The same FAQ document also provides that the required "commitment" of GARM
members to "adopt and implement [GARM] solutions both internally and where working with
partners" is not limited to unilateral conduct but may also involve collective action among GARM
members.   Specifically, by requiring members to "align with our charter" and to the "uncommon
collaboration" called for by that Charter to promote GARM's goals, GARM, in the FAQ
document, contemplates the collective action of its advertising and advertising agency members
in enforcing adherence to the GARM Brand Safety Standards, including in their commercial
transactions with digital media and social media platforms.

58.     The collective action to enforce the GARM Brand Safety Standards contemplated by GARM in the FAQ and in the GARM Charter involves the collective exercise of market power to promote through GARM the economic interests of GARM's advertiser members.  As alleged above, GARM's Charter recognizes the "collective power" of GARM's advertiser members, and GARM defines "uncommon collaboration" as competitors setting aside unilateral interests—in Rakowitz's words, "putting aside competitive concerns"—to achieve common goals.  Thus, read together, the GARM FAQ and GARM Charter memorialize a conscious commitment to a common scheme among GARM-member advertisers and advertising agencies to enforce the implementation of the GARM Brand Safety Standards by digital media and social media platforms, including through the collective exercise of market power in their commercial transactions with those platforms.

59.     The agreement by and among GARM's advertiser and advertising agency members to adopt, implement, and enforce the Brand Safety Standards is memorialized in a number of GARM documents other than the FAQ and the Charter.  For example, in a new member application, GARM explained that members must "agree to work with industry partners and category peers in a collaborative, non-competitive way, actively support GARM's charter, and agreement [*sic*] to make commensurate changes to business operations in pursuit of GARM's goals."

60.     The agreement by and among GARM's advertiser and advertising agency members to adopt, implement, and enforce the Brand Safety Standards is also memorialized in the Brand Safety Floor and Suitability Framework, which provides that "Individual GARM members will adopt these shared principles in their operations, whether they are a marketer, agency, or media platform."  The Brand Safety Floor and Suitability Framework provides that advertising agencies

18

"will leverage the framework to guide how they invest with platforms at the agency-wide level and at the individual campaign level." The Brand Safety Floor and Suitability Framework provides that "marketers," or brand advertisers, "will use the definitions to set brand risk and suitability standards for corporate, brand and campaign levels."

61.     The agreement by and among GARM's advertiser and advertising agency members to adopt, implement, and enforce the GARM Brand Safety Standards requires those advertisers and advertising agencies to limit or discontinue their purchases of advertising from digital media and social media platforms not compliant with the Brand Safety Standards.

62.     GARM member CVS Health manifested its assent to the agreement by and among GARM's advertiser members to adopt, implement, and enforce the Brand Safety Standards by publicly incorporating the GARM Brand Safety Floor into its policies governing its purchase of paid advertising.   Pursuant to its agreements with GARM, and as confirmed by its public statements, CVS will not purchase advertising from digital media and social media platforms that do not adhere to the GARM Brand Safety Standards.

63.     Other GARM member advertisers have similarly manifested the agreement by and among GARM's advertiser members to adopt, implement, and enforce the Brand Safety Standards, sometimes by stating publicly that they adhere to the GARM Brand Safety Standards in their purchase of digital advertising and endeavor to make no more than one percent of their advertising purchases in connection with content falling below the GARM Brand Safety Floor.

64.     Unilever, as well as other GARM members, have told X that X's compliance with GARM's Brand Safety Standards and full participation in GARM's internal processes are conditions precedent to the purchase of digital advertising from X by those advertisers.

65.     GARM-member advertisers and advertising agencies enforce the implementation of the Brand Safety Standards by digital media and social media platforms in multiple ways, including by exchanging information with and through GARM (i) about the implementation of the Brand Safety Standards by those platforms and (ii) about actual or potential deviations from those Standards by those platforms.  GARM members will, from time to time, bring suspected deviations from the Brand Safety Standards by digital media and social media platforms to the attention of GARM, which in turn will investigate those concerns and whether a platform is adhering to the Brand Safety Standards.

66.     Another way in which GARM-member advertisers and advertising agencies enforce the Brand Safety Standards is through advertising boycotts of digital media and social media platforms deemed by GARM not to be complying with the Brand Safety Standards.  For example, GARM members, including Unilever, Mars, and CVS Health, boycotted Facebook, Instagram, and Twitter in 2020 with the goal of forcing them to adhere to the Brand Safety Standards.  WFA facilitated this boycott by surveying WFA members about their willingness to boycott these social media platforms and disseminating the results of this survey to its members. This boycott ended once Meta and Twitter agreed in discussions with the GARM Steer Team and with Unilever U.S. to adhere to the Brand Safety Standards.

67.     GARM-member advertisers and advertising agencies commonly look to GARM to determine the compliance of a digital or social media platform with the GARM Brand Safety Standards and will reduce or discontinue their purchases of advertising from media platforms deemed by GARM not to be complying with the Brand Safety Standards.

68.     GARM will, from time to time, in communications with digital media and social media platforms, threaten to communicate to its advertiser and advertising agency members that

the media platform is not complying with the Brand Safety Standards.  Pursuant to the agreement of GARM-member advertisers and advertising agencies to adopt, implement, and enforce the Brand Safety Standards, the natural, foreseeable, and intended effect of a communication by GARM that a digital media or social media platform is not adhering to the Brand Safety Standards is to induce a boycott of that platform by GARM-member advertisers and advertising agencies.

69.    GARM members will, on occasion, contact GARM to learn GARM's views as to the adherence of digital media and social media platforms with the GARM Brand Safety Standards and whether GARM-member advertisers and advertising agencies will be boycotting media platforms not adhering to the Brand Safety Standards.  For example, Coca-Cola contacted GARM on February 17, 2022, seeking information about a possible boycott of Spotify for failure to adhere to the Brand Safety Standards.  A Coca-Cola executive wrote:

> Specifically I am wondering if anyone has said that they are boycotting Spotify from an advertising perspective.  I know that Spotify have recently joined GARM but also aware that they have not published anything around compliance to their policies.  It would be great to hear anything you have heard from other advertisers, although I appreciate you might not be able to say which advertisers have made the comments.

*See* Exhibit B at HJC-WFA-GARM-000025817.  Rakowitz responded by proffering GARM's views as to Spotify's adherence to the Brand Safety Standards, as well as other information redacted in the version of the email available to Plaintiff.  Rakowitz did not, in the unredacted portion of this email, disclaim an interest in facilitating or profess an unwillingness to facilitate a boycott of Spotify.  *Id.*  The Coca-Cola executive responded by reiterating his request for information about the intentions of other GARM members: "Interested to hear if you have had any members raise concerns with you."  *Id*. at HJC-WFA-GARM-000025816.

70.     GARM will, on occasion, publish its views on the adherence of digital media and social media platforms with the GARM Brand Safety Standards.  These statements are made after GARM learns of concerns with the adherence of a digital media or social media platform and after consultation with the GARM Steer Team and the CEO of WFA.  Rakowitz has explained that these statements are made publicly "to reflect advertiser concerns.  It's to reflect industry best practices.  It's to reflect on our work."  The purpose of these public statements by GARM is to trigger a boycott of those platforms by GARM-member advertisers and advertising agencies by apprising GARM members of GARM's concerns with respect to a platform's adherence to the Brand Safety Standards.

71.     For example, after being contacted by Coca-Cola on February 17, 2022, about "possibly boycotting Spotify," Rakowitz wrote to Spotify on February 22, 2022, demanding a meeting between Spotify executives and GARM, including the Steer Team.  If Spotify did not give in to GARM's demands, Rakowitz threatened to publicly convey GARM's views that Spotify was not adhering to the GARM Brand Safety Standards, which would—pursuant to GARM's rules— trigger a boycott of Spotify by GARM-member advertisers and advertising agencies, just as Coca-Cola had suggested to Rakowitz five days earlier.  Rakowitz wrote to Spotify:

> Im [*sic*] sorry but this isn't working.
>
> We are gravely concerned about the lack of fundamental policies and decision making at your platform.
>
> This is a statement backed by the Steer Team - which you will recall functions as a board of directors and brings together P&G, Unilever, Mars, Diageo, 4As, GroupM, ISBA, ANA[.]
>
> I'm a little disappointed by the lack of seriousness this meeting is being handled with – we've held back on press commentary on this incident out of deference.

> I'd really like to understand the hold up in securing a root to top with
> a holistic team covering trust and safety, revenue, etc.
>
> If we're unable to connect and discuss the issues we'll only be able
> to comment with what we're able to glean.

Exhibit C at HJC-WFA-GARM-000017651–52.  Rakowitz forwarded this email to a GARM

Steer Team member, writing: "Throttled."  *Id.* at HJC-WFA-GARM-000017651.

### The 2022 Boycott of Twitter

72.     Many digital media and social media platforms are free to use for consumers and

rely on revenue derived from advertising for profitable operation.  In 2022, WFA knew that Twitter

was vulnerable to an advertiser boycott by GARM-member advertisers and advertising agencies,

as public reports indicated that ninety percent of Twitter's revenue was derived from advertising.

73.     On April 4, 2022, Elon Musk publicly disclosed that he had become Twitter's

largest shareholder.  On April 24, 2022, Twitter and Musk announced that they had reached an

agreement for a Musk-led shareholder group's purchase of Twitter in a transaction that ultimately

closed on October 27, 2022.

74.     WFA was concerned that Musk's acquisition of Twitter could mark a change in

Twitter's implementation of and adherence to the GARM Brand Safety Standards.

75.     WFA organized an advertiser boycott of Twitter through GARM, with the goal of

coercing Twitter to comply with the GARM Brand Safety Standards to the satisfaction of GARM.

The terms of the boycott agreement were that Twitter must implement and adhere to GARM's

Brand Safety Standards to the satisfaction of GARM as a condition of WFA members purchasing

advertising from Twitter.  These terms were communicated publicly by WFA and GARM and by

members of WFA and GARM.  These public communications of the terms on which advertisers

would purchase advertising from Twitter served as a focal point for the organization of the boycott.

The terms of the agreement to boycott Twitter were also discussed privately among WFA members, including communications organized and facilitated through GARM.

76.    Following the playbook established earlier in 2022 regarding a possible boycott of Spotify, WFA triggered the boycott of Twitter through public statements of its concerns with Twitter's continued compliance with the GARM Brand Safety Standards.  These statements were cleared by the GARM Steer Team, including Defendants Unilever PLC and Mars.  These statements were intended to, and did, communicate the collective views of Defendants and other competing advertisers, speaking through WFA, about Twitter's adherence to the Brand Safety Standards, a statement that in turn would—pursuant to GARM's rules—implicate the advertising purchasing decisions of GARM-member advertisers and advertising agencies and trigger a boycott of Twitter.

77.    WFA issued a public letter to Musk on October 31, 2022, captioned "GARM calls on Twitter to uphold existing commitments on brand safety and deepen future collaboration."  The letter stated that:

> The Global Alliance for Responsible Media (GARM) is an advertiser-led cross-industry effort to remove harmful content from ad-supported digital media, in the interest of protecting consumers and safeguarding advertiser rights on supporting suitable media content.
>
> Twitter has been a member since the organization was brought together by advertisers in June 2019 and has been a partner with GARM in developing industry standards and applying them to its platform.
>
> Effectively removing harmful content from ad-supported media is a challenging endeavor that requires consistent support, investment and innovation.
>
> Brand safety is non-negotiable for advertisers.  The industry has come a long way in developing industry standards that drive

24

> increased transparency and control in the interests of consumer safety.
>
> Despite the transition in ownership, we expect Twitter to uphold its previous commitments to GARM and continue to engage with GARM. We are monitoring Twitter's actions, such as setting up a content moderation review panel, and assessing their design, governance, and potential to improve implementation of digital media safety best practice. We will share these views with members, as we have with previous events.
>
> GARM members will continue to leverage such insights as part of their own independent assessments and decision-making processes.

78. That same day, Rakowitz posted on Twitter, addressing Musk. The post was captioned: "A statement from GARM and [WFA] … on our work on #brandsafety – we must have Twitter uphold existing agreements and deepen future collaboration – the stakes are simply too high." The statement said, in relevant part, that:

> A new industry-defining standard can be set here, and we're eagerly awaiting to see how Twitter can uniquely answer this. Platforms should be safe for all, and suitable for advertisers. For advertisers this is non-negotiable – and we expect Twitter to uphold its commitments to GARM.

Rakowitz signed the statement as "Rob on behalf of the Global Alliance for Responsible Media."

79. Musk responded the same day, posting in response to Rakowitz that "Twitter's commitment to brand safety remains unchanged."

80. The purpose and effect of the two public statements made by WFA and GARM on October 31, 2022, were to communicate proposed terms of coordination to competing advertisers. These were written plans for a conspiracy promulgated through the collective action of competing advertisers. Both communications conveyed that GARM had promulgated the Brand Safety Standards; that advertisers collectively desired Twitter to adhere to those Brand Safety Standards to promote the economic interests of the advertisers; that this demand was "non-negotiable"; that

25

WFA and GARM expected Twitter to commit to implementation and adherence to the Brand Safety Standards; and that advertisers would be collectively awaiting evidence of Twitter's implementation and adherence to the Brand Safety Standards, as determined by GARM, as part of their decision whether to purchase advertising from Twitter.

81.     The description of the advertisers' requirement that Twitter be in compliance with the GARM Brand Safety Standards in WFA's two communications of October 31, 2022, as "non-negotiable" was a reference to the preexisting agreement among and between GARM-member advertisers and advertising agencies to adopt, implement, and enforce the GARM Brand Safety Standards, if necessary by a boycott of Twitter.

82.     WFA's statement in its October 31, 2022, communication that it would "share these views with members" who would "leverage such insights as part of their own independent assessments and decision-making processes" conveyed to WFA members that WFA would, acting through GARM, make a recommendation relating to future advertising purchases from Twitter, and that members would consider this recommendation in deciding whether to purchase advertising from Twitter.  WFA's reference to following this course of action "as we have done with previous events" was a reference to the earlier 2020 boycott of Twitter and other social media platforms facilitated by and through WFA, as well as other instances of the collective exercise of market power by advertisers and advertising agencies through GARM.

83.     WFA's October 31, 2022, statements were made publicly, rather than privately, to Twitter to serve as a focal point for the coordination of a group boycott of Twitter.  There was no purpose served by the public dissemination of the terms of coordination other than to facilitate collusion by creating common knowledge among WFA's members about the criteria that all of the WFA-member advertisers would be applying in deciding whether to deal with Twitter.  By

pointedly announcing the same criteria in two communications on the same day, WFA had laid the framework for the boycott that followed.  By making those announcements public, WFA ensured not only that every WFA member knew the terms on which WFA proposed to boycott Twitter, but also that every WFA member knew that *every other WFA member* knew the terms on which WFA proposed to boycott Twitter.

84.     Economic theory in the field of industrial organization has identified this type of communication among competitors—the communication of focal points identifying the terms of collusion—as conducive to the formation and implementation of collusive agreements.  WFA intended to facilitate a boycott of Twitter through its communications on October 31, 2022.

85.     The advertising agency members of GARM quickly followed the October 31, 2022, WFA communications with announcements of their own, recommending to their clients that they suspend paid advertising on Twitter.  On or about November 1, 2022, GARM member Interpublic Group, one of the "Big Six" advertising agency holding companies, recommended that clients of its IPG Media Brands agencies suspend all paid advertising on Twitter for at least a week.  On or about November 1, 2022, GARM member Havas, one of the "Big Six" advertising agency holding companies, recommended that clients suspend paid advertising on Twitter.  Sometime between November 2 and November 7, 2022, GARM member Dentsu, one of the "Big Six" advertising agency holding companies, recommended that clients suspend paid advertising on Twitter.  No later than November 11, 2022, GARM member Omnicom Media Group, one of the "Big Six" advertising agency holding companies, recommended that its clients "pause activity on Twitter in the short term."  No later than November 14, 2022, GARM member GroupM, a component of one of the "Big Six" advertising agency holding companies and a member of the GARM Steer Team, announced that it viewed advertising on Twitter to be "high risk," a recommendation to its clients

not to advertise on Twitter.  No later than December 13, 2022, GARM member Publicis, one of the "Big Six" advertising agency holding companies, recommended that clients suspend paid advertising on Twitter.

86.     The recommendations of the GARM-member advertising agencies to their clients to refrain from advertising on Twitter were widely followed.  Many of Twitter's largest advertisers discontinued or curtailed their purchases of advertising from Twitter.

87.     On November 3, 2022, Musk met with representatives of more than 100 advertisers and advertising agencies to assure them of his intent and plans to keep Twitter attractive to advertisers.

88.     In November 2022, GARM membership discussed an assessment developed by the GARM Steer Team of Twitter's implementation of GARM's Brand Safety Standards.   The assessment developed by the GARM Steer Team noted "Brand Safety Concerns" with Twitter's "Adherence to GARM Standards."

89.     Between November 7 and November 14, 2022, the GARM Steer Team conducted a survey, described as a "WFA-GARM Benchmark Survey," of WFA members and GARM members, including both advertisers and advertising agencies.  The survey sought information relating to the plans that these competing advertisers had with respect to purchasing advertising from Twitter in light of Musk's acquisition of the company.  The purpose and effect of the survey was to facilitate a boycott of Twitter by gathering and then disseminating information about the willingness of competing advertisers to boycott Twitter, as WFA had previously done with a survey conducted in connection with the 2020 boycott of Twitter and other social media platforms. One hundred eighteen advertisers and advertising agencies that were members of WFA and

GARM responded to the WFA-GARM Benchmark Survey.  Rakowitz shared the results of the survey with members of the WFA Executive Committee and widely among GARM members.

90.    On November 4, 2022, GARM member Ørsted contacted Rakowitz seeking guidance as to GARM's views of Twitter's compliance with the GARM Brand Safety Standard and of an advertiser boycott of Twitter.  Ørsted's November 4, 2022, email stated:

> I'm reaching out to you to ask you if it's possible to arrange a meeting and hear more about your perspectives about the Twitter situation and a possible boycott from many companies.
>
> As you know we have a lot of focus on responsible marketing and we are about to make a recommendation to management about actions and when we need to consider whether we should continue promotion on the platform or find alternatives.  It is an important platform for us in the US market and it will have an impact that we need to asses[s] and outline.
>
> Is this something you can help us with by setting up a meeting Wednesday next week to hear your perspectives and advise?

*See* Exhibit D at HJC-WFA-GARM-000051210–11.

91.    In seeking GARM's "perspectives on the Twitter situation and a possible boycott from many companies" in deciding whether to continue purchasing advertising from Twitter, Ørsted was following the plan described in WFA's October 31, 2022, communication, which contemplated that WFA would share its views with members about Twitter's adherence to the GARM Brand Safety Standards and that advertisers would use that information in deciding whether to continue purchasing advertising from Twitter.

92.    Ørsted was also seeking GARM's recommendation on participation in a boycott of Twitter pursuant to Ørsted's preexisting agreement as a GARM-member advertiser to adopt, implement, and enforce the GARM Brand Safety Standards and to consider, in purchasing

advertising, the compliance of digital media and social media platforms with those standards as determined by GARM.

93.    Ørsted was willing to follow GARM's recommendation even though Twitter was "an important platform for [Ørsted] in the US market."  *See* Exhibit D at HJC-WFA-GARM-000051211.  Because Twitter was "an important platform for [Ørsted] in the US market," before reducing its purchases of advertising, Ørsted sought assurances from GARM that other GARM members would be doing the same.

94.    On November 7, 2022, Ørsted wrote again: "I haven't heard from Rob and the Twitter issue is critical to us.  Would you be able to help us and set up a meeting where we can learn more?"  *See* Exhibit D at HJC-WFA-GARM-000051210.

95.    A WFA employee other than Rakowitz responded the same day, writing:

> I hope you're doing well.  While I don't manage Rob's calendar, I can certainly nudge him to see when he is available.  I assume he is waiting to get back to you as I've just sent out a survey to some of our members to gauge their perceptions on the issue.  We will have the results from that survey by EoW, have been in constant contact with Twitter and plan to meet with Elon in the coming weeks. Would it make sense to schedule something next week after the survey results come in?

*See* Exhibit D at HJC-WFA-GARM-000051210.  The WFA employee did not, in this email, disclaim an interest in or profess an unwillingness to facilitate a boycott of Twitter.  In responding to Ørsted's request for GARM's "perspectives on the Twitter situation and a possible boycott from many companies," the WFA employee described the WFA-GARM Benchmark Survey as "a survey to some of our members to gauge their perceptions on this issue."  *Id.*

96.    Ørsted responded on November 8, 2022, writing:

> It sounds good with [t]he survey and the talk with Twitter and Elon Musk.

> We would very much like to know more as soon as you have the results.  When do you expect to have it?  Do you think Tuesday next week is realistic to share the results and your recommendations?
>
> Do you have a description on the situation that you can share?

*See* Exhibit D at HJC-WFA-GARM-000051209.   Once again, Ørsted was seeking GARM's "recommendation" with respect to Ørsted continuing to purchase advertising from Twitter.  In this communication, Ørsted identified the results of the WFA-GARM Benchmark Survey as an important piece of information that it desired to obtain and use in deciding whether to continue purchasing advertising from Twitter.

97.     Ørsted wrote again to Rakowitz on November 14, 2022:

> We are following the conversation and communication about the Twitter situation very closely.  It seems like some agencies are now starting to recommend their clients to pause all advertising on the platform.
>
> We would like to make a situation/complication/resolution presentation to top management based on your recommendations.
>
> Do you know when you have more info from the survey you sent out last week - and can we arrange a meeting one of the coming days where you share your reflections and results?

*See* Exhibit D at HJC-WFA-GARM-000051209.   Once again, Ørsted was seeking GARM's "recommendations" with respect to Ørsted continuing to purchase advertising from Twitter.  Once again, Ørsted identified the results of the WFA-GARM Benchmark Survey as an important piece of information that it desired to obtain and use in deciding whether to continue purchasing advertising from Twitter.

98.     In reply, a WFA employee offered to speak with Ørsted on November 17, 2022.  *See* Exhibit D at HJC-WFA-GARM-000051209.   The WFA employee did not in this email disclaim an interest in, or profess an unwillingness to facilitate, a boycott of Twitter or deny that GARM had made or would be making a recommendation as to participation in such a boycott.

99.     Ørsted wrote again to Rakowitz on December 2, 2022:

I know you had planned to have a meeting yesterday with Elon
Musk. Is it possible to arrange a meeting next week to learn more
about how the conversation went and how you see the situation now
and expectations going forward?

*See* Exhibit D at HJC-WFA-GARM-000051208.  Rakowitz responded: "This is likely to come up

and be discussed in the Community Call on Thursday next week.  Can we discuss then and there?"

*Id.*  GARM's Community Calls are monthly events with a scheduled duration of ninety minutes.

Participation in Community Calls is an expectation for GARM members, and the events are widely

attended by senior executives of GARM-member advertisers and advertising agencies.   Ørsted

wrote again on December 7, 2022, seeking confirmation that Rakowitz would indeed be discussing

these topics in the upcoming Community Call, and Rakowitz confirmed that was indeed the case.

*See* Exhibit D at HJC-WFA-GARM-000051207–08.

100.    A document prepared by GARM for the WFA Executive Committee on November

28, 2022, related to an upcoming meeting among WFA Executive Committee members, GARM

Steer Team members, and Musk and others from Twitter.  The document stated that WFA

Executive Committee members and GARM Steer Team members would be prepared to "ask some

prepared and pointed questions" on a number of topics, including "The role of advertising in

Twitter's future" and "The plan to close the gap on slipping standards on controlling harmful

content, reporting delays, changes in monetized users, [*sic*]."

101.    In advance of a December 1, 2022, meeting with Musk and other Twitter

executives, WFA prepared to expel Twitter from GARM if its demands were not met in a

timeframe acceptable to GARM.  Rakowitz opined that taking a firm stance with Twitter by

expelling Twitter from GARM for non-compliance with the GARM Brand Safety Standards would

send a desirable message to other digital media and social media platforms.  In preparing for the

meeting, Rakowitz outlined his proposed requirements for Twitter to remain a member of GARM:

> 1. Responsiveness to requests within a reasonable amount of time
> [72 business hours]
>
> 2. Demonstrable support of the GARM Brand Safety Floor globally
> inclusive of policies and tools
>
> 3. Regular participation in GARM Working Groups relevant to
> member organization type

102.    At the December 1, 2022, meeting with GARM and WFA, Twitter agreed to take

certain steps to adhere to the GARM Brand Safety Standards.  While some members of the GARM

Steer Team were pleased with the concessions made by Twitter, other members of the Steer Team,

including Unilever, were not.  In a December 3, 2022, communication about the press release to

be issued regarding the December 1 meeting, Rakowitz explained that:

> Separately, I connected with the 4As and GroupM yesterday –
> they're pleased with the concessions - especially the social listening
> - since that proves/disproves the safety of the platform.  UL will not
> trust until they see the data and have said they have issues with
> overtly partisan takes (e.g., Hunter Biden laptop expose.)

103.    On December 5, 2022, WFA issued a statement about its discussions with Musk.

The statement was titled "WFA and GARM meet Musk to discuss brand safety" and announced:

> On December 1st, the WFA Executive Committee met with
> Twitter's new leadership team to discuss Twitter's commitments to
> brand safety and the Global Alliance for Responsible Media
> (GARM), which Twitter reinforced.
>
> WFA held this meeting to discuss advertiser concerns on the
> platform under Chatham House Rules.  The conversation focused on
> Twitter's continued commitments to GARM around common
> definitions, common measures, common tools and independent
> verification.
>
> Twitter's leadership was engaged and committed to working with
> GARM to document brand safety measures currently in place and

> develop a roadmap for future improvements, on an accelerated but mutually agreed timeframe.
>
> The GARM Steer Team will work with Twitter and make this roadmap for improved brand safety measures public in due course.

WFA's promise to share publicly a plan for bringing Twitter into compliance with the GARM Brand Safety Standards was intended to and did provide a roadmap for the advertisers and advertising agencies boycotting Twitter to understand the terms on which the boycott would continue and, upon GARM's permission, might someday end.

104.    On or about December 8, 2022, GARM members convened for their monthly Community Call, which was widely attended by senior executives of GARM-member advertisers and advertising agencies.  According to GARM, on this call, there was "extensive debriefing and discussion around Elon Musks' [*sic*] takeover of Twitter," as well as a discussion of the commitments Twitter had made to comply with the GARM Brand Safety Standards, the results of the WFA-GARM Benchmark Survey of GARM-member advertisers and advertising agencies, and GARM's expectations of Twitter going forward.

105.    On December 19, 2022, WFA issued a statement about its discussions with Musk. The statement was titled, "Twitter announces its acceleration agenda with GARM to answer brand safety needs," and provided a summary of steps Twitter had agreed to take to implement and adhere to the GARM Brand Safety Standards.  The statement noted: "Twitter are [*sic*] already working against these mechanisms, many of which were shared with the GARM Community in its December Community Call."

106.    In seeking to become GARM members and to demonstrate to advertisers their adherence to the Brand Safety Standards, other sellers of digital advertising referenced GARM's actions against Twitter and their perception that GARM and its members had deemed Twitter not

to be complying with the GARM Brand Safety Standards and taken disciplinary action against it. For example, Quizlet—a digital platform and advertising seller—emailed GARM on November 22, 2022, asking in part: "Is there a way for Quizlet Ads to become 'approved' or 'certified' by GARM?  I found the framework online, is there a way for publishers to use the framework to show that they are following the GARM standards?"  In a subsequent email, Quizlet referred expressly to GARM's action against Twitter: "Other than the Twitter statement that was released a few weeks ago, are there others [*sic*] cases where GARM took any kind of action against a company that has claimed to be in line with GARM standards?"

107.    GARM internally discussed the connection between its conduct and the advertiser boycott of Twitter, as well as delighting in the enormous harm that its boycott had already caused. While editing a February 2023 draft of an email to TikTok regarding brand safety issues, Rakowitz wrote: "I'd like to point out that nowhere in this email is the 'you may recognize my name from being the idiot who challenged Musk on brand safety issues.  Since then they are 80% below revenue forecasts.'"  *See* Exhibit E at HJC-WFA-GARM-000030997.   Rakowitz appended a form of smiley-face emoji to the end of this message.  *Id.*

108.    On March 13, 2023, Ørsted wrote to WFA employees, including Rakowitz:

> Since the news about Elon Musk acquiring Twitter, we chose to take off all of our paid advertisement on the platform due to brand safety concerns.  This was decided in Q4 2022.  Now, some time has passed, and I am curious to know what you would advise us to do.  And what are other global advertisers doing - have they come back to the platform, or are they still off?

*See* Exhibit F at HJC-WFA-GARM-000026945.

109.    Nine days later, the House Judiciary Committee contacted GARM in connection with the Committee's investigation of GARM.

110.    Now aware that its activities had attracted interest from the House Judiciary Committee, WFA did not respond to Ørsted's March 13, 2023, email.  On April 14, 2023, Ørsted wrote to Rakowitz and others at WFA:

> Hi again
>
> Can you please advise me on the latest updates regarding Twitter? Or perhaps you have a place where I can read more about your perspective on Twitter as a platform after Elon Musk's acquisition?
>
> Based on your recommendations, we have stopped all paid advertisement, because the platform was rather unsafe due to Elon Musk's decision of firing a lot of ressources [*sic*] etc, and therefore little control over the content on the platform.  But its [*sic*] an important platform for us to reach our audience, so we would like to consider going back, we just need to know whether or not the platform is safe.
>
> Thanks!

*See* Exhibit F at HJC-WFA-GARM-000026944.

111.    Rakowitz, now conscious of the Committee's investigation, responded to Ørsted four days later, on April 18, 2024, falsely denying that WFA or GARM had made any recommendation with respect to advertising on Twitter.  *See* Exhibit F at HJC-WFA-GARM-000026943–44.

### *Implementation and Effect of the Boycott*

112.    As desired and intended by the conspirators, shortly after Twitter's merger with the Musk-controlled entities, a substantial portion of Twitter's existing advertising customers, including both GARM-member advertisers and advertising agencies, as well as advertisers who were clients of GARM-member advertising agencies, abruptly discontinued or sharply curtailed their purchases of advertising from Twitter.

113.    Between November 2022 and December 2022, at least eighteen GARM-member advertisers, including Defendants Ørsted, CVS Health, Unilever U.S., and Mars, stopped purchasing advertising from Twitter either in the United States or worldwide.  Of the remaining GARM-member advertisers that had been purchasing advertising from Twitter in October 2022, dozens more substantially reduced their purchases of advertising from Twitter (and then X) over the course of 2023, in many instances by over 70 percent.  Mars, Ørsted, Unilever U.S., CVS Health, and the other GARM-member advertisers discontinued or curtailed their purchases of advertising knowing as a result of communications facilitated by and through WFA that other GARM-member advertisers and advertising agencies would do the same.

114.    Defendants Mars, Ørsted, Unilever U.S., and CVS Health and other GARM-member advertisers acted in parallel to discontinue their purchases of advertising from Twitter, in a marked departure from their prior pattern of purchases. Mars purchased no advertising from Twitter (or X) in the United States, and only a *de minimis* amount outside the United States, after October 2022.  Ørsted purchased no advertising from Twitter (or X) after November 2022. Unilever U.S. purchased no more than *de minimis* amounts of advertising from Twitter (or X) in the United States after December 2022.  CVS Health sharply cut its purchases of advertising from Twitter in November 2022, cut them again in December 2022, and purchased no advertising from Twitter (or X) after December 2022.  Fourteen or more other GARM-member advertisers that stopped purchasing advertising from Twitter between November 2022 and December 2022 similarly purchased no further advertising from Twitter (or X) afterwards.

115.    The boycott of Twitter (and now X) through GARM continues to the present day despite the fact that X's brand safety practices meet or exceed those specified by the GARM Brand Safety Standards.  More than 99 percent of X's measured ad placement in 2023 and 2024 appeared

adjacent to content scored above the GARM Brand Safety Floor, in line with industry standards. X offers robust functionality to give advertisers control over where their advertisements appear on X's platform.  This allows advertisers to ensure their ads are not served alongside content that doesn't align with their brand's message and values.  However, GARM has not, to Plaintiff's knowledge, rescinded its recommendation to GARM-member advertisers and advertising agencies to refrain from purchasing advertising from Twitter, now X.

116.    The advertising boycott of Twitter (and now X) is contrary to the economic self-interest of the boycotting advertisers, absent the conduct challenged herein.  Due to the boycott of Twitter, prices charged by Twitter for advertising declined substantially beginning in November 2022 and remain well below those charged by X's closest competitors in the social media advertising market.  By refraining from purchasing advertising from X, boycotting advertisers are forgoing a valuable opportunity to purchase low-priced advertising inventory on a platform with brand safety that meets or exceeds industry standards.

117.    Instead, as a result of their agreement to boycott Twitter (and now X), GARM-member advertisers and advertising agencies are paying prices above competitive levels for advertising inventory purchased from social media platforms deemed by GARM to be adhering to the GARM Brand Safety Standards.  Because digital advertising on social media platforms is a product without close economic substitutes, the boycott of Twitter predictably caused GARM-member advertisers and advertising agencies to shift their advertising purchases to other social media platforms rather than to other sellers of advertising.  These other social media platforms do not need to lower the price at which they offer to sell advertising to match the low prices offered by Twitter (and now X) because these other social media platforms are all GARM members and know that GARM-member advertisers and advertising agencies have agreed not to purchase

advertising from Twitter (and now X), eliminating the need for these other social media platforms to compete with Twitter (and now X) in the sale of advertising to GARM-member advertisers and advertising agencies.

### *Relevant Markets and Market Power*

118.    The relevant product market in which to assess the conduct of Defendants and their co-conspirators alleged herein is the market for digital advertising on social media platforms.  X is a seller in the relevant product market, and the Defendants and their co-conspirators are purchasers in the relevant product market.  Digital advertising sold by social media platforms has distinct characteristics that differentiate it from digital advertising sold by other types of digital platforms, including search advertising, and from offline print, radio, and broadcast advertising.

119.    Digital advertising is differentiated from offline "traditional" media due to the ability of advertisers to use data to target specific audiences online.

120.    Digital advertising consists of display and search advertising.  Display advertising refers to the display of advertisements—in the form of images, text, or videos—on websites or apps when a user visits or uses them.  Search advertising is a form of digital advertising that is shown to a person when he or she enters a specific search term in an online search engine, like Google or Bing.

121.    Display and search advertising are not substitutable because they perform different roles in the sales process.  Search advertising is intent-based—designed to encourage consumers who have already shown interest in buying the product to make a purchase—whereas display advertising is suitable for raising brand awareness and reaching new audiences that might not yet have shown interest.  Additionally, search advertising is text-based and, therefore, provides limited

space for the client's creative message, while display advertising can be used for imagery and video.

122.    Social media advertising is differentiated from other forms of digital display advertising.  Because social media platforms generally require users to create an account and allow for users to interact with user and advertiser-generated content on the platform, advertisers on social media can target their advertisements to reach highly specific audiences in a way not possible through other forms of digital display advertising.  Social media advertising and other forms of digital display advertising are sold through distinct distribution channels, with social media platforms selling advertising inventory directly to advertisers and advertising agencies, and other forms of online display advertising inventory being sold through a complex ecosystem of intermediaries not active in the sale of social media advertising.

123.    One relevant geographic market is the world.  Social media platforms sell digital advertising inventory to advertisers located around the world, and social media platforms are generally accessible worldwide.  The Defendants and their co-conspirators purchase digital advertising inventory from social media platforms worldwide.  Another relevant geographic market is the United States.  Social media platforms sell digital advertising inventory for display in specific markets, including in the United States.  The Defendants and their co-conspirators purchase digital advertising inventory for display in the United States.

124.    The Defendants and their co-conspirators have market power, called monopsony power on the buy side, in the relevant market, controlling ninety percent or more of spending in the relevant market.

125.    X has suffered injury and damages from the boycott alleged herein.  Competition in the market for digital advertising on social media platforms has been restrained by the boycott.

40

The boycott had and continues to have its natural and intended effect on X's business operations. Existing advertising customers ceased or curtailed their purchases of advertising from X, and new customers were deterred or restrained from purchasing from X, leading to lost revenue and profit for X and diminishing its equity value and goodwill. The majority of X's advertising revenue today comes from small- and medium-sized businesses that are not GARM members or clients of GARM-member advertising agencies. As demand for advertising on X has declined as a result of the boycott, the price X's remaining advertisers are willing to pay has declined as well.

126. As a result of the boycott, X became a less effective competitor to other social media platforms in the sale of digital advertising and in competing for user engagement on its platform. By sharply curtailing its revenues, the boycott has reduced X's ability to invest in new or improved functionality, thus harming the consumers who use X's platform.

### X's Claims for Relief

### Count One – Group Boycott (All Defendants)

127. Plaintiff realleges Paragraphs 1–126 above.

128. The conduct of Defendants and their co-conspirators alleged herein is a group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants and their co-conspirators agreed to boycott Twitter by withholding purchases of digital advertising from Twitter.

129. The conduct of Defendants and their co-conspirators alleged herein is *per se* illegal, or, in the alternative, illegal under the Rule of Reason or "quick look" analytical framework. There are no procompetitive effects of the group boycott, which was not reasonably related to, or reasonably necessary for, any procompetitive objectives of the GARM Brand Safety Standards.

Alternatively, there are no procompetitive effects of the group boycott that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

130.    The conduct of Defendants and their co-conspirators has caused injury and damage to X in the form of lost profits.

131.    The conduct of Defendants and their co-conspirators has caused injury and damage to X in the form of diminished equity value and goodwill, diminishing the value of X as a going concern.

### Count Two – Information Exchange (All Defendants)

132.    Plaintiff realleges Paragraphs 1–126 above.

133.    The conduct alleged herein constitutes an unlawful agreement to exchange competitively sensitive information among competing advertisers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants and their co-conspirators agreed to exchange information relating to their willingness and intent to boycott Twitter by withholding purchases of digital advertising from Twitter.

134.    The conduct of the Defendants and their co-conspirators alleged herein is unlawful under the Rule of Reason as facilitating a boycott of X.  Through GARM, Defendants and their co-conspirators exchanged, disseminated, and discussed non-public, forward-looking, and competitively-sensitive information relating to the intentions of competing advertisers with respect to the purchase of digital advertising from Plaintiff.  The information exchange had the likely and actual effect of making each competing advertiser's decision to curtail the purchase of digital advertising from Plaintiff more likely and more profitable than would have otherwise been the case.  There were no procompetitive effects of the information exchange facilitated by and through GARM, which was not reasonably related to, or reasonably necessary for, any procompetitive

objectives of the GARM Brand Safety Standards.  Alternatively, there are no procompetitive effects of the information exchange that outweigh its substantial anticompetitive effects or that could not be achieved through less restrictive means.

135.    The conduct of Defendants and their co-conspirators has caused injury and damage to X in the form of lost profits.

136.    The conduct of Defendants and their co-conspirators has caused injury and damage to X in the form of diminished equity value and goodwill, diminishing the value of X as a going concern.

**Prayer for Relief**

Wherefore, Plaintiff respectfully prays for relief and judgment against Defendants as follows:

a.  That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

b.  That the Court hold Defendants jointly and severally liable for the injuries caused by each one of them and their non-defendant co-conspirators and award Plaintiff actual damages in an amount to be determined at trial, such amount to be trebled as permitted by law;

c.  That the Court award Plaintiff pre- and post-judgment interest on any recovery;

d.  That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses;

e.  That the Court award Plaintiff a permanent injunction under Section 16 of the Clayton Act, enjoining Defendants from continuing to conspire with respect to the purchase of advertising from Plaintiff; and

f.  That the Court award such other relief as the Court may deem just and proper.

**Jury Trial Demand**

Plaintiff hereby demands a trial by jury of all claims so triable in this lawsuit.

August 6, 2024                                      Respectfully submitted.

                                                   /s/ John C. Sullivan
                                                   John C. Sullivan
                                                   Texas Bar No. 24083920
                                                   john.sullivan@the-sl-lawfirm.com
                                                   Jace R. Yarbrough
                                                   Texas Bar No. 24110560
                                                   jace.yarbrough@the-sl-lawfirm.com
                                                   S|L LAW PLLC
                                                   610 Uptown Boulevard, Suite 2000
                                                   Cedar Hill, TX 75104
                                                   (469) 523-1351 (phone)
                                                   (469) 613-0891 (facsimile)

                                                   DHILLON LAW GROUP, INC.
                                                   Christopher G. Renner*
                                                   D.C. Bar No. 1025699
                                                   cgrenner@dhillonlaw.com
                                                   (571) 430-2240 (voice and fax)
                                                   Jonathan M. Shaw*
                                                   Virginia Bar No. 98497
                                                   jshaw@dhillonlaw.com
                                                   (703) 748-2266 (voice and fax)
                                                   Andrew K. Mann*
                                                   Virginia Bar No. 77021
                                                   akmann@dhillonlaw.com
                                                   (571) 695-2677 (voice and fax)
                                                   2121 Eisenhower Avenue, Suite 608
                                                   Alexandria, VA 22314

                                                   Harmeet K. Dhillon*
                                                   California Bar No. 207873
                                                   harmeet@dhillonlaw.com
                                                   (415) 433-1700 (voice and fax)
                                                   177 Post Street, Suite 700
                                                   San Francisco, CA 94108

                                                       *pro hac vice motion forthcoming

                                                   **Attorneys for Plaintiff X Corp.**

44