IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| X CORP., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | No. 7:24-cv-00114-B |
| | § | |
| WORLD FEDERATION OF ADVERTISERS; | § | |
| MARS, INCORPORATED; | § | |
| CVS HEALTH CORPORATION; | § | |
| ØRSTED A/S; | § | |
| NESTLÉ S.A.; NESTLE USA, INC.; | § | |
| ABBOTT LABORATORIES; | § | |
| COLGATE-PALMOLIVE COMPANY; | § | |
| LEGO A/S; LEGO BRAND RETAIL, INC.; | § | |
| PINTEREST, INC.; | § | |
| TYSON FOODS, INC.; | § | |
| SHELL PLC; SHELL USA, INC.; AND | § | |
| SHELL BRANDS INTERNATIONAL AG, | § | |
| | § | |
| *Defendants.* | § | |

**BRIEF IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

Page(s)

**TABLE OF CONTENTS** ......................................................................................... i

**TABLE OF AUTHORITIES** ................................................................................... ii

**INTRODUCTION** .................................................................................................... 1

**BACKGROUND** ...................................................................................................... 4

    A.    Through GARM, platforms like Twitter worked together with advertisers to develop a voluntary Brand Safety Framework that facilitates advertising online ..................................................................................................................... 4

    B.    Advertisers had widespread concerns about brand safety on Twitter, which were heightened by Twitter's worsening brand safety protections after Mr. Musk's acquisition in 2022 ....................................................................................... 7

    C.    GARM members independently decided whether and how to make changes to their advertising on Twitter ................................................................................ 8

**LEGAL STANDARD** ............................................................................................. 10

**ARGUMENT AND AUTHORITIES** ..................................................................... 11

I.    X does not state a claim under the Sherman Act for group boycott (Count One). ........... 11

    A.    X has not plausibly alleged Defendants agreed to boycott X. ............................. 12

        1.    X does not allege direct evidence of an agreement to boycott. ................ 12

        2.    X's alleged circumstantial evidence refutes the existence of a conspiracy to boycott. ........................................................................... 16

    B.    X has not plausibly alleged antitrust injury. ......................................................... 20

    C.    X does not state a claim for group boycott under the *per se* rule or the rule of reason ...................................................................................................................... 22

        1.    X does not plausibly allege a *per se* unlawful group boycott. ................. 23

        2.    X does not satisfy the elements of a rule of reason claim because it fails to allege anticompetitive effects. ...................................................... 30

    D.    The First Amendment bars X's boycott theory ..................................................... 33

II.    X does not state a claim under the Sherman Act for conspiracy to exchange information (Count Two). ....................................................................................................... 35

III.    X relies on improper group pleading (Counts One & Two). ........................................... 38

**CONCLUSION AND PRAYER** ............................................................................ 40

**CERTIFICATE OF SERVICE** ............................................................................. 46

# TABLE OF AUTHORITIES

**Pages(s)**

## Cases

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)............................................................................34

*Acad. of Allergy & Asthma in Primary Care and United Biologics, LLC v.*
    *Superior Healthplan, Inc.*,
    2022 WL 18076843 (W.D. Tex. July 24, 2022).......................................26

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
    2022 WL 980791 (W.D. Tex. Mar. 31, 2022)...................................30, 32

*Allen v. Vertafore, Inc.*,
    28 F.4th 613 (5th Cir. 2022) .............................................................5, 10

*Anderson v. U.S. Dep't of Housing & Urban Dev.*,
    554 F.3d 525 (5th Cir. 2008) ..............................................................39

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
    2020 WL 5642941 (N.D. Ill. Sept. 22, 2020) ........................................27

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990).........................................................................21

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ..............................................................39

*Barry's Cut Rate Stores Inc. v. Visa, Inc.*,
    2019 WL 7584728 (E.D.N.Y. Nov. 20, 2019)........................................39

*In re Beef Indus. Antitrust Litig., MDL Docket No. 248*,
    907 F.2d 510 (5th Cir. 1990) ..............................................................31

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................... *passim*

*Boy Scouts v. Dale*,
    530 U. S. 640 (2000).........................................................................34

*BRFHH Shreveport v. Willis-Knighton Med. Ctr.*,
    49 F.4th 520 (5th Cir. 2022) ...........................................................................17, 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)...........................................................................................20

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)...........................................................................17, 36

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986)...........................................................................................20

*Cenedella v. Metro. Museum of Art*,
    348 F. Supp. 3d 346 (S.D.N.Y. 2018)...............................................................14

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980)...........................................................................................34

*Childers v. Lifestyles Unlimited, Inc.*,
    2023 WL 3961702 (N.D. Tex. June 12, 2023) ..................................................39

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
    92 F.4th 381 (2d Cir. 2024) .............................................................12, 14, 19, 20

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
    846 F.2d 284 (5th Cir. 1988) ...........................................13, 16, 25, 29, 36

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    491 F.3d 380 (8th Cir. 2007) ...........................................................................28

*Diaz v. Farley*,
    215 F.3d 1175 (10th Cir. 2000) ........................................................................24

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...........................................................................33

*DM Rsch., Inc. v. Coll. of Am. Pathologists*,
    170 F.3d 53 (1st Cir. 1999)...........................................................................16, 28

*Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*,
    691 F.2d 241 (6th Cir. 1982) ...........................................................................33

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)...............................................................................39

*Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*,
    833 F.3d 680 (6th Cir. 2016) ...............................................................................11

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    663 F.2d 253 (D.C. Cir. 1981) ............................................................................13

*Flaa v. Hollywood Foreign Press Ass'n*,
    55 F.4th 680 (9th Cir. 2022) ......................................................25, 26, 27, 32

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)......................................................................................28, 30

*Ginzburg v. Mem'l Healthcare Sys.*,
    993 F. Supp. 998 (S.D. Tex. 1997) ..............................................................22, 37

*Golden Bridge Tech, Inc. v. Motorola, Inc.*,
    547 F.3d 266 (5th Cir. 2008) ...................................................................13, 14, 28

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    105 F.4th 1346 (11th Cir. 2024) .........................................................................33

*Janus v. AFSCME*,
    585 U.S. 878 (2018)............................................................................................34

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ...........................................................................39

*Krystal One Acquisitions, L.L.C. v. Bank of Am., N.A.*,
    805 F. App'x 283 (5th Cir. 2020) .........................................................................7

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)....................................................................11, 22, 23, 30

*In re Loc. TV Advert. Antitrust Litig.*,
    2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) .....................................................37

*Location Servs., LLC v. Digital Recognition Network, Inc.*,
    2018 WL 5787317 (N.D. Tex. Nov. 5, 2018)................................................21, 32

*Madison Square Garden, L.P. v. Nat'l Hockey League*,
    2007 WL 3254421 (S.D.N.Y. Nov. 2, 2007).......................................................29

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
    302 F.3d 1207 (11th Cir. 2002) ..........................................................................27

*Martinez v. City of North Richland Hills*,
    846 F. App'x 238 (5th Cir. 2021) ..................................................................39, 40

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
    751 F.3d 368 (5th Cir. 2014) ..........................................................11, 12, 15, 22, 33

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)...................................................................................12

*Missouri v. Nat'l Org. for Women*,
    620 F.2d 1301 (8th Cir. 1980) ...............................................................................35

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984).........................................................................................12, 40

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
    714 F. Supp. 3d 209 (W.D.N.Y. 2024)....................................................................17

*N.M. Oncology v. Presbyterian Healthcare Servs.*,
    418 F. Supp. 3d 826 (D.N.M. 2019) .......................................................................27

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)................................................................................................35

*Nat'l Org. for Women v. Scheidler*,
    968 F.2d 612 (7th Cir. 1992) .................................................................................35

*Norris v. Hearst Tr.*,
    500 F.3d 454 (5th Cir. 2007) .................................................................................20

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985).....................................................................................22, 23, 24

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)................................................................................................23

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)...........................................................................................30, 31

*Okavage Grp., LLC v. United Wholesale Mortg., LLC*,
    2022 WL 17478298 (M.D. Fla. July 27, 2022) ..................................................26, 27

*Okavage Grp., LLC v. United Wholesale Mortg. LLC*,
    2024 WL 982380 (M.D. Fla. Feb. 6, 2024)..............................................................27

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
    2014 WL 5460450 (N.D. Tex. Oct. 27, 2014) ........................................................................18

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
    997 F. Supp. 2d 526 (N.D. Tex. 2014) .............................................................14, 16, 17, 18

*Outlaw Laboratory, LP v. Shenoor Enterprise, Inc.*,
    371 F. Supp. 3d 355 (N.D. Tex. 2019) ...........................................................................10, 40

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .........................................................................................29

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    158 F. Supp. 3d 544 (E.D. La. 2016) ...............................................................................13

*Pope v. Miss. Real Est. Comm'n*,
    872 F.2d 127 (5th Cir. 1989) ...........................................................................................28

*Pulse Network, L.L.C. v. Visa, Inc.*,
    30 F.4th 480 (5th Cir. 2022) .....................................................................................21, 32

*S. Volkswagen, Inc. v. Centrix Fin., LLC*,
    357 F. Supp. 2d 837 (D. Md. 2005) .................................................................................23

*Schachar v. Am. Academy of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ...........................................................................................16

*Schafer v. State Farm Fire & Cas. Co.*,
    507 F. Supp. 2d 587 (E.D. La. 2007) ...............................................................................18

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) .....................................................................................16, 30

*Sligh v. City of Conroe*,
    87 F.4th 290 (5th Cir. 2023) ...........................................................................................11

*Tera Grp., Inc. v. Citigroup, Inc.*,
    2024 WL 4501967 (2d Cir. Oct. 16, 2024) .......................................................................15

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .....................................................................................37, 38

*United Biologics, LLC v. Allergy & Asthma Network/Mothers of Asthmatics, Inc*,
    2019 WL 830967 (W.D. Tex. Feb. 21, 2019) ...................................................................24

*U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*,
    390 F. Supp. 3d 892 (N.D. Ill. 2019) ....................................................................39

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993) ...................................................................................29

*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969)............................................................................................38

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)......................................................................................37, 38

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001)............................................................................................34

*Va. St. Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)............................................................................................34

*Veritext Corp. v. Bonin*,
    417 F. Supp. 3d 778 (E.D. La. 2019) .................................................................13

*Viazis v. Am. Ass'n of Orthodontists*,
    314 F.3d 758 (5th Cir. 2002) ...................................................................12, 16, 24

*Wiltfong v. Cal. State Bd. of Accountancy*,
    2018 WL 935398 (W.D. Tex. Feb. 16, 2018).....................................................39

**Statutes**

15 U.S.C. § 1 .................................................................................................... *passim*

**Other Authorities**

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of*
    *Antitrust Principles and their Application* (rev. ed. 1995) .....................................31

GARM's Harm, Interim Staff Report of the House Committee on the Judiciary
    (July 10, 2024) ....................................................................................................33

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust*
    *Principles and Their Applications* (5th ed. 2024).................................................35

**Rules**

Fed. R. Civ. P. 12(b)(6).............................................................................................10

## INTRODUCTION

X Corporation's suit is an attempt to use the courthouse to win back the business X lost in the free market when it disrupted its own business and alienated many of its customers. Its Second Amended Complaint does not allege a plausible conspiracy, does not allege an injury within the scope of antitrust law, and does not allege a harm to competition. It should therefore be dismissed.

Twitter, Inc., like many early social media companies, developed technologies to engage users and serve advertisers. Twitter understood that to attract advertisers it needed to assure advertisers their ads would not appear next to offensive or obscene user-generated content that would upset the customers those advertisers hoped to reach. For years, Twitter worked with advertisers to create and improve tools to make sure their ads ran in the contexts those advertisers wanted. But by 2022, many advertisers had become increasingly concerned about Twitter's commitment to brand safety. And upon Elon Musk's acquisition of Twitter on October 27, 2022, Twitter immediately made drastic changes to the platform, including firing many of the people who helped make the platform welcoming to users and accommodating to family-friendly brands—only exacerbating its brand safety issues. Individual advertisers and ad agencies responded in different ways to Twitter's brand safety woes. Some continued advertising on Twitter without change. Some slowed or paused their ad spending, awaiting information about Twitter's commitment to brand safety. A small proportion chose to leave the platform and run their ads elsewhere.

In this lawsuit, Twitter's new owner, X, claims that any Twitter customer who chose to curtail its ad spending on Twitter must have been part of a conspiracy to boycott the platform. X accuses Defendants, a Belgian nonprofit and a disparate collection of 14 companies that sometimes advertise goods and services, of violating the Sherman Act. X's antitrust theory collapses under the weight of the facts that X itself alleges.

First, X does not allege facts supporting a plausible inference of conspiracy to engage in a group boycott. Antitrust law requires X to plead facts giving rise to a plausible inference that each Defendant joined with other conspirators in a conscious commitment to an unlawful purpose. X fails to do so. X alleges no facts showing the Defendants agreed on some common course of conduct; on the contrary, X alleges the Defendants made different individual choices, as did advertisers throughout the industry. Lacking facts showing a common plan or common conduct, X simply tries to tie the Defendants together through a World Federation of Advertisers ("WFA") initiative called the Global Alliance for Responsible Media ("GARM"). Yet GARM is just a group of advertisers and platforms—of which Twitter was a member—that worked together to facilitate online advertising. X alleges that the vast majority of GARM's members (100 of 118) *never stopped advertising on X*. Second Amended Complaint ("Compl."), Dkt. 77, ¶¶ 110, 137. The Complaint establishes GARM was not a conspiracy against X, and does not allege sufficient facts to directly or indirectly identify any other alleged agreement. Boiled down, X's core allegation is that Defendants cut back advertising on Twitter—but, as X alleges, many companies not alleged to have conspired also individually decided to do precisely that. Thus, X's group boycott claim should be dismissed because X fails to allege "enough factual matter (taken as true) to suggest that an agreement was made" and alleges facts as consistent with rational independent behavior as they are with conspiracy. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see* Part I(A).

Second, X does not allege an injury within the scope of antitrust law, a threshold requirement for its claims. X does not allege that advertisers sought to reduce what they paid for ads by capping prices or cutting how much ad space they used. Rather, X alleges that some kept advertising on X, and some turned to X's competitors to buy ads for higher prices. Compl. ¶ 143. That is not a restraint on competition; it is simply a functioning market, in which buyers select the

sellers with whom they prefer to deal and reward the sellers most responsive to their needs.  X cannot state an antitrust claim by alleging it is losing sales to competitors in a free and open market. Antitrust law protects *competition*; it does not protect X *from* competition.  *See* Part I(B).

Third, X does not allege facts showing that any advertiser's decision to reduce or withdraw its ad spending on Twitter violated the substantive standards of antitrust law under either the *per se* rule or the rule of reason.  X does not allege this so-called "group boycott" blocked X from a purported market or prevented social media platforms from competing on the merits to attract advertisers.  And X does not allege that Defendants' conduct caused unreasonable harm to competition, such as shrinking the purported social media ad market or depressing the prevailing market price for ad space.  X's allegations actually refute the elements required to assert a group boycott claim.  *See* Part I(C).  Moreover, if one credited X's scant and conclusory assertions that advertisers chose to avoid X for social or political reasons, X would still not state an antitrust claim.  A choice about whether to speak on a given social media platform—whether supporting or opposing that platform's politics—would itself be a choice constituting an act of free speech that is protected by the First Amendment and outside the scope of antitrust law.  *See* Part I(D).

X's "information exchange" claim is entirely without substance:  X does not allege who agreed to exchange information, what information they exchanged, or what they did with any information they received.  It fails for the same reasons as the group boycott claim.  *See* Part II.

Antitrust law does not require advertisers to keep doing business with a platform that degrades the quality of its service.  Neither does it presume an illegal conspiracy when advertisers make rational, independent business decisions.  The Court should dismiss X's Complaint with prejudice.

## BACKGROUND

X, the successor to Twitter, operates a social media platform. Compl. ¶ 10. X sells ad space to companies and ad agencies, and those ads appear in "feeds" along with posts generated by X users. *Id*. ¶ 33. X alleges that 14 of the 15 Defendants have purchased its advertising. *Id*. ¶¶ 13–23. The other defendant, WFA, is a Belgian nonprofit trade association whose members advertise products and services around the world. *Id*. ¶¶ 11–12.

### A.    Through GARM, platforms like Twitter worked together with advertisers to develop a voluntary Brand Safety Framework that facilitates advertising online.

In 2019, WFA established an initiative called GARM, whose participants included advertisers, ad agencies, and online platforms. *Id*. ¶¶ 11, 36. Twitter was one of GARM's original participants, *id*. ¶ 96, as was Meta, the operator of the Facebook and Instagram platforms, *id*. ¶ 46. Participation in GARM was voluntary for both advertisers and platforms. *Id*. ¶ 68.

GARM's participants sought to address a problem plaguing online platforms and their customers. *Id*. ¶¶ 36, 68. Conscious of risks to their brands, advertisers "d[id] not want their advertisements appearing in connection with or adjacent to" hateful, obscene, or otherwise objectionable content, *id*. ¶ 63, and they wanted tools to (i) better understand and decide where their ads would appear relative to such content, *id*. ¶¶ 41, 49, 53, and (ii) streamline discussions with platforms on how to avoid placing their ads next to such content, *id*. ¶ 63. Without those tools or a common language to discuss such issues, X alleges, advertisers and online platforms "negotiated individually" to "customize" where ads would be placed so as "to avoid unwanted content," a process that X concedes was "unsatisfying and costly." *Id*. ¶ 63. Accordingly, GARM sought to create "common definition[s], common measures, and common tools" to facilitate negotiations between advertisers and platforms. *Id*. ¶ 49.

GARM thus addressed the need for better information flow between advertisers and platforms about the quality and nature of the advertising inventory available for purchase. To establish a common framework that online platforms could use to measure and verify their brand safety processes and that advertisers could use to gauge the risk to their brands from advertising on particular platforms, X alleges GARM "promulgate[d] standards relating to the placement of advertising on digital platforms." *Id.* ¶¶ 48, 56, 68.

In September 2020, GARM published its Brand Safety Floor and Suitability Framework (the "Framework") to improve transparency in ad placements on online platforms.[1] *Id.* ¶¶ 52–53.[2] The Framework established a rubric to identify and assign risk to various categories of objectionable content. *Id.* ¶ 51. The categories were split into two tiers. The first tier—the "Brand Safety Floor"—designated the most egregious content, such as "child pornography," and allowed advertisers to effectively communicate their desire for where "ads should not appear," Ex. 1 (App. 2); Compl. ¶ 53. The second tier—the "Brand Suitability Framework"—designated risk levels for "sensitive content," such as nudity,[3] next to which advertisers could choose whether or not their ads "may" appear. Compl. ¶ 53. Neither the Framework nor the three other documents X relies upon in its Complaint constrained companies' advertising decisions, much less did they require

---

[1] The GARM Brand Safety Floor and Suitability Framework is "central to the [plaintiff's] claim and referenced by the complaint" (*e.g.*, Compl. ¶¶ 52–54, 57, 74, 79–80, 82, 122, 141; *see* Ex. 1), and is therefore deemed to be incorporated by reference in the Complaint. *See Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022).

[2] Notably, X fails to allege that each Defendant participated in establishing the Framework or was in a "Working Group" that promulgated aspects of it. Compl. ¶¶ 51–57.

[3] Ex. 1 (App. 5–6); Compl. ¶ 53. In addition to the Brand Safety Floor and Suitability Framework, the GARM Adjacency Standards Framework set forth "common measures to define and measure the placement of advertising on digital media and social media platforms." Compl. ¶ 55. X collectively describes these guidelines, "along with ancillary agreements and understandings" that X does not specify, under a term of its own creation—"Brand Safety Standards," *id.* ¶ 57, though these documents do not reflect "standards" in the sense commonly used in antitrust law relating to standard-setting organizations.

companies to boycott any online platforms.  Instead, the Framework established "a common way to categorize sensitive content" so that advertisers could set their own "brand risk and suitability standards" and platforms could respond to those standards.  Ex. 1 (App. 2–3).  And the other three documents X identifies as central to its claims did not mandate any action toward X or others.  If anything, they suggested only that the Framework was discretionary:

- The GARM Charter discussed "creating tools that better connect with company and agency risk settings" and did not call on advertisers to refuse to do business with any online platform.  Ex. 2 (App. 9) (cited at Compl. ¶ 72).

- The Ad-Tech Member Application—for "ad-tech/developer members," not advertisers or platforms—states "conditions" of membership—just participation in monthly calls and in a working group.  Ex. 3 (App. 12) (cited at Compl. ¶ 73).  It did not mention any boycotts or exclusions.  *Id.*  On the contrary, it expressly admonished that participants should not reach agreements with competitors, exchange confidential information, engage in collusive conduct, or impair full and fair competition.  Ex. 3 (App. 13).

- The "FAQ" described GARM members' "commitment" as being merely to attend monthly calls and to "implement solutions" relating to harmful content definitions, reporting standards, and tools for media buying that fit advertisers' content preferences.  There was no mention of excluding platforms or advertisers who chose not to participate.  Ex. 4 (App. 19–20).

None of these documents contained any enforcement mechanism to discipline online platforms or advertisers if they chose not to use the Framework—and X does not allege otherwise.  Indeed, X alleges many GARM participants—including some Defendants—continued to advertise on platforms that did not utilize GARM's guidelines.[4]

---

[4] Compl. ¶ 137.  X also asserts GARM implemented boycotts in the past but alleges no specific facts in support of that assertion.  *Id.* ¶¶ 46–47 (asserting GARM had taken a "first step" against Meta in 2022 but not stating what that step was or whether it involved a boycott); *id.* ¶¶ 85, 101 (claiming some GARM participants boycotted Meta in 2020, but saying nothing about the boycott, how it was carried out, or whether it involved withholding ad spending); *id.* ¶¶ 90, 95 (claiming advertisers considered a "possible" boycott of Spotify over misogynistic content); *id.* ¶ 90 (conceding the only result of the Spotify discussion was that GARM wrote it a letter that it was "gravely concerned" about Spotify's policies).

### B. Advertisers had widespread concerns about brand safety on Twitter, which were heightened by Twitter's worsening brand safety protections after Mr. Musk's acquisition in 2022.

Prior to GARM's adoption of the Framework in 2020, advertisers had, for a number of years, expressed concerns with brand safety measures on online platforms, *see* Compl. ¶¶ 59–60, including Twitter. Indeed, X alleges that Twitter engaged "in discussions with . . . GARM" in 2020 regarding advertisers' brand safety concerns on its platform. *Id.* ¶ 85. X's Complaint says nothing about any concrete steps that Twitter took to ameliorate those concerns in the years that followed—only that Twitter "partner[ed] with GARM in developing industry standards and applying them to its platform." *Id.* ¶ 96. What it does acknowledge, however, is that by the end of 2022, Twitter still had ways to go "to improve implementation of digital media safety best practice[s]," *id.*, and ultimately needed to "close the gap on slipping standards on controlling harmful content," *id.* ¶ 121; *see also id.* ¶ 124 (noting need for X to "improve[ ] brand safety measures" in the "future").

Mr. Musk announced his intention to buy Twitter in April 2022. *Id.* ¶ 92. After litigation over his attempt to terminate the acquisition—which, Mr. Musk admitted, was sparked in part by his own "concern[s]" about "the flood of misinformation, scams, and other undesirable content on the platform" in "recent years"[5]—the transaction closed October 27, 2022. *Id.* Four days later, WFA wrote Mr. Musk, reminding him that Twitter was one of GARM's original members, and explained that GARM would monitor Twitter's actions so GARM members would have the

---

[5] *See* Defendants' Verified Amended Counterclaims, Answer, and Affirmative Defenses to Plaintiff's Verified Complaint ¶ 18, *Twitter, Inc. v. Musk*, C.A. No. 2022-0613-KSJM (Del. Ch. Sept. 8, 2022), *available at* https://cdn.arstechnica.net/wp-content/uploads/2022/09/public-version-of-amended-musk-counterclaims-twitter-v-musk.pdf; *see also Krystal One Acquisitions, L.L.C. v. Bank of Am., N.A.*, 805 F. App'x 283, 287 (5th Cir. 2020) (per curiam) (noting that court was "permitted to consider" various "filings from prior lawsuits").

information they needed to make "their own independent assessments" of the platform. *Id.* ¶ 96. Although Mr. Musk publicly responded to WFA that "Twitter's commitment to brand safety remain[ed] unchanged," *id.* ¶ 98, he immediately dismissed many of Twitter's personnel who helped make the platform safe for advertisers, *id.* ¶ 132.

Over the course of the next couple of weeks, multiple ad agencies issued recommendations that clients pause their advertising on the platform "based on concerns" about impending changes to Twitter's content policy. *Id.* ¶ 104. X does not allege their recommendations were made collusively. Indeed, X alleges the agencies made recommendations at different times and for different reasons, and X does not claim the agencies' concerns were anything other than genuine. *Id.* On November 3, Mr. Musk, trying to salvage X's advertising relationships, met with more than 100 companies and ad agencies "to assure them" Twitter would remain "attractive to advertisers." *Id.* ¶ 107. X does not allege Mr. Musk calmed advertisers' fears about the potential loss of Twitter's brand-safety tools.

### C.    GARM members independently decided whether and how to make changes to their advertising on Twitter.

As X alleges, WFA made clear that members' advertising decisions should be made through each member's "independent assessments" and "decision-making processes"—not collectively as a group. Compl. ¶ 101. Indeed, X alleges WFA expressly discouraged "calls for boycotts and counter boycott," saying they would not be "good for any party," and argued any boycott discourse must be "disrupted." *Id.* ¶ 108.

Advertisers' actions thereafter varied. X alleges that on November 4, 2022, one GARM member asked WFA how others in the industry were reacting to the changes at Twitter, but X admits that GARM simply put off the member's questions and mentioned that GARM intended to meet with Twitter. *Id.* ¶¶ 111, 115, 117. X alleges that meeting took place December 1, 2022, and

that afterward some GARM members were "pleased" with the response, while others were not yet ready to "trust" what they had been told. *Id.* ¶¶ 122–23. X acknowledges that on multiple occasions, WFA publicly praised Twitter's response to GARM's concerns. WFA issued a December 1 statement that "Twitter's leadership was engaged and committed to working with GARM," *id.* ¶ 124, and issued a December 19 statement that Twitter was "already working" with GARM "to answer brand safety needs," *id.* ¶ 126. Nevertheless, as X alleges, some companies, including both Defendant and non-Defendant advertisers alike, had already decided to pause or cease some part of their Twitter advertising—long before GARM met with Twitter or publicly praised Twitter's commitment to brand safety.[6]

X does not allege that GARM ever instructed participants to engage in a boycott; rather, X alleges that advertisers' decisions varied and that relatively few GARM members withdrew from the platform. X does not allege how the Defendants interacted with GARM, or how becoming a voluntary member of GARM constrained the Defendants' advertising purchases in any way. *Id.* ¶¶ 13–24. Although X alleges the GARM initiative included at least 60 and as many as 118 companies and was started by WFA and the Association of National Advertisers ("ANA," a coalition of 1,100 advertisers), *id.* ¶¶ 37, 68, 110, it also alleges that only **18** GARM members

---

[6] Compl. ¶ 138 (alleging one defendant cut off U.S. purchases, but not international purchases, as of October 2022; another reduced (but did not cut off) purchases as of November 2022; five others cut off all purchases as of November 2022; three cut off U.S. purchases but not international purchases as of November 2022; and one gradually reduced purchases until cutting them off in December 2022); *see also id.* ¶ 137 ("*[O]ver the course of 2023* . . . [Defendants] and the other GARM-member advertisers *discontinued or curtailed* their purchases of advertising." (emphases added)). Curiously, X's Complaint does not detail the dates on, nor the extent to, which advertisers ceased or reduced advertising on Twitter—noting only that advertisers "purchased no" or less advertising "after" a certain month, which (in conclusory fashion) represented "a marked departure from their prior pattern of purchases." *Id.* ¶ 138. That Mars, for example, allegedly "purchased no advertising from Twitter (or X) in the United States, and only a *de minimis* amount outside the United States, after October 2022," *id.*, says nothing about whether it ceased or reduced its Twitter ad purchases at an earlier time—*e.g.*, prior to Mr. Musk closing the Twitter acquisition.

supposedly stopped purchasing ads on X, *id.* ¶ 137. Those that pulled back took different approaches at different times, with some cutting back over several months in the U.S. while still advertising on the platform overseas; others withdrew completely. *Id.* ¶ 138. Meanwhile, other advertisers who were not GARM participants exhibited nearly identical behavior: some continued advertising on X and others stopped. *Id.* ¶¶ 139, 154. Individual GARM participants made independent advertising decisions, and those decisions were similar to decisions made by advertisers who did not participate in GARM. *Id.* ¶¶ 3, 66, 85–88, 154–55.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss and proceed to the "potentially enormous expense of discovery" in an antitrust case, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. A court is not required to accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Outlaw Laboratory, LP v. Shenoor Enterprise, Inc.*, 371 F. Supp. 3d 355, 368 (N.D. Tex. 2019) (Boyle, J.).

Stating a Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. A mere "allegation of parallel conduct and a bare assertion of conspiracy will not suffice"; a plaintiff must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* Moreover, the court may not assume that the plaintiff can "prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Id.*

When evaluating a motion to dismiss, a court may consider "the complaint, any documents attached to the complaint, and any documents" incorporated by reference—i.e., documents "that are central to the claim and referenced by the complaint." *Allen v. Vertafore, Inc.*, 28 F.4th 613,

616 (5th Cir. 2022). While a court must generally accept a plaintiff's allegations as true, it should

not do so if the allegation contradicts a document incorporated by reference. *Sligh v. City of

Conroe*, 87 F.4th 290, 297–98 (5th Cir. 2023). Under these circumstances, "the exhibit and not

the allegation controls." *Id.*

## ARGUMENT AND AUTHORITIES

X pleads two causes of action, both under Section 1 of the Sherman Act. Section 1

prohibits agreements between two or more persons that unreasonably restrain competition. *See* 15

U.S.C. § 1; *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 374–75 (5th

Cir. 2014). Part I of this motion addresses X's claim alleging a group boycott conspiracy; Part II

addresses X's claim alleging a conspiracy to exchange information; and Part III addresses how X

improperly groups all 15 defendants together in its Complaint.

**I.     X does not state a claim under the Sherman Act for group boycott (Count One).**

To state a group boycott claim under Section 1 of the Sherman Act, X must adequately

allege: (1) that Defendants formed an unlawful agreement to refuse to deal with X (2) that caused

X to suffer an antitrust injury sufficient to confer antitrust standing and (3) that was either *per se*

anticompetitive or anticompetitive under the rule of reason. *See generally Twombly*, 550 U.S. at

553–57 (detailing requirements to adequately plead an unlawful Section 1 agreement); *Energy

Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 689 (6th Cir. 2016) ("Every

private antitrust plaintiff, including those challenging an agreement as unlawful under § 1, must

include in its complaint allegations of 'antitrust injury.'"); *Leegin Creative Leather Prods., Inc. v.

PSKS, Inc*., 551 U.S. 877, 885–87 (2007) (explaining the difference between *per se* and rule of

reason treatment). X fails to adequately plead an unlawful agreement (Part I(A)), antitrust injury

(I(B)), a *per se* unlawful boycott (I(C)(1)), or unlawful boycott under the rule of reason (I(C)(2))—

and its group boycott theory seeks relief that violates the First Amendment (I(D)). For each of

these reasons, X fails to state a group boycott claim.

### A.    X has not plausibly alleged Defendants agreed to boycott X.

Section 1 of the Sherman Act prohibits only concerted action, not independent action. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984). To state a Section 1 claim, X must plausibly allege that Defendants acted pursuant to an *agreement* with one another to achieve an unlawful purpose. *Twombly*, 550 U.S. at 556–57. The *Twombly* standard is not satisfied by merely alleging defendants behaved alike. *Id.* Without some further "factual enhancement," an allegation that defendants behaved in a similar fashion "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks and citation omitted). "[C]onclusory allegations that support one of many inferential possibilities," only some of which would involve a "meeting of the minds," are insufficient to state a plausible claim. *Marucci Sports*, 751 F.3d at 375 (citation omitted).

A plaintiff pleads a Section 1 agreement through factual allegations that "directly" evidence an agreement, or by "indirect or circumstantial evidence" that the defendants' conduct must have resulted from agreement. *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024). X does neither.

### 1.    X does not allege direct evidence of an agreement to boycott.

X's Complaint fails to specify what precise conduct X challenges as a conspiracy. At times, X seems to allege that GARM membership itself constituted a conspiracy to boycott; at other times, X suggests there was some separate agreement to "withhold" advertising from Twitter. Compl. ¶¶ 2, 7, 68, 157. But X does not allege direct evidence of either supposed agreement.

In the antitrust context, "direct" evidence is evidence that "explicitly refers to an understanding between the alleged conspirators" to restrain competition. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002). Evidence qualifies as "direct" when it is

12

tantamount to a "smoking gun," *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013), *i.e.*, when it establishes a conspiracy without any "additional inference." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 551 (E.D. La. 2016).

### a.    X does not allege facts showing that GARM is a conspiracy to boycott.

As a matter of law, X's allegation that Defendants were members of GARM does not and cannot suffice to plausibly allege an unlawful agreement. "Mere membership in associations is not enough to establish participation in a conspiracy with other members of those associations." *Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 786 (E.D. La. 2019) (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 265 (D.C. Cir. 1981)) (granting motion to dismiss). Indeed, the Fifth Circuit has long rejected the notion that a trade association is "by its nature a 'walking conspiracy.'" *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988). The Fifth Circuit "recognize[s]" the "legitimate and beneficial function of trade associations," including trade associations that promulgate quality standards. *Id.*; *accord Golden Bridge Tech, Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008).

The Fifth Circuit's rule applies here because X does not allege that GARM's membership terms constituted an agreement to restrain trade. Compl. ¶¶ 36–90. Nothing in the Framework or the other materials X cites in its Complaint establishes that GARM members were required to boycott X. *Id.* None of the membership materials refers to boycotts, the exclusion of competitors, or the disclosure of competitively sensitive information. *See supra* pp. 5–6. It would be difficult to imagine otherwise, as Twitter was itself an original GARM member and a "partner" in its efforts. Compl. ¶ 96. Plus, many non-GARM members also ceased advertising with X, which is further evidence ceasing advertising with X was not driven by membership in GARM. *Id.* ¶¶ 139, 154.

Most telling, though, are X's own allegations demonstrating that GARM members did not behave as though they had made an agreement to boycott. X alleges that only 18 out of as many as 118 GARM participants ceased advertising on Twitter for any period of time. *Id.* ¶¶ 37, 68, 110, 137. That means that X alleges that *more than 80% of GARM participants did not stop advertising on Twitter*. *Id.* X's allegation that less than 20% of GARM's members stopped advertising on Twitter dispels any suggestion that GARM membership was tantamount to an agreement to boycott Twitter.

### b. X does not allege direct evidence of a separate agreement to boycott.

Because Defendants' GARM membership itself cannot serve as the relevant agreement in restraint of trade, X must point to some *other* agreement to restrain trade. There is no such agreement, and X does not allege facts that would evidence one.

X does not identify any direct evidence of this agreement either: its Complaint is bereft of facts concerning specific persons who agreed to take some action, or a date, time, or place at which they did so. *See Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358–59 (S.D.N.Y. 2018) (dismissing antitrust claims "devoid of facts indicating who agreed with whom, to what, and when"). X instead speculates that communications among GARM members *could have* created opportunities to discuss an illegal conspiracy. *E.g.*, Compl. ¶¶ 94, 137. However, courts routinely reject speculation that communications created an opportunity to conspire when the communications at issue do not themselves constitute an agreement or refer to some prior agreement. *See, e.g., Golden Bridge Tech*, 547 F.3d at 272 (emails between defendants failed to "show an explicit understanding"); *City of Pontiac*, 92 F.4th at 397 ("Even allowing that these discussions occurred . . . there is no allegation showing that they furthered an antecedent agreement."); *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526,

14

541 (N.D. Tex. 2014) (Boyle, J.) (finding communications did not show agreement because they "at best, show[ed] that Defendants had an opportunity to conspire, but [did] not suggest that they actually did conspire").

The emails and communications X identifies do not come close to establishing that *anyone* agreed with anyone else to boycott X. *See Twombly*, 550 U.S. at 565 n.10. X claims that in a November 17, 2022, email, a WFA employee did not "disclaim an interest in, or profess an unwillingness to facilitate, a boycott of Twitter." Compl. ¶ 119. But X admits that WFA *had already rejected* calls for a boycott two weeks earlier. *Id.* ¶ 108. X also cites a series of November 2022 emails in which one company, Ørsted, asked WFA how others were reacting to the changes at Twitter.[7] But none of those emails mentions any agreement or plan to boycott X, or specifics thereof. X's "conclusory allegation[s] of agreement at some unidentified point" do not "supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. A single company asking for information about what others are doing does not show "a 'meeting of the minds'" on any agreed course of action among even the participants to those few emails, let alone all Defendants. *Marucci Sports*, 751 F.3d at 375; *see also Tera Grp., Inc. v. Citigroup, Inc.*, 2024 WL 4501967, at *5 (2d Cir. Oct. 16, 2024) ("[M]erely possessing the capability to carry out an effective boycott does not suggest that such a boycott resulted from any agreement."). Contrary to the conspiracy *conclusion* X asserts, the *fact* on which it relies—the email exchange—establishes GARM's members were in the dark about how others were responding to Twitter.

---

[7] *See* Compl. ¶¶ 111, 115, 117 (on November 4, an Ørsted affiliate requested information about "a possible boycott" but Rakowitz did not respond; on November 7–8, another WFA employee suggested Ørsted wait to hear about a forthcoming meeting with X and its CEO); ¶¶ 120, 122, 124 (meeting with X occurred December 1, 2022 and results were discussed publicly December 5); ¶ 104 (alleging that five non-defendant ad agencies had already paused Twitter advertising before that date, on dates ranging from October 31 to November 11); ¶ 137 (alleging 18 GARM-member advertisers ceased their ad purchases beginning in November 2022).

And even if GARM had *recommended* that its members not advertise on a particular platform, as X asserts, that still would not state an antitrust claim under Fifth Circuit precedent. A trade association's recommendations to avoid a plaintiff's products or services do not give rise to a Section 1 conspiracy claim. *See, e.g.*, *Viazis*, 314 F.3d at 766 ("[W]here an association's product recommendations were nonbinding and the association did not coerce its members to abide by its recommendations, its refusal to sanction plaintiff's product did not show that plaintiff was excluded from the market."); *Consol. Metal*, 846 F.2d at 292 (holding a trade association does not violate Section 1 where it "evaluates products and issues opinions, without constraining others to follow its recommendations"); *Schachar v. Am. Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989) ("[W]hen a trade association . . . does not constrain others to follow its recommendations, it does not violate the antitrust laws.") (citation omitted). Courts thus routinely dismiss antitrust complaints when the pleading is premised on an association's recommendation. *See, e.g.*, *DM Rsch., Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (upholding dismissal of challenge to allegedly "unjustified restriction" recommended by association); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 436–38 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015) (similar).

X does not allege direct evidence that Defendants agreed to boycott it through GARM or via some separate agreement.

### 2. X's alleged circumstantial evidence refutes the existence of a conspiracy to boycott.

A plaintiff that does not plead direct evidence of a Section 1 conspiracy can try to plead "circumstantial evidence" of an unlawful agreement by alleging parallel conduct by the defendants supported by "plus factors" indicating the parallel behavior "would probably not result absent an agreement." *In re OTC*, 997 F. Supp. 2d at 536 & n.13. Notably, in assessing plus factors, courts

may consider "obvious alternative explanation[s]" or "natural explanation[s]" for the defendants' alleged parallel conduct. *Id.* Plus factors are necessary because, as the Supreme Court recognizes, the mere "parallel adoption of similar business strategies" by competitors is commonplace, and it "is not suspicious or suggestive of an agreement" unless the plaintiff pleads "factual enhancements" showing behavior changes "made at the very same time by multiple competitors and made for no other discernible reason" other than conspiracy. *Id.* at 536–37 (quoting *Twombly*, 550 U.S. at 556 n.4). Courts routinely dismiss complaints that fail this plausible-circumstances threshold. *See, e.g., id.*; *BRFHH Shreveport v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 526 (5th Cir. 2022). Here, X falls short because it does not plausibly allege either parallel conduct or the necessary plus factors.

### a.    X does not allege Defendants engaged in parallel conduct.

X's Complaint does not get out of the gate using the circumstantial-evidence approach, because X fails even to allege parallel conduct. If Defendants did not act at the same time and in the same manner, it is not plausible to infer they must have acted pursuant to an agreement with one another. *Cf. Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (finding that a conspiracy claim fell "far short" when the defendants "were choosing to decline, decrease, and even increase credit" to the plaintiff at different times); *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 220 (W.D.N.Y. 2024) (dismissing conspiracy claim partly because "the alleged conspirators engaged in divergent conduct").

X does not plead that Defendants (let alone all GARM members) acted in unison or followed some common instruction from GARM. At most, X pleads that some Defendants and Twitter worked together to develop online advertising guidelines, *see* Compl. ¶ 68, and years later, advertisers and ad agencies reacted in different ways and at different times to brand safety issues on X's platform. As discussed, X alleges that approximately 80% of GARM participants did *not*

stop advertising on Twitter, and the 18 alleged advertisers who pulled back did not do so in the same way or at the same time. *See supra* pp. 9, 14 & n.6. And none of their conduct was related in time to any announcement by GARM; X alleges that nearly all draw-downs in ad purchases occurred before X even met with GARM to discuss platform concerns and before GARM commented on X's post-takeover plans.[8] "[Plaintiff's] timeline is too vague and contradictory to render their parallel conduct allegations suggestive." *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 2014 WL 5460450, at *5 (N.D. Tex. Oct. 27, 2014) (Boyle, J.).

> **b.    X does not allege plus factors that could suggest Defendants' conduct must have been the result of conspiracy.**

For a plaintiff taking the circumstantial-evidence route, plausibly alleging plus factors is essential; parallel conduct by itself is insufficient. *Twombly*, 550 U.S. at 556. "An allegation of parallel conduct" "without some further factual enhancement" has too many possible innocent explanations and "stops short of the line between possibility and plausibility." *Id.* at 557.

The most common "plus factor" is a fact demonstrating that a defendant would not have behaved as it did unless it had first reached an agreement with competitors, because without an advance agreement, the defendant's conduct would be inconsistent with its "own self-interest." *BRFHH*, 49 F.4th at 526. Courts routinely dismiss Section 1 cases where, as here, conduct attributed to conspiracy is rational, self-interested conduct a business might undertake on its own. *See, e.g.*, *id.* at 528 (affirming dismissal where plaintiff alleged only "ordinary, self-interested decision" by defendant); *In re OTC*, 997 F. Supp. 2d at 538 (granting motion to dismiss where defendants' conduct could be attributed to "self-interested explanation"); *Schafer v. State Farm*

---

[8] Compl. ¶¶ 122–26 (alleging WFA met with Twitter on December 1, 2022, and engaged in communications with Twitter until making an announcement on December 19, 2022, that Twitter had agreed to implement GARM standards).

*Fire & Cas. Co.*, 507 F. Supp. 2d 587, 597 (E.D. La. 2007) (granting motion to dismiss when "[d]efendants' activities were not economically irrational in a competitive market").

Here, X pleads the "obvious alternative explanation," *Twombly*, 550 U.S. at 567: that any advertiser, regardless of what other companies were doing, would have been independently motivated to pause or withdraw from Twitter based on brand safety concerns and Twitter's degrading the quality of the services it was offering. Indeed, X alleges that multiple ad agencies (none of which are defendants or alleged co-conspirators) advised their clients to pull back from the platform "based on [brand safety] concerns." Compl. ¶ 104. X cites documents in which advertisers expressed concern over Twitter's "slipping standards on controlling harmful content, reporting delays, [and] changes in monetized users." *Id.* ¶¶ 121, 141. And X acknowledges those changes would put advertisers in the position of needing to constantly monitor whether their ads appeared "alongside content that doesn't align with their brand's message and values." *Id.* ¶ 141. "Rational economic self-interest" is a "ready explanation" for the "supposed failure to patronize . . . enterprises that could disrupt" a defendant's business model. *City of Pontiac*, 92 F.4th at 403.

X even admits that it reacted to widespread fears among advertisers that the platform was becoming inhospitable. As X alleges, "[o]n November 3, 2022, Musk met with representatives of *more than 100 companies and advertising agencies* to assure them of his intent and plans to keep Twitter attractive to advertisers." *Id.* ¶ 107 (emphasis added). And numerous companies who are not alleged to be GARM members or conspirators ceased advertising with X around this time. *Id.* ¶¶ 139, 154. So, according to X, the behavior of the alleged conspirators looked no different from alleged non-conspirators; some cut off their Twitter advertising, some cut back, and some continued unabated. *Id.* ¶¶ 3, 37, 66, 68, 85–88, 137–39, 154–55. Thus, X does not allege "anything more than the natural, unilateral reaction of each [Defendant]" to common stimuli.

*Twombly*, 550 U.S. at 566. The choice to mitigate brand risk by reducing or terminating ad buys on a platform that has brand safety problems (much less one in the throes of transition) is rational based on X's own allegations, as seen through how advertisers outside of GARM acted similarly. Because X's theory is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," it fails to state a Section 1 claim. *Id.* at 554; *see City of Pontiac*, 92 F.4th at 403 ("The most Plaintiffs plausibly allege is that the [bank] Defendants, *along with some or all of the other [banks]*, pursued their own respective business interests . . . and were averse to major market changes or reforms that might disadvantage them." (emphasis added)).

Rather than alleging facts that give rise to an inference of conspiracy, X alleges facts that give rise to the opposite conclusion, and therefore, X fails to state a claim. *Twombly*, 550 U.S. at 557 (alleging "parallel conduct," even "consciously undertaken," does not state a Section 1 claim and "stays in neutral territory" absent "circumstance pointing toward a meeting of the minds").

**B.    X has not plausibly alleged antitrust injury.**

The Court should dismiss X's Count I for an independent reason. X lacks antitrust standing because it has not alleged an antitrust injury. Rather than alleging the kind of harm that flows from a violation of the antitrust laws, X alleges that it lost business to competitors when it changed the services it offered to advertisers—in other words, a loss it suffered as a result of competition.

The antitrust laws protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citation omitted). For that reason, an antitrust plaintiff must show not only that it has ordinary Article III standing but also antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986); *Norris v. Hearst Tr.*, 500 F.3d 454, 465 & n.16 (5th Cir. 2007). "Antitrust injury," one of the three elements of "antitrust standing," is an "injury of the type the antitrust laws were intended to prevent and that flows from

that which makes defendants' acts unlawful." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (quotations omitted). That means "a loss stemming from a competition-reducing aspect or effect of defendant's behavior" and an "injury to the relevant market, as a whole." *Location Servs., LLC v. Digital Recognition Network, Inc.*, 2018 WL 5787317, at *2 (N.D. Tex. Nov. 5, 2018) (McBryde, J.) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (dismissing antitrust claim where plaintiff only pleaded harm to itself)).

X does not allege any injury of the kind that would plausibly arise from a restraint on the purported social media advertising market. Besides a conclusory assertion that "[c]ompetition . . . has been restrained," Compl. ¶ 154—one of only two times the word "competition" even appears in X's Complaint—X fails to allege injury to competition. X does not allege there are fewer social media platforms in the purported market, fewer ads being run than would be expected, or lower ad prices than there should be in a competitive market. Instead of an injury to the social media ad market as a whole or to the competitive process in that market, X simply pleads that it lost business when advertisers chose to switch from Twitter to different providers. *E.g.*, *id.* ¶ 154 ("lost revenue and profit *for X*"); *id.* ¶ 155 ("*X* became a less effective competitor to other social media platforms") (emphases added). Absent alleged harm to the competitive process in the alleged market, that does not qualify as antitrust injury. *See Location Servs.*, 2018 WL 5787317, at *2.

Customers choosing platforms other than X "does not constitute antitrust injury"—what X complains about is merely "[l]oss from competition itself—that is, loss in the form of customers' choosing the competitor's goods and services over the plaintiff's." *Pulse Network*, 30 F.4th at 489. That companies were willing to pay higher prices to advertise on platforms that provide adequate protections for their brands (as X alleges, *see* Compl. ¶ 143) is competition in action, not a violation of the law. *See id.* ¶¶ 4, 142, 144.

The Fifth Circuit has repeatedly focused courts on the distinction between harm to the competitive market and harm to an individual competitor. In a case involving baseball-bat standards, a plaintiff bat manufacturer alleged that league rules against more powerful bats excluded some of its bats from the market. *Marucci Sports*, 751 F.3d at 376. But the fact that those standards excluded a few options out of the entire industry did not mean competition had been harmed—because the plaintiff had not alleged the number of remaining manufacturers or products had dropped below the level needed to maintain competition. *Id.* The court held that the competitive marketplace had not been harmed because "the only plausible injury" the plaintiff asserted was to itself, whereas in antitrust law, only "injuries to the market are cognizable." *Id.*

The same is true here. X cannot establish it has antitrust injury by pleading only some limited injury to itself. Thus, X's failure to allege that "the challenged conduct affected the prices, quantity or quality of goods or services" in the alleged market and "not just [its] own welfare" means that, as a threshold matter, it has not alleged antitrust injury or antitrust standing to assert its group boycott claim. *Ginzburg v. Mem'l Healthcare Sys.*, 993 F. Supp. 998, 1015 (S.D. Tex. 1997) (quotations omitted).

## C.    X does not state a claim for group boycott under the *per se* rule or the rule of reason.

Even if X had alleged Defendants entered into an unlawful agreement to boycott X and that it had suffered an antitrust injury, X's claims would be dismissed for the separate reason that it has failed to allege a group boycott claim under either the *per se* rule or the rule of reason. Not all restraints of trade are unlawful; courts analyze whether an alleged restraint of trade violates Section 1 using two guideposts. First, some types of restraints, like agreements to fix prices or reduce output, are "unlawful *per se*" because they "always or almost always tend to restrict competition." *Leegin*, 551 U.S. at 886–87 (citations omitted); *Nw. Wholesale Stationers, Inc. v.*

*Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).  Because the *per se* rule is a departure from the "accepted standard" of applying the rule of reason, courts apply the *per se* rule *only* to specific categories of restraints with which they have "considerable experience" and only when they "can predict with confidence that [the restraint] would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 885–87.  Second, for all other restraints, "the rule of reason is the accepted standard for testing whether a practice" violates Section 1.  *Id.* at 885.  Under the rule of reason, the "factfinder weighs all of the circumstances of a case" in deciding whether a practice "impos[es] an unreasonable restraint on competition."  *Id.*  X has not plausibly alleged a Section 1 violation under either standard.

### 1.    X does not plausibly allege a *per se* unlawful group boycott.

The Supreme Court has explained that simply characterizing conduct as a boycott does not mean it belongs in the *per se* category.  *Nw. Wholesale Stationers*, 472 U.S. at 294.  Even when multiple companies in a market adopt practices that result in the exclusion of a competitor, "concerted refusals to deal" may not be of the type that invariably causes competitive harm.  *Id.*

To determine whether a refusal to deal is *per se* unlawful, courts consider:  (1) whether the defendants "cut off" the plaintiff's "access" to a supply or facility necessary for competition, (2) whether the boycotting firms held a "dominant position in the relevant market" in which the plaintiff competes and engaged in "joint efforts" "to disadvantage [their] competitors," and (3) whether there exist "plausible arguments" that the practice in question was "intended to enhance overall efficiency or make markets more competitive."  *Id.*; *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).  Application of the *per* se rule to alleged group boycotts is rare.  For decades now, "most" such boycotts have been "evaluated under [the] rule of reason."  *S. Volkswagen, Inc. v. Centrix Fin., LLC*, 357 F. Supp. 2d 837, 847 (D. Md. 2005) (citation omitted).  The conspiracy X alleges is far afield from anything courts treat as *per se* unlawful.

a.    **X does not—and cannot—allege Defendants cut off access to a necessary input.**

X does not plausibly allege that Defendants cut off access to anything that X needs in order to compete. In evaluating this factor, courts consider whether a plaintiff has plausibly alleged that the purported boycott "cut off access to" an element it must have to compete, *Nw. Wholesale Stationers*, 472 U.S. at 294, and to which the purported boycott participants have "exclusive access," *id.* at 296, or as to which they "control access," *United Biologics, LLC v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, 2019 WL 830967, at *4 (W.D. Tex. Feb. 21, 2019), *aff'd on other grounds*, 819 F. App'x 204 (5th Cir. 2020).

X's theory of foreclosure falters at the gate, as X concedes Defendants have not cut it off from necessary advertising revenues. X alleges that "dozens" of "GARM-member advertisers" continued to advertise with X, Compl. ¶ 137, other "small- and medium-sized businesses" continued to advertise with X, *id.* ¶ 154, and only "[18] GARM-member advertisers" stopped advertising with X, *id.* ¶ 137. X cannot even come close to establishing that it was "cut off" from advertising revenues when it avers that only a mere 18 GARM participants, a miniscule percentage of the more than 1,100 advertisers in the ANA, *see id.* ¶ 37, allegedly chose to stop advertising on its platform. X "remained free" to offer advertising "and free to compete to increase [its] access to" advertising companies. *Diaz v. Farley*, 215 F.3d 1175, 1183 (10th Cir. 2000) (rejecting *per se* approach where defendant did not control access to an essential element).

X similarly fails to allege Defendants control access to advertising revenue. X cannot allege that the "[18] GARM-member advertisers [that it claims] stopped" advertising on its platform have exclusive access to or control over advertising money—they do not "control who, when, or how" other third parties spend their advertising dollars on X. *United Biologics*, 2019 WL 830967, at *4 (holding that *per se* analysis would be improper); *see also Viazis*, 314 F.3d at

24

766 (declining to infer professional organization had "influence over its members' purchasing decisions"). X all but concedes that WFA and GARM could do nothing more than *recommend* that companies stop or reduce their ad spending on X. Compl. ¶¶ 101, 141; *see also id.* ¶¶ 91–135 (using a form of the word "recommend" approximately 25 times to describe the alleged "boycott"). The only possible inference from that fact is that each firm undertook actions consistent with its "independent business judgment," which counsels strongly against application of the *per se* rule. *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 689–90 (9th Cir. 2022) (declining to apply *per se* rule and affirming dismissal); *see also supra* pp. 7–10.

The Fifth Circuit's decision in *Consol. Metal* is illustrative. 846 F.2d 284. There, the plaintiff alleged that the defendant trade association facilitated a group boycott by delaying certification for the plaintiff's equipment. *Id.* at 286–88. Without the certification, the plaintiff lost some sales but still sold a "substantial amount" of its equipment. *Id.* at 292. Because the plaintiff failed to allege that customers were "constrained from buying its products," the court held there was no *per se* unlawful group boycott: even without the certification, the plaintiff was "free to sell its products and consumers [were] free to buy them." *Id.* at 291–92. The same is true here. X claims that (1) GARM promulgated a framework that was not required to sell advertising and, at most, merely recommended a course of action, and (2) advertisers could and did keep advertising on X, while X has continued to collect advertising revenue to date. X thus fails to allege that Defendants controlled access to—let alone cut it off from—anything X needs to compete.

### b.    X does not allege Defendants held a dominant market position.

X also cannot claim that Defendants hold a dominant position in a purported market and participated in a joint effort to disadvantage one of their competitors.[9] That argument for *per se*

---

[9] By addressing X's discussion of a "social media advertising market" in this motion to dismiss, Defendants do not concede that X has properly defined a relevant market under applicable law.

treatment, typically invoked when incumbent sellers try to shut down a new entrant that threatens to take business from them in the future, does not apply here at all.

The "dominant position" concept requires that the alleged boycott members are the major participants in a relevant market and are able to exercise "market control" sufficient to limit a party from competing in that market, based on factors like market share and barriers to entry. *See, e.g.*, *Acad. of Allergy & Asthma in Primary Care and United Biologics, LLC v. Superior Healthplan, Inc.*, 2022 WL 18076843, at *18 (W.D. Tex. July 24, 2022). Courts routinely dismiss complaints where, as here, the plaintiff does not plausibly allege that defendants hold a dominant position in a defined, relevant market. *See, e.g.*, *Flaa*, 55 F.4th at 690, 693–94 ("[T]he complaint does not plausibly allege that the HFPA . . . possess market power in any reasonably defined market."); *Okavage Grp., LLC v. United Wholesale Mortg., LLC*, 2022 WL 17478298, at *17–18 (M.D. Fla. July 27, 2022) (holding plaintiff failed to plead what percentage of the market "joined the boycott" or quantify "what the effect of the boycott was vis-à-vis the relevant market").

Defendants here are not alleged to dominate the social media advertising market in competition with X; indeed, almost none of the Defendants compete with X at all. Even X's attempt to allege a *per se* claim by labeling Defendant "competing advertisers" misses the mark as X's own allegations undermine the plausibility that an oil and gas company horizontally competes with a toy company or a medical device manufacturer for the same ad space. *See* Compl. ¶ 151.

X rests its theory of "dominance" on a different theory: the premise that "Defendants and their co-conspirators . . . control[] ninety percent or more of spending in the relevant market," *id.* ¶ 153, which is based on the notion that WFA "represent[s] roughly 90% of global marketing communications spend," *id.* ¶ 12. This claim is both illogical and irrelevant. First, the overall "global marketing communications" industry is not the alleged market at issue, *id.* ¶ 146; and that

broad market has little to do with what companies spend in the alleged social media segment at issue here. A spending figure in some broader market "is irrelevant, and cannot be imputed" to X's social media advertising market, *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1215 (11th Cir. 2002). Indeed, courts regularly refuse to assume market share in one market based on "shares of an entirely different market." *N.M. Oncology v. Presbyterian Healthcare Servs.*, 418 F. Supp. 3d 826, 857 (D.N.M. 2019). Second, X never even hints at *who* Defendants' alleged "co-conspirators" are that make up this supposed 90% share, so there are "no facts" to support their alleged market power. *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *7 (N.D. Ill. Sept. 22, 2020); *see also Okavage Grp., LLC*, 2022 WL 17478298, at *17. The 90% figure refers to WFA's entire membership, Compl. ¶¶ 12, 40, and the Complaint does not and could not allege that every WFA member (or even most of them) agreed to boycott Twitter. Because X affirmatively alleges that only a subset of WFA members participated in GARM, and only a smaller subset of them ceased advertising with X, the purported market power of a different, larger group is irrelevant to establish the "dominance" of any parties involved in the alleged conspiracy. *Supra* pp. 8–10; *Flaa*, 55 F.4th at 690, 693–94 (rejecting theory that defendants had market power when there were "many market participants" beside them).

Moreover, X never explains the theory that some group of advertisers can "dominate" the market in the relevant manner—*i.e.*, that Defendants, or any group of advertisers, could somehow prevent other advertisers from buying ads on social media. X does not even address whether other advertisers would be unable to enter its alleged market, underscoring its failure to plausibly allege that Defendants and their co-conspirators have market power. *Okavage Grp., LLC v. United Wholesale Mortg. LLC*, 2024 WL 982380, at *15 (M.D. Fla. Feb. 6, 2024). Nor does X allege that the purported boycott involved any action against the boycotting firms' competitors. *See FTC v.*

*Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986).  Indeed, X does not allege that Defendants harmed any competing advertisers and alleges impacts only to itself (a supplier in a vertical relationship with the alleged conspirators).

> **c.    X concedes that, at a bare minimum, there were procompetitive justifications for the Framework.**

The existence of plausible procompetitive benefits as alleged in X's own Complaint makes *per se* treatment inapplicable.  As explained above, *see supra* pp. 13–16, courts routinely decline to find antitrust liability against trade organizations that provide industry guidance or develop standards.  Because such associations are often recognized as procompetitive, beneficial, and useful, courts have made clear that "it is not intrinsically an antitrust violation for an organization to limit its endorsement to those who meet its published standards unless the standard itself is shown to be anticompetitive in purpose or effect."  *DM Rsch.*, 170 F.3d at 58; *see also Pope v. Miss. Real Est. Comm'n*, 872 F.2d 127, 130 (5th Cir. 1989) ("If properly administered, membership requirements serve pro-competitive purposes."); *Golden Bridge Tech.*, 547 F.3d at 273 ("[E]stablishment and monitoring of trade standards is a legitimate and beneficial function."); *Craftsmen Limousine, Inc. v. Ford Motor Co.* ("*Craftsmen II*"), 491 F.3d 380, 384–85 (8th Cir. 2007) (safety standards often have "pro-competitive effects").  This case is no different.  According to X's Complaint, the Framework was procompetitive for at least two reasons:  it encouraged more online advertising and created efficiencies by reducing transaction costs.

*First*, the Framework was procompetitive because it made online advertising a more attractive option in general, to the benefit of both the advertisers who buy ads and the platforms that sell ads, and thereby encouraged more transactions overall.  *Craftsmen II*, 491 F.3d at 388, 393 (observing that standards that protect the "public image" of industry participants "may be legitimately procompetitive," as they "could promote consumer confidence in the industry as a

whole"). As X alleges, "WFA organized GARM in part to promulgate standards relating to the placement of advertising on digital media and social media platforms," Compl. ¶ 48, and GARM established the Framework because "some advertisers do not want their advertisements appearing in connection with or adjacent to [certain] types of content," *id.* ¶ 63, such as "hateful content," *id.* ¶ 60, on social media platforms. Making social media advertising a more attractive service is procompetitive. "The Supreme Court has recognized improvement in the quality of a product or service that enhances the public's desire for that product or service as one possible procompetitive virtue." *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993). Here, X admits the Framework endeavored to give advertisers more "transparency" and "control" over the placement of their ads, Compl. ¶ 52, so that they could better avoid unintentionally endorsing "hate speech and misinformation" or otherwise placing their ads next to harmful content, *see id.* ¶ 60; Ex. 1 (App. 4). Therefore, the *per se* rule cannot apply.

*Second*, as X suggests, the Framework created efficiencies for ad buyers and sellers by reducing transaction costs. *See Consol. Metal*, 846 F.2d at 296 n.46 (holding certification program was procompetitive because it "reduce[d] uncertainty" in the market); *Madison Square Garden, L.P. v. Nat'l Hockey League*, 2007 WL 3254421, at *9 (S.D.N.Y. Nov. 2, 2007) (recognizing it is procompetitive to "reduc[e] transaction costs in advertisement negotiations"); *see also Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1156–57 (9th Cir. 2003) (reducing transaction costs is procompetitive). X alleges that before GARM promulgated the Framework, advertisers "negotiated individually with . . . platforms" through a process that was "costly" and "unsatisfying," Compl. ¶ 63, because advertisers and platforms lacked "common definition[s], common measures, [and] common tools"—*i.e.*, a common language—to communicate about ad placement. *Id.* ¶ 49. GARM's advertiser and *platform* members used the Framework to lower

29

"costs of advertising on social media platforms." *Id.* ¶ 63. Although X complains that the Framework allowed "GARM-member advertisers" to "shift to social media platforms a portion of the costs previously borne by advertisers," *id.* ¶ 63, there would be "nothing anticompetitive or exclusionary in that" even if it were true. *See SD3*, 801 F.3d at 435, 438.

X's allegations that the Framework responded to advertiser concerns about buying social media ads and reduced transaction costs are concessions that there are plausible procompetitive benefits of the Framework, making *per se* treatment inapplicable as a matter of law.

**2.    X does not satisfy the elements of a rule of reason claim because it fails to allege anticompetitive effects.**

X claims in the alternative that the alleged boycott violates the rule of reason. Compl. ¶ 158. But X's alternative claim fares no better. X does not allege any anticompetitive effects on the market, which is a required element of any rule of reason claim.

"[T]he accepted standard for testing whether a practice restrains trade in violation of § 1" is "the rule of reason." *Leegin*, 551 U.S. at 885. "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id.* (citation omitted). "In its design and function," the rule of reason prohibits only "restraints with anticompetitive effect." *Id.* at 886.

Plausibly alleging anticompetitive effects requires a plaintiff to allege that the challenged restraint harms consumers in the relevant market either "directly or indirectly." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 2022 WL 980791, at *46 (W.D. Tex. Mar. 31, 2022). Direct proof of anticompetitive effects is proof of "actual, sustained adverse effects on competition," *id.* (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 461), such as "reduced output, increased prices, or decreased quality in the relevant market," *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018). Indirect proof of anticompetitive effects is "proof of market power plus some

evidence that the challenged restraint harms competition" in the relevant market. *Id.* X does not plead either type of anticompetitive effect.

*First*, X does not plead anticompetitive effects directly. X does not bemoan any decreased market prices, nor reduction in market output or decreased quality. Instead, X complains only that the prices *it* charges on its platform have "declined," Compl. ¶¶ 154, 142, and that "GARM member-advertisers and advertising agencies are paying prices above competitive levels for advertising" on other social media platforms because those platforms "do not need to lower [their] price[s]" to match X's lower prices, *id.* ¶ 143.

These allegations confuse the relevant antitrust principles and do not state a claim. In this case, X alleges a buyer's cartel—a conspiracy in which customers (not sellers) in a market allegedly agree to engage in anticompetitive practices. The typical resulting harm to competition from a buyer-side cartel would be that (1) buyers agree to cap the prices they pay, so market prices dip below a competitive level, or (2) buyers agree to limit how much they buy, so purchasing volume falls below a competitive level. *See* 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and their Application* ¶ 375b at 297 (rev. ed. 1995); *see In re Beef Indus. Antitrust Litig., MDL Docket No. 248*, 907 F.2d 510, 515 (5th Cir. 1990) (for plaintiffs to show that buyers "had obtained monopsony power . . . to depress prices," they had to show that conspiracy reduced "purchases" and "prices"). But X does not contend its alleged buyer-side conspiracy depressed the market price for social media ads. Indeed, X alleges the *opposite*: that the buyers who switched away from Twitter to different providers ended up paying *higher* prices to place ads. Compl. ¶ 143 ("GARM-member advertisers and advertising agencies are paying prices above competitive levels. . . ."). Thus, X does not allege there are fewer social media platforms, fewer ads, or lower advertising prices than there should be in a competitive market.

Instead, X alleges the Defendants turned to competing platforms other than X for their social media ad needs. *E.g.*, Compl. ¶ 154 ("lost revenue and profit *for X*") (emphasis added). But, as detailed above, *see supra* pp. 20–22, an injury that applies only to the plaintiff, and not to the alleged market or the competitive process, does not qualify as antitrust injury. *Location Servs.*, 2018 WL 5787317, at *2. Though individual firms may be "injured" by competition when their competitors offer better or more desirable products, that "does not constitute antitrust injury." *Pulse Network*, 30 F.4th at 489. When advertisers chose platforms other than X as a result of X's content moderation choices, that is merely a "[l]oss from competition itself—that is, loss in the form of customers' choosing the competitor's goods and services over the plaintiff's." *Id.*

*Second*, X's allegations are also insufficient to plead anticompetitive effects indirectly— and for several reasons. As already discussed, X does not plausibly allege that Defendants and their purported co-conspirators have market power in the alleged relevant market, *see supra* pp. 25–28. *See Flaa*, 55 F.4th at 694–95 (affirming dismissal of rule of reason claim due to failure to plausibly allege market power and for the same reasons as failure to plausibly allege dominance); *Quest Diagnostics*, 2022 WL 980791, at *7–8 (holding that plaintiff failed to plead anticompetitive effects under the rule of reason because it did not plausibly allege market power). Moreover, X does not allege that the challenged restraint harms competition; X only alleges that *it* was harmed by the alleged boycott. *See supra* pp. 20–22. X's complaint is that while its own revenues suffered, others flourished. But rather than suggest harm to competition, that fact only supports the existence of a thriving digital advertising market with healthy competition.

Because the Complaint alleges "no factual information about other competitors dropping out of the market, significant price changes, or diminution in the quality," the alleged restraint's "anticompetitive evils . . . are virtually non-existent," and X's rule of reason claim fails. *Marucci*

*Sports*, 751 F.3d at 377; *see also, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 212 (4th Cir. 2002) (no Section 1 claim when plaintiff provided "no factual basis to support [ ] allegation" that agreements "produced anticompetitive effects"). X fails to allege an unlawful restraint under the rule of reason, and its Section 1 group boycott claim must be dismissed. *See, e.g.*, *Marucci Sports*, 751 F.3d at 377; *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1356–57 (11th Cir. 2024) (affirming dismissal of Section 1 claim when plaintiff failed to allege anticompetitive effects); *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 245 (6th Cir. 1982) ("no rule of reason case alleged" when alleged practice had no anticompetitive effects).

### D.    The First Amendment bars X's boycott theory.

X's Complaint refers to a theory that advertisers collectively chose to boycott Twitter based on social or political concerns about Mr. Musk, the X platform, or the speech conducted on X.[10] That theory contradicts X's other allegations that GARM worked with Twitter after the takeover, praised its efforts, and discouraged boycotting. Compl. ¶¶ 96, 101, 107–08, 122–26. But in all events, X's mistaken boycott theory does not give rise to a Section 1 claim because the First Amendment protects Defendants' right to choose where and with whom they advertise.

Advertising is speech. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980). Speech "does not lose its First Amendment protection because money is spent to project it." *Va. St. Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748,

---

[10] According to X, Defendants withdrew their advertising from X to punish X for the political views of its owner. *See* Compl. ¶¶ 8–9 (quoting House Judiciary Committee majority interim staff report); *id.* ¶ 123 (advertisers allegedly "had issues with overtly partisan takes" on X); *see also* GARM's Harm, Interim Staff Report of the House Committee on the Judiciary at 2–3 (July 10, 2024) ("Interim Rpt."), https://tinyurl.com/p45asyxk (asserting GARM attempted to punish X for Mr. Musk's political views), 7 (asserting GARM advocates on issues of Constitutional interpretation), 24–27 (asserting GARM safety standards are applied based on the political viewpoints of the outlets GARM monitors), 27–32 (asserting GARM sought to influence elections), 33 (asserting GARM Working Groups sought to influence government policy at Department of Homeland Security and Cybersecurity Infrastructure Security Agency).

33

761 (1976). And "[j]ust as the First Amendment may prevent the government from prohibiting speech," it also may prevent the government from "compelling individuals to express certain views" or "compelling certain individuals to pay subsidies for speech to which they object." *United States v. United Foods, Inc.*, 533 U.S. 405, 410, 413 (2001). X's effort to use the antitrust laws to punish Defendants for not advertising on its platform runs afoul of the prohibition against compelled speech. X alleges that Defendants withdrew their advertising from X for political reasons. *See supra* pp. 33 n.10. The First Amendment forbids interfering with a speaker's message by requiring her to speak when she "would prefer to remain silent." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *see also Boy Scouts v. Dale*, 530 U.S. 640, 660–61 (2000). Requiring Defendants to spend money to associate with X would flout the basic tenet that "[f]reedom of association . . . plainly presupposes a freedom not to associate." *Id.* at 648 (citation omitted).

Indeed, forcing Defendants to pay X to place advertisements on its platform irrespective of what kind of user-generated content the ads appear next to would, according to X, *see* Compl. ¶¶ 63, 141, effectively require Defendants to subsidize speech on the platform that they disagree with. *See, e.g.*, *Janus v. AFSCME*, 585 U.S. 878 (2018); *United Foods*, 533 U.S. at 413. For the same reason that mandatory assessments under a statute requiring mushroom producers to subsidize "generic advertising to promote mushroom sales" were "not permitted under the First Amendment," *United Foods*, 533 U.S. at 413, the First Amendment does not permit Defendants to be compelled to pay for advertising on X that would financially support certain speech on the platform that X claims Defendants disagree with. *See supra* pp. 33 n.10.

That X (incorrectly) alleges a group boycott (as opposed to individual advertising choices) is therefore beside the point; speech that is constitutionally protected when one person engages in it does not become constitutionally unprotected when multiple people engage in it. Supreme Court

precedent shields expressive boycotts from antitrust liability.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913–14 (1982).  *Claiborne Hardware* involved a boycott of merchants in Mississippi on civil rights issues.  *Id.* at 899–900.  The Supreme Court rejected antitrust claims against the boycotters, holding that the state's interest in enforcing its antitrust laws "could not justify a complete prohibition against a nonviolent, politically motivated boycott" that was not intended "to destroy legitimate competition."  *Id.* at 914.  Since then, courts have consistently held that boycotts involving political speech are not subject to antitrust liability.  *See, e.g.*, *Nat'l Org. for Women v. Scheidler*, 968 F.2d 612, 617–23 (7th Cir. 1992); *Missouri v. Nat'l Org. for Women*, 620 F.2d 1301, 1315 (8th Cir. 1980) (overruled on other grounds); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Applications* ¶ 262(b) (5th ed. 2024) (boycotts in which "the boycotters do not profit in their own business interests" are not commercial conduct within the scope of antitrust law).

To be clear, the only plausible inference to be drawn from the alleged facts is that Defendants did not agree to act as a group and made individual decisions about their individual advertising plans.  But under the nonexistent boycott X imagines, X alleges that Defendant advertisers acted to achieve a social purpose, not an economic advantage—namely, that Defendants engaged in "collusive conduct to demonetize disfavored content" with the goal not of achieving commercial aims, but of influencing public discourse, government policy, and elections.  Compl. ¶ 9 & Interim Rpt. at 22.  That allegation makes the alleged boycott political rather than economic and thereby renders the Sherman Act inapplicable.

## II.    X does not state a claim under the Sherman Act for conspiracy to exchange information (Count Two).

X asserts an alternative claim that Defendants agreed to exchange information with one another about their "willingness" to engage in a boycott.  Compl. ¶ 162.  X's second claim fares

no better than the first, and for the same reasons:  X fails to allege an agreement, fails to allege antitrust injury, and fails to state a claim under either the *per se* rule or the rule of reason.

First, an information-exchange claim "still requires showing that the defendants had an agreement," *Burtch*, 662 F.3d at 223, and X does not allege facts showing the Defendants entered into an agreement to exchange information, either through direct or circumstantial evidence.  X does not allege which Defendants agreed to exchange information, when they agreed to do so, or what information they actually shared.  Because X does not allege that any Defendant actually shared any information, X necessarily cannot point to any circumstances to explain any information-sharing conduct.  Even if X alleged that some information had been shared by some advertiser, that would not establish that there had been agreement among any of the Defendants to do so.  The mere sharing of market information cannot be actionable absent a showing that the exchange was conducted pursuant to an agreement to unlawfully restrain trade.  *See, e.g.*, *Consol. Metal*, 846 F.2d at 294 n.30.

Second, X's failure to allege antitrust injury for its information-exchange claim is particularly flagrant.  Given that X does not even explain what precise information was exchanged, or by whom, it is impossible to determine whether any information exchange harmed competition or resulted in antitrust injury to X.  Further, as detailed above in Parts I(B) and I(C)(2), X fails to allege any harm to competition in any market anywhere in its Complaint.  X's defective allegations mean that there's no telling whether any agreed sharing of information (whatever that information may be) "affected the prices, quantity or quality of goods or services" in a relevant market rather than "just [X's] own welfare."  *Ginzburg*, 993 F. Supp. at 1015.  Without an antitrust injury, X does not have antitrust standing, and X's complaint makes no effort to explain how the alleged exchange of unidentified information harmed competition in any way.

36

Finally, X does not allege that any agreement to share information would violate the rule of reason because X does not allege anticompetitive effects or injury to competition. Agreements to share information "do not constitute a *per se* violation of the Sherman Act"; courts recognize that information exchanges "do[] not invariably have anticompetitive effects" and can "render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). X's only option, then, is to state a claim under the rule of reason.

What matters most in assessing an information-exchange claim under the rule of reason is "the nature of the information exchanged" and its likelihood of producing downstream anticompetitive effects. *U.S. Gypsum Co.*, 438 U.S. at 441 n.16. On motions to dismiss, courts recognize that viable information-exchange claims involve detailed, competitively sensitive data (e.g., "future price" data) and have required allegations that speak to "the time frame of th[at] data," its "specificity," and whether it is "made publicly available." *Todd v. Exxon Corp.*, 275 F.3d 191, 211–13 (2d Cir. 2001). Where, as here, those facts are missing, dismissal is appropriate. *See In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *6 (N.D. Ill. Aug. 29, 2022) (dismissing claim for failure to allege "specificity").

X alleges no facts whatsoever about what information was allegedly exchanged between Defendants, much less what made the information "competitively-sensitive." Compl. ¶ 163. Instead, X claims in vague and conclusory fashion that unidentified Defendants could have discussed "sensitive" information about their intentions to buy advertising. But labeling information "sensitive" does not make it so. *Twombly*, 550 U.S. at 555 (plaintiff cannot rely merely on "labels and conclusions"). Unlike certain price, output, or cost information, which courts recognize may be competitively sensitive to the extent they may lead to price stabilization, *United States v. Container Corp. of Am.*, 393 U.S. 333, 338 (1969), alleged vague public

statements by advertisers about the standards they expect of media partners in general, Compl. ¶ 82, lack any comparable cause for concern. And X's vague references to a one-time "survey" of "some" GARM members about their "perceptions" of Twitter, *id.* ¶¶ 110, 116, lead nowhere. X does not allege who participated in any survey (among the Defendants or otherwise), what information was sought or provided, whether any survey results were circulated or to whom, or what anyone did with any survey data. Nor does X explain how a survey that it alleges was conducted *after* most major advertising agencies had already recommended suspending Twitter ads, *id.* ¶¶ 104, 110, has anything to do with the events at issue. Conclusory assertions and speculation aside, X simply does not allege a single fact supporting the theory that any Defendant shared non-public or competitively sensitive information.[11]

## III.  X relies on improper group pleading (Counts One & Two).

X's Complaint should be dismissed for yet another reason: it does not identify how or when any individual Defendant agreed to participate in an alleged group boycott or information exchange. Instead, X relies on improper pleading by grouping vast numbers of parties and nonparties and treating them as a single unit. Setting aside its lack of any plausible antitrust violation, that pleading defect independently dooms X's Complaint.

As the Fifth Circuit has explained, "allegations based on a theory of collective responsibility cannot withstand a motion to dismiss"; a Complaint cannot survive if it "is devoid of facts that would put the defendant on notice as to what conduct supports the claims." *Martinez*

---

[11] Information exchange claims also require an assessment of the "structure of the industry involved," which in turn requires courts evaluating motions to dismiss to consider factors like industry "concentration," the "fungibility" of the services at issue, and whether demand is "inelastic." *Todd*, 275 F.3d at 207–11 (quoting *U.S. Gypsum*, 438 U.S. at 441 n.1). These factors only further underscore the deficiencies inherent in X's Count II, as there is little doubt that an industry made up of thousands of advertisers is not concentrated, and X does not even attempt to address the fungibility or demand elasticity of digital advertising in its Complaint.

*v. City of North Richland Hills*, 846 F. App'x 238, 241, 243 (5th Cir. 2021) (citing *Anderson v. U.S. Dep't of Housing & Urban Dev.*, 554 F.3d 525, 528 (5th Cir. 2008)); *see also Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir. 2007).  In the antitrust conspiracy context, a plaintiff "must allege that *each* individual defendant joined the conspiracy and played some role in it because . . . the heart of an antitrust conspiracy is an agreement and a conscious decision by *each* defendant to join it."  *U.S. Bd. of Oral Implantology v. Am. Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 904–05 (N.D. Ill. 2019) (emphases added).  In particular, merely alleging that a company is a member of an association is insufficient to state an antitrust claim against that company for the allegedly anticompetitive policies of the association.  *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *Barry's Cut Rate Stores Inc. v. Visa, Inc.*, 2019 WL 7584728, at *31 (E.D.N.Y. Nov. 20, 2019).  Without allegations of individual Defendants' actions, "it is impossible to determine who is allegedly conspiring with whom, when they agreed to conspire, the scope of the conspiracy, or how their conduct has affected [the] Plaintiff specifically."  *Wiltfong v. Cal. State Bd. of Accountancy*, 2018 WL 935398, at *2 (W.D. Tex. Feb. 16, 2018).

Treating Defendants as a "singular entity, which gives none of the defendants any information about the specific allegations against it," constitutes "impermissible group pleading" that falls short of *Twombly*'s individualized pleading threshold.  *Childers v. Lifestyles Unlimited, Inc.*, 2023 WL 3961702, at *4 (N.D. Tex. June 12, 2023) (Starr, J.).  X routinely groups parties and non-parties in sweeping, broad-brush allegations:

- X alleges "*Defendants* conspired, along with *dozens* of non-defendant co-conspirators, to *collectively* withhold billions of dollars in advertising revenue from Twitter," Compl. ¶ 2 (emphases added);

- X groups together separate corporate entities—like Nestle S.A. and Nestle USA; LEGO A/S and LEGO Brand Retail, Inc.; Shell plc, Shell USA, Inc., and Shell

Brands International AG—and treats them as single units despite their separate corporate existences, *see, e.g.*, *id*. ¶¶ 17, 20, 23;

- X alleges the existence of four separate GARM "Working Groups" with discrete memberships and purposes, *id*. ¶¶ 51–57, but does not explain what each Working Group did relative to the alleged conspiracy, or even identify which Defendant was in which Working Group;

- For many Defendants (e.g., Colgate and Tyson Foods), there are no allegations linking the company to the promulgation of the Framework or suggesting that they even knew about any of GARM's publications or statements;

- X groups all Defendants but WFA under the label "Advertiser Defendants," and then alleges conduct by "Advertiser Defendants" as one unit.

A complaint should "avoid improper 'group pleading' that does not distinguish the conduct of individual Defendants." *Outlaw Laboratory*, 371 F. Supp. 3d at 369. X "furnishes no clue[s]" as to which Defendants "supposedly agreed, or when and where the illicit agreement took place." *Twombly*, 550 U.S. at 565 n.10. X only generalizes Defendants' actions, without specifying each Defendant's individual conduct, including the "where," "why," or "how" of each Defendant's purported participation. Without specifics about each Defendant, the allegations cannot support a plausible inference that any given Defendant "engaged in concerted action—that is, a conscious commitment to a common scheme designed to achieve an unlawful objective." *Spray-Rite*, 465 U.S. at 764 (citation and internal quotation marks omitted). X's group pleading approach renders its Complaint defective and warrants dismissal. *Martinez*, 846 F. App'x at 241.

## CONCLUSION AND PRAYER

For these reasons, Defendants ask the Court to grant their motion to dismiss with prejudice.

Dated: May 14, 2025

/s/ *Brian E. Robison*
Brian E. Robison
  Texas Bar No. 00794547
  brian@brownfoxlaw.com
Michael L. Baum
  Texas Bar No. 24006815
  mbaum@brownfoxlaw.com
Paulette C. Miniter
  Texas Bar No. 24075153
  paulette@brownfoxlaw.com
C. Alan Carrillo
  Texas Bar No. 24109693
  alan@brownfoxlaw.com
Farwa Zahra
  Texas Bar No. 24134610
  farwa@brownfoxlaw.com
Brown Fox PLLC
8111 Preston Road, Suite 300
Dallas, TX 75225
Phone: (214) 327-5000

*Attorneys for Defendant Pinterest, Inc.*

/s/ *Russ Falconer*
Russ Falconer
  Texas Bar No. 24069695
  RFalconer@gibsondunn.com
Scott Hvidt
  Texas Bar No. 24097864
  SHvidt@gibsondunn.com
Gibson, Dunn & Crutcher LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201-2923
Phone: (214) 698-3100

Gregg Costa
  Texas Bar No. 24028160
  GCosta@gibsondunn.com
Prerak Shah
  Texas Bar No. 24075053
  PShah@gibsondunn.com
Gibson, Dunn & Crutcher LLP
811 Main Street, Suite 3000
Houston, TX 77002-6117
Phone: (346) 718-6600

*Attorneys for Defendant Nestlé USA, Inc.*

/s/ *Layne E. Kruse*
Layne E. Kruse
   Texas Bar No. 11742550
   layne.kruse@nortonrosefulbright.com
Carlos R. Rainer
   Texas Bar No. 24027641
   carlos.rainer@nortonrosefulbright.com
Norton Rose Fulbright US LLP
1550 Lamar Street, Suite 2000
Houston, TX 77010
Phone: (713) 651-5151

Ellen Sessions
   Texas Bar No. 00796282
   ellen.sessions@nortonrosefulbright.com
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Phone: (214) 855-8000

*Attorneys for Defendant Shell USA, Inc.*

/s/ *William F. Cavanaugh, Jr.*
William F. Cavanaugh, Jr. (admitted *pro hac vice*)
   wfcavanaugh@pbwt.com
Christine Harper (admitted *pro hac vice*)
   charper@pbwt.com
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Phone: (212) 336-2000

/s/ *Thomas M. Melsheimer*
Thomas M. Melsheimer
   Texas Bar No. 13922550
   tmelsheimer@winston.com
Winston & Strawn LLP
2121 N. Pearl Street, 9th Floor
Dallas, TX 75201
Phone: (214) 453-6500

*Attorneys for Abbott Laboratories*

/s/ *John Terzaken*
John F. Terzaken, III (admitted *pro hac vice*)
   john.terzaken@stblaw.com
Simpson Thacher & Bartlett LLP
900 G Street, NW
Washington, D.C. 20001
Phone: (202) 636-5858

Joshua G. Hazan (admitted *pro hac vice*)
   joshua.hazan@stblaw.com
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Phone: (212) 455-2683

Michael K. Hurst
   Texas Bar No. 10316310
   mhurst@lynnllp.com
Clint S. Cowan
   Texas Bar No. 24109760
   ccowan@lynnllp.com
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
Phone: (214) 981-3800

*Attorneys for Tyson Foods, Inc.*

42

/s/ *Chahira Solh*
Chahira Solh (admitted *pro hac vice*)
   csolh@crowell.com
Crowell & Moring LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Phone: (949) 798-1367

Sima Namiri-Kalantari (admitted *pro hac vice*)
   snamiri@crowell.com
Crowell & Moring LLP
515 South Flower Street, 41st Floor
Los Angeles, CA 90071
Phone: (213) 443-5564

Kenneth Dintzer (admitted *pro hac vice*)
   kdintzer@crowell.com
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
Phone: (202) 624-2561

Minoo Blaesche
   Texas Bar No. 24075102
   mblaesche@jw.com
Jackson Walker LLP
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Phone: (214) 953-6051

*Attorneys for LEGO Brand Retail, Inc.*

/s/ *Jonathan B. Pitt*
Jonathan B. Pitt (admitted *pro hac vice*)
   jpitt@wc.com
Nicholas Gamse (admitted *pro hac vice*)
   ngamse@wc.com
Kimberly Broecker (admitted *pro hac vice*)
   kbroecker@wc.com
Williams & Connolly LLP
680 Maine Avenue, SW
Washington, D.C. 20024
Phone: (202) 434-5000

Thomas C. Riney
   tom.riney@uwlaw.com
   Texas Bar. No. 16935100
C. Jason Fenton
   jason.fenton@uwlaw.com
   Texas Bar No. 24087505
Underwood Law Firm, P.C.
500 S. Taylor, Suite 1200
Amarillo, TX 79101
Phone: (806) 379-5613

*Attorneys for CVS Health Corporation*

<u>/s/ David C. Miller</u>
David C. Miller
  Texas Bar No. 24110114
  dmiller@bradley.com
William S. Snyder
  Texas Bar No. 00786250
  wsnyder@bradley.com
Samuel T. Acker
  Texas Bar No. 24100111
  sacker@bradley.com
Bradley Arant Boult Cummings LLP
Fountain Place
1445 Ross Avenue, Suite 3600
Dallas, TX 75202
Phone: (214) 257-9800
Fax: (214) 939-8787

Charles E. Elder (admitted *pro hac vice*)
  Tennessee Bar No. 038250
  celder@bradley.com
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
Phone: (615) 252-3597
Fax: (615) 252-6380

*Attorneys for Defendant World Federation of Advertisers*

<u>/s/ Jason M. Powers</u>
Jason M. Powers
  Texas Bar No. 24007867
  jpowers@velaw.com
Vinson & Elkins L.L.P.
845 Texas Avenue, Suite 4700
Houston, TX 77002
Phone: (713) 758-2222

George M. Kryder
  Texas Bar No. 11742900
  gkryder@velaw.com
Avery Westerlund
  Texas Bar No. 24125453
  awesterlund@velaw.com
Vinson & Elkins L.L.P.
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Phone: (214) 220-7700

Stephen Medlock (admitted *pro hac vice*)
  D.C. Bar No. 995636
  smedlock@velaw.com
Adam Hudes (admitted *pro hac vice*)
  D.C. Bar No. 495188
  ahudes@velaw.com
Vinson & Elkins L.L.P.
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, D.C. 20037
Phone: (202) 639-6578

*Attorneys for Defendant Ørsted A/S*

44

*/s/ Karen Hoffman Lent*
Karen Hoffman Lent (admitted *pro hac vice*)
   karen.lent@skadden.com
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3276

Noelle M. Reed
   Texas Bar No. 24044211
   noelle.reed@skadden.com
Skadden, Arps, Slate, Meagher & Flom LLP
1000 Louisiana Street, Suite 6800
Houston, TX 77002
Phone: (713) 655-5122

*/s/ Ralph H. Duggins*
Ralph H. Duggins
   Texas Bar No. 06183700
   rduggins@canteyhanger.com
Philip Vickers
   Texas Bar No. 24051699
   pvickers@canteyhanger.com
Kate Hancock
   Texas Bar No. 24106048
   khancock@canteyhanger.com
Cantey Hanger LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
Phone: (817) 877-2800

*Counsel for Mars, Incorporated*

*/s/ Lars L. Berg*
Lars L. Berg
   Texas Bar No. 00787072
   lars.berg@kellyhart.com
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Phone: (817) 878-3524

Fred A. Rowley, Jr. (*pro hac vice* motion
forthcoming)
   fred.rowley@wsgr.com
Wilson Sonsini Goodrich & Rosati
Professional Corporation
953 East Third Street, Suite 100
Los Angeles, CA 90013
Phone: (323) 210-2902

Jeffrey C. Bank (*pro hac vice* motion
forthcoming)
   jbank@wsgr.com
Wilson Sonsini Goodrich & Rosati
Professional Corporation
1700 K Street, NW, 5th Floor
Washington, D.C. 20006
Phone: (202) 973-8800

Taylor M. Owings (*pro hac vice* motion
forthcoming)
   towings@wsgr.com
Wilson Sonsini Goodrich & Rosati
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Phone: (212) 999-5800

*Counsel for Colgate-Palmolive Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

*/s/ Russ Falconer*

Russ Falconer