# In the United States District Court
## For the Northern District of Texas
### Wichita Falls Division

X Corp.,                               §
                                       §
    *Plaintiff*,              §
                                       §
v.                                     §          No. 7:24-cv-00114-B
                                       §
World Federation of Advertisers;       §
    *et al.*,                 §
                                       §
    *Defendants*.             §


## PLAINTIFF X CORPORATION'S RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ................................................................................. 2

ARGUMENT ...................................................................................................... 3

   1.   Legal Standard. ..........................................................................................3

   2.   Defendants Misstate the SAC's Allegations about the Conspiracy's Scope. ......................3

   3.   X has Plausibly Alleged its Antitrust Claims. ....................................... 4

      3.1.   X has Plausibly Alleged a Group Boycott Agreement. ................................. 4

         3.1.1.   GARM's Rules Contemplated Group Boycotts of Media Platforms.......................5

         3.1.2.   GARM's Acts and Practices are Themselves Concerted Action. ...........................13

         3.1.3.   The Advertiser Defendants Accepted GARM's Invitations to Boycott.................15

         3.1.4.   The SAC Alleges Consciously Parallel Conduct and Further Factual Enhancement ................................................................. 20

      3.2.   The Alleged Boycott Is an Unreasonable Restraint of Trade....................................... 29

      3.3.   The First Amendment Does Not Bar X's Boycott Claim. ...............................................32

      3.4.   X has Plausibly Alleged an Unlawful Information Exchange Agreement......................35

      3.5.   X has Standing Under the Clayton Act. ..............................................................38

      3.6.   The SAC Does Not Rely on Group Pleading. ........................................................39

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Cases**

*Acad. of Allergy & Asthma in Primary Care and United Biologics, LLC v. Superior Healthplan, Inc.*,
No. SA-17-CA-1122-FB (HJB), 2022 WL 18076843 (W.D. Tex. July 14, 2022) ..................... 30

*Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*,
No. SA-17-CA-1122-FB (HJB), 2022 WL 18034365 (W.D. Tex. Oct. 18, 2022) .................... 30

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) .................................................................................. 14, 32, 34

*Am. Needle, Inc. v. Nat'l Football League*,
560 U.S. 183 (2010) .................................................................................. 14

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ..................................................................... 21, 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................. 3

*Associated Press v. United States*,
326 U.S. 1 (1945) ..................................................................................... 9, 10

*Baker v. Putnal*,
75 F.3d 190 (5th Cir. 1996) ....................................................................... 3, 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544  (2007) ................................................................................. 3, 5, 28

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999) .................................................................. 39

*Bosarge v. Miss. Bureau of Narcotics*,
796 F.3d 435 (5th Cir. 2015) .................................................................... 25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ................................................................................. 39

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3rd Cir. 2011) .................................................................... 21

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
394 F.3d 285 (5th Cir. 2004) .................................................................... 33

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
846 F.2d 284 (5th Cir. 1988) .................................................................... 26

*Crownalytics, LLC v. SPINS LLC*,
No. 22-cv-01275-NYW-JPO, 2024 WL 2111570 (D. Colo. May 10, 2024) .............................. 21

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) .................................................................... 39

*Eastern States Retail Lumber Dealers' Ass'n v. United States*,
234 U.S. 600 (1914) ................................................................................................ 8

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ............................................................................................... 32

*Eller v. KBR, Inc.*,
No. H-08-3495, 2009 WL 10714747 (S.D. Tex. May 15, 2009) ............................... 32

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013) ........................................................................ 18, 24, 27

*Fashion Originators' Guild of Am. v. FTC*,
312 U.S. 457  (1941) ............................................................................................. 13

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
391 U.S. 253 (1968) ............................................................................................... 23

*Fishman v. Wirtz*,
No. 74 C 2814, 1981 WL 2153 (N.D. Ill. Oct. 28, 1981) ......................................... 25

*FTC v. Superior Ct. Trial Lawyers Ass'n*,
493 U.S. 411 (1990) ............................................................................................... 33

*Full Draw Prods. v. Easton Sports, Inc.*,
182 F.3d 745 (10th Cir. 1999) ................................................................................ 39

*Gainesville Utils. Dep't v. Florida Power & Light Co.*,
573 F.2d 292 (5th Cir. 1978) ........................................................................... 16, 25

*Goldfarb v. Virginia State Bar*,
421 U.S. 773  (1975) ............................................................................................. 26

*Greenhaw v. Lubbock Cnty. Beverage Ass'n*,
721 F.2d 1019 (5th Cir. 1983) ................................................................................ 35

*Guidry v. U.S. Tobacco Co.*,
188 F.3d 619 (5th Cir. 1999) .................................................................................. 38

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017) ..................................................................... 21

*In re Omnicom Grp. Inc. & The Interpublic Grp. of Cos., Inc.*,
FTC File No. 251-0049 ( June 23, 2025) .......................................................... 28, 31

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
997 F. Supp. 2d 526 (N.D. Tex. 2014) ............................................................. 20, 28

*In re Pool Prods. Distrib. Market Antitrust Litig.*,
988 F. Supp. 2d 696 (E.D. La. 2013) ...................................................................... 23

*Int'l Woodworkers of Am., AFL-CIO & Its Loc. No. 5-376 v. Champion Int'l Corp.*,
790 F.2d 1174 (5th Cir. 1986) ................................................................................ 36

*Interstate Circuit v. United States*,
306 U.S. 208 (1939) ................................................................................................. 7

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018) ................................................ 40

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019) .................................................................39

*James Julian, Inc. v. Raytheon Co.*,
557 F. Supp. 1058 (D. Del. 1983) ......................................................15

*Jews for Jesus Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*,
968 F.2d 286 (2d Cir. 1992) ...............................................................33

*Lease Am. Org. Inc. v. Rowe Int'l Corp.*,
No. 13–40015–TSH, 2014 WL 1330928 (D. Mass. Mar. 31, 2014) ........................................ 28

*Llacua v. W. Range Ass'n*,
930 F.3d 1161 (10th Cir. 2019) .........................................................10

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .........................................................3, 9

*Missouri v. Nat'l Org. for Women, Inc.*,
620 F.2d 1301 (8th Cir. 1980) ...........................................................33

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
806 F.3d 835 (5th Cir. 2015) ........................................................... 4

*Molzan v. Bellagreen Holdings, L.L.C.*,
112 F.4th 323 (5th Cir. 2024) ......................................................4, 11

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
714 F. Supp. 3d 209 (W.D.N.Y. 2024) ..............................................21

*N. Tex. Specialty Physicians v. FTC*,
528 F.3d 346 (5th Cir. 2008) ...........................................14, 15, 19, 26

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ...........................................................................33

*Nat'l Org. for Women v. Scheidler*,
968 F.2d 612  (7th Cir. 1992) ............................................................33

*Nw. Pac. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
472 U.S. 284 (1985) ............................................................ 11, 29, 32

*Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co.*,
998 F.2d 1224 (3d Cir. 1993) ............................................................ 20

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) .................................................. 16, 32, 37

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
364 U.S. 656 (1961) ......................................................................... 29

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) .............................................................27

iv

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*,
   61 F.4th 299 (2d Cir. 2023) ...................................................................10

*Robertson v. Sea Pines Real Est. Cos.*,
   679 F.3d 278 (4th Cir. 2012) .................................................................10

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
   547 U.S. 47 (2006) ...............................................................................34

*SD3, LLC. v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) .................................................... 21, 24, 27

*Silver v. New York Stock Exchange*,
   373 U.S. 341 (1963) ...............................................................................10

*SourceOne Dental, Inc. v Patterson Cos., Inc.*,
   310 F. Supp. 3d 346 (E.D.N.Y. 2018).....................................................37

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ....................................................30, 31, 36, 37

*St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*,
   712 F.2d 978 (5th Cir. 1983) ................................................................. 11

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)...................................................................35

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
   496 F.3d 403 (5th Cir. 2007) ....................................................... 4, 30, 31

*Turner v. Pleasant*,
   663 F.3d 770 (5th Cir. 2011) ..................................................................3

*United States v. Flom*,
   558 F.2d 1179 (5th Cir. 1977) ...............................................................12

*United States v. Realty Multi-List, Inc.*,
   629 F.2d 1351 (5th Cir. 1980)...................................................... 5, 6, 13

*United States v. Richerson*,
   833 F.2d 1147 (5th Cir. 1987) ...............................................................18

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978)...............................................................................35

*Viazis v. Am. Ass'n of Orthodontists*,
   314 F.3d 758 (5th Cir. 2002) ................................................................ 26

*Wood v. Bexar Cnty., Texas*,
   No. 22-50888, 2023 WL 3563012 (5th Cir. May 19, 2023) .......................33

*Yoder Bros. v. California-Florida Plant Corp.*,
   537 F.2d 1347 (5th Cir. 1976) ............................................................... 29

**Statutes**

15 USC. § 1 *et seq.* ................................................................................................ *passim*

Fed. R. Civ. Proc. 12 ................................................................................................ *passim*

## INTRODUCTION

In 2022, a World Federation of Advertisers ("WFA") initiative called the Global Alliance for Responsible Media ("GARM") and certain of its members organized and engaged in a boycott of Twitter (now Plaintiff X Corp. or "X") intended to force Twitter to adhere to advertising standards promulgated by GARM. The boycott's scope and market impact were massive. Billions of dollars in advertising were withheld. Twitter's advertising prices, which are set at a level reflective of market-wide demand through an auction mechanism, plummeted. WFA cheered the seismic impact of its boycott, boasting it had reduced the revenues of Twitter, one of the largest and most popular social media platforms in the world, by 80 percent.

Twitter did not rush to the courthouse in response to this boycott. Rather, the Second Amended Complaint ("SAC") alleges the patient efforts that Plaintiff invested in repairing its relationship with WFA and its members and wooing them back to the platform. And without the benefit of any discovery, X had no way to sort the sheep from the antitrust goats; to distinguish between those advertisers who left for innocent reasons and might be persuaded to return from those who were members of an illegal boycott conspiracy.

But in 2024, a Congressional investigation revealed the inner workings of the GARM boycott conspiracy. A House Judiciary Committee report detailed GARM's role as the ringleader of an advertiser cartel, organized through GARM to enforce adherence to GARM's advertising standards through boycotts of media platforms identified by GARM. The report also disclosed emails between GARM and one of its members, Ørsted A/S, explicitly discussing a boycott of Twitter. The emails showed that GARM had recommended a boycott of Twitter to its members and orchestrated an information exchange to make the boycott effective, and that Ørsted stopped advertising because of GARM's efforts, contrary to its own unilateral self-interest.

This action shortly followed the publication of the House Judiciary Committee report, naming as defendants WFA and a subset of those GARM-member advertisers that most closely resembled Ørsted through their participation in GARM, their receipt of GARM's boycott communications, and their acts to further the conspiracy, including in their parallel refusals to deal. Several other

1

GARM members agreed to settle with X before the SAC was filed. Since then, additional federal enforcement actions and investigative reports have continued to document the GARM boycott conspiracy, and X expects that further evidence obtained in discovery or through regulatory and other investigations will result in additional defendants.

The SAC's allegations comfortably satisfy *Twombly's* plausibility standard. In *Twombly*, there was merely parallel conduct and no further factual enhancement that suggested directly or indirectly that the parallel conduct was the result of a prior meeting of the minds among the defendants. Here, the SAC alleges what was missing in *Twombly*: the details of the conspiracy and evidence of its formation, motivation, and implementation, supported by the contemporaneous emails and memoranda of the conspirators. While "smoking gun" evidence is unnecessary to plead a plausible claim under *Twombly*, this is the rare case where such evidence is present even before discovery: The House Judiciary Committee uncovered an email in which two of the alleged co-conspirators literally discuss the "boycott." The conspiracy alleged in the SAC is more than plausible, and the Defendants' motion to dismiss for failure to state a claim should be denied.

## STATEMENT OF FACTS

Defendants organized GARM to facilitate collective action by advertisers in the purchase of advertising from social media platforms to further the economic interests of those advertisers. SAC (ECF 77) ¶¶ 36–47. GARM promulgated the Brand Safety Standards relating to the purchase of advertising, which promoted the economic interests of advertisers. *Id.* ¶¶ 62–65. GARM required its members to assent to certain conditions of membership, including an agreement to limit or discontinue the purchase of advertising from media platforms deemed by GARM to be non-compliant with the Brand Safety Standards with the understanding that other members would do the same (the "GARM Rules"). *Id.* ¶¶ 66–83. The avowed purpose and effect of the GARM Rules were to facilitate the collective exercise of market power by GARM's members to further their collective economic interests through GARM. *Id.* ¶¶ 67, 43–47. The collective market power of GARM members created by the GARM Rules was directed by GARM, which monitored the adherence of digital

media platforms to the Brand Safety Standards and organized boycotts of platforms suspected of non-compliance with the Standards. *Id.* ¶¶ 84–90.

In 2022, GARM and its members grew concerned that Twitter, after its acquisition by Elon Musk and other investors, would not comply with the Brand Safety Standards. *Id.* ¶¶ 91–93. Following their past practice in similar situations, GARM and its members organized, threatened, and then implemented a boycott of advertising purchases from Twitter by GARM members. *Id.* ¶¶ 94–143. One GARM member, Ørsted, admitted to GARM that it "stopped all paid advertisement" on Twitter "[b]ased on your recommendations." *Id.* ¶ 132. The other Advertisers Defendants reduced their purchases of advertising from Twitter in parallel with Ørsted. *Id.* ¶¶ 137–38.

# ARGUMENT

## 1. Legal Standard.

A 12(b)(6) motion "is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must liberally construe the complaint, accept the plaintiff's allegations as true, and draw all reasonable inferences for the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). A court may not pick and choose between the plausible inferences to which the plaintiff is entitled and alternative explanations offered by the defendants. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009) ("[W]e are not authorized or required to determine whether the plaintiff's plausible inference … is equally or more plausible than other competing inferences ….").

## 2. Defendants Misstate the SAC's Allegations about the Conspiracy's Scope.

Defendants base many of their arguments on the false premise that the alleged conspiracy involved only a small fraction of GARM-member advertisers and no GARM-member advertising agencies. (MTD (ECF 161) 2, 9–10, 14, 17–18, 24). This claim contradicts the well-pleaded allegations of the SAC, which alleges instead that the conspiracy included at a minimum (i) WFA, (ii)

Ørsted and the "at least" 17 other GARM-member advertisers that acted in parallel with Ørsted in eliminating their purchases of advertising by December 2022; (iii) "dozens of non-defendant co-conspirators" in the form of GARM-member advertisers that substantially reduced their purchases of advertising from Twitter during the following year; and (iv) the advertising agency members of GARM, who furthered the conspiracy's ends by amplifying GARM's recommendation not to deal with Twitter.[1] SAC ¶¶ 2, 4, 104–05, 136–38.

The Court must reject such arguments premised on Defendants' reimagination of the SAC. *Molzan v. Bellagreen Holdings, L.L.C.*, 112 F.4th 323, 333 (5th Cir. 2024) (reversing dismissal when "the district court erroneously assumed the veracity of Defendants' assertions in their motion to dismiss over the well-pleaded factual allegations in [plaintiff's] complaint.").

### 3.  X has Plausibly Alleged its Antitrust Claims.

"To establish liability under § 1 of the Sherman Act, 15 U.S.C. § 1, a plaintiff must show that the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015) (cleaned up).

#### 3.1    X has Plausibly Alleged a Group Boycott Agreement.

At trial, the plaintiff must present "evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007) (cleaned up). In other words, at summary judgment, "[t]here must be evidence that tends to exclude the possibility of independent action." *Id.* But at the pleading stage, the plaintiff's burden is lower. The inference of agreement must be merely "plausible," a standard that "does not impose a

---

[1] It is black-letter law that not every participant in a conspiracy must be named as a defendant, and X's decision to proceed in this action only against some of the obviously culpable remaining co-conspirators does not support the inference that the conspiracy that will be proved at trial is limited to the Advertiser Defendants. Indeed, left unsaid by Defendants is that the reason many alleged co-conspirators are not named is because they settled before (and, in one instance, after) X filed the SAC. That hardly creates an inference that they were not participants in a conspiracy, and in any event, those are factual questions not appropriate for a motion to dismiss.

probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. "And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (cleaned up).

There are many types of concerted action under the Sherman Act and many ways of pleading and proving it. The SAC alleges more than enough factual matter to plausibly infer the alleged conspiracy under four separate, but related, theories. *First*, GARM's members agreed, as a condition of membership, to the collective enforcement of the GARM Brand Safety Standards through group boycotts organized by GARM of non-compliant media platforms. These GARM Rules are themselves concerted action that foreseeably involved the Twitter boycott. *See* Section 3.1.1, *infra*. *Second*, GARM's acts and practices in ordering the boycott of Twitter are themselves the concerted action of GARM members because GARM is the agent and instrumentality of its members, who controlled GARM and who also ratified those acts and practices through their assent to GARM's Rules. *See* Section 3.1.2, *infra*. *Third*, there is ample additional basis to infer that each Advertiser Defendant individually and knowingly participated in the boycott conspiracy. *See* Section 3.1.3, *infra*. *Fourth*, the Advertiser Defendants' knowing participation in the conspiracy is established through their parallel conduct of boycotting Twitter, bolstered by further factual allegations supporting the inference of their knowing participation in a common course of concerted action. *See* Section 3.1.4, *infra*. Some of the SAC's allegations will, when reduced to admissible evidence, establish a triable issue of fact on the boycott conspiracy's existence. Other allegations in the SAC are "suggestive enough to render a § 1 conspiracy plausible." *Twombly*, 550 U.S. at 553. Together, they are more than enough to meet Plaintiff's burden at the pleading stage.

### 3.1.1.  GARM's Rules Contemplated Group Boycotts of Media Platforms.

The boycott of Twitter did not arise suddenly and in a vacuum, but against the backdrop of prior commitments solicited and received by GARM from its members to act collectively to boycott media platforms suspected by GARM of non-compliance with the GARM Brand Safety Standards. SAC ¶¶ 84–90, 95. This is concerted action under Section 1. *See United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1354, 1360 (5th Cir. 1980) (finding concerted action in association rules that

"authorize [the association] to establish a group boycott"). When GARM identified Twitter as being non-compliant with the Standards, the boycott of Twitter followed as the natural and foreseeable consequence of the advertisers' implementation of their prior commitments to GARM.

GARM members agreed to adopt, implement, and enforce the GARM Brand Safety Standards as a condition of membership. SAC ¶¶ 66–74. These commitments governed the commercial activities of GARM members in purchasing advertising. GARM's documents provided that members "agree to adopt GARM solutions to improve business operations" (*id.* ¶ 68), that members had "an agreement to adopt and implement [GARM] solutions both internally and where working with partners" (*id.* ¶ 70), and members "will adopt these principles in their operations, whether they are a marketer, agency or media platform" (*id.* ¶ 74). Advertiser members of GARM further agreed to use the Brand Safety Standards to "set brand risk and suitability standards for corporate, brand and campaign levels." *Id.* Advertising agency members of GARM agreed to use the Brand Safety Standards "to guide how they invest with platforms at the agency-wide level and at the individual campaign level." *Id.* Other members of GARM agreed to "make commensurate changes to business operations in pursuit of GARM's goals." *Id.* ¶ 73. As a gloss on these commitments (the "GARM Rules"), GARM's Steer Team explained that "GARM have agreed that where content is part of the ***Brand Safety Floor***, it is not appropriate for it to be supported by any advertising content." *Id.* ¶ 79 (emphasis added). As a further gloss on these Rules, GARM described the Brand Safety Standards as "***Setting the Limits*** for Advertising Support." *Id.* ¶ 74 (emphasis added).

GARM's Rules are themselves concerted action under Section 1. *Realty Multi-List, Inc.*, 629 F.2d at 1361 n.20 ("The concerted action necessary to establish a Section 1 violation exists in the agreement of [the association's] members to adopt and apply these rules and membership criteria."). As the SAC plausibly alleges, the GARM Rules contemplated concerted action by GARM members through GARM and required their advance assent to that concerted action. GARM described these Rules as a "***commitment***" to engage in "***uncommon collaboration***" through the exercise of the "***collective power***" of GARM members while "***putting aside competitive concerns***" to achieve common goals. SAC ¶¶ 70–72 (emphases added). It is hard to be more direct. Because

these membership requirements were publicly available, and applied generally to GARM members, it is plausible to infer that each member agreed to "put[] aside competitive concerns" and made such a "commitment" knowing that the others also had. *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939) ("It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it."). The SAC alleges as much: "GARM explained to its advertiser and advertising agency members, and those members understood, that substantial uniformity in their adoption, implementation, and enforcement of the Brand Safety Standards was important in ensuring that GARM members would collectively control a sufficient volume of advertising purchases, and sufficient market power, to force digital media and social media platforms to adopt and adhere to the Brand Safety Standards." SAC ¶ 67.

The concerted action plausibly encompassed group boycotts of ad sellers suspected by GARM of non-compliance with the GARM Brand Safety Standards. The facial plausibility of this interpretation is bolstered by extensive factual allegations showing how WFA and GARM members understood and implemented the GARM Rules in practice. *See Realty Multi-List*, 629 F.2d at 1381–82 (relying at summary judgment on evidence of purpose and intent of association members implementing association rules in resolving disputed interpretation of association rules as a boycott agreement). GARM trained and encouraged members to reduce purchases of advertising from non-compliant media platforms. SAC ¶¶ 75–78. GARM members manifested their commitment to the Rules by refraining from purchases of advertising from non-compliant media platforms. *Id.* ¶¶ 79–83. The conduct of GARM and its members also shows that GARM led in declaring boycotts on its members' behalf and makes it plausible that the conspirators contemplated this leading role. A GARM executive admitted to discussing "enforcement" of the Brand Safety Standards with members. *Id.* ¶ 39. GARM identified media platforms suspected of non-compliance with the Brand Safety Standards as candidates for retaliatory boycotts by GARM members, which were to be triggered by public statements by GARM identifying a platform as non-compliant. *Id.* ¶¶ 85–90. For example, a GARM member contacted GARM to learn its views of a boycott of Spotify, and GARM

then contacted Spotify with a veiled boycott threat on behalf of GARM members. *Id.* ¶¶ 88–90.[2] Following this same playbook only months later, WFA intentionally triggered a boycott of Twitter by publicly identifying Twitter as non-compliant with the Brand Safety Standards. *Id.* ¶¶ 93–103.

In *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 608 (1914), a boycott agreement was found on similar facts, where a trade association identified certain firms on a list circulated to association members as engaged in conduct contrary to the economic interests of association members with the "evident purpose that [association members] should know of such conduct and act accordingly" by refusing to deal with the identified firms. The allegations here are stronger than the evidence in *Eastern States* because the SAC plausibly alleges a preexisting common understanding to boycott media platforms so identified by GARM in the form of the GARM Rules, when such evidence was lacking in *Eastern States*. *Id.* at 608–09 ("True it is that there is no agreement among the retailers to refrain from dealing with listed wholesalers, nor is there any penalty annexed for the failure so to do; but he is blind indeed who does not see the purpose in the predetermined and periodical circulation of this report to put the ban upon wholesale dealers whose names appear in the list …."). In *Eastern States*, a boycott agreement was inferred from the evidence that identification of the boycott target "had and was intended to have the natural effect of causing such retailers to withhold their patronage from the concern listed." *Id.* at 609. The allegations in the SAC are stronger because they plausibly allege not only that WFA's identification of

---

[2] The threatened boycott of Spotify and the boycott of Twitter display striking similarities. In the Spotify episode, a GARM member (Coca-Cola) contacted GARM inquiring about "boycotting Spotify from an advertising perspective." SAC ¶ 88. In the Twitter boycott, a GARM member (Ørsted) contacted GARM inquiring about the "Twitter situation and a possible boycott from many companies." *Id.* ¶ 111. Both times, GARM used or threatened to use public statements to trigger the boycott. With Spotify, GARM threatened to issue a public statement on Spotify's compliance with the Brand Safety Standards. *Id.* ¶ 90 (providing that GARM would issue a public statement if Spotify refused to meet with GARM and demonstrate adherence to the Standards). With Twitter, GARM went further, intentionally triggering the boycott of Twitter as it had earlier threatened to do to Spotify. *Id.* ¶¶ 95–97. Together, the two episodes reveal GARM's *modus operandi* of orchestrating boycotts of media platforms through public statements relating to those platforms' adherence to the Brand Safety Standards. *See also id.* ¶ 89 (describing the role of public statements by GARM in orchestrating boycotts of media platforms).

Twitter as non-compliant "had and was intended to have the natural effect of causing [GARM members] to withhold their patronage from" Twitter (SAC ¶¶ 96, 99–103), but also that GARM members had agreed to that course of conduct through their "commitment" to the GARM Rules.

Defendants do not contest that WFA and the Advertiser Defendants agreed to the GARM Rules. While disputing that the GARM Rules contemplated group boycotts of non-compliant media platforms generally or Twitter specifically, they offer no alternative interpretation, and even if they had, the Court may not choose between plausible alternative inferences to be drawn from factual allegations on a Rule 12(b)(6) motion. *Lormand*, 565 F.3d at 267. It suffices for present purposes that Plaintiff has plausibly alleged that the GARM Rules governed the commercial conduct of GARM members in the purchase of advertising and that GARM and its members foreseeably contemplated the boycott of non-compliant media platforms. That GARM-member advertisers would contact GARM to inquire about "boycotts" of media platforms is, by itself, sufficient to plausibly infer that GARM members understood their "commitment" to the GARM Rules to foreseeably involve boycotts of non-compliant media platforms. *See* SAC ¶¶ 88 (Coca-Cola contacting GARM about "boycotting Spotify from an advertising perspective"), 111 (Ørsted contacting GARM regarding the "Twitter situation and a possible boycott from many companies").

The GARM Rules, including the express understanding that they served as a "commitment" to engage in "uncommon collaboration" through the exercise of the "collective power" of GARM members while "putting aside competitive concerns" to achieve common goals, are direct evidence of a boycott agreement. SAC ¶¶ 70–72. The Court could end its concerted action analysis at this point. The Supreme Court has consistently held § 1's concerted action requirement satisfied by an association rule that its members have agreed to follow and that governs their separate businesses. *See, e.g.*, *Associated Press v. United States*, 326 U.S. 1, 8 (1945) (treating association rules imposing "duties and restrictions in the conduct of [members'] separate businesses" as agreements subject to § 1). Thus, when a § 1 complaint rests not "on evidence of parallel business conduct," but rather on allegations that association members "conspired in the form of the [association's] rules," circumstantial facts of the sort required in *Twombly* are "superfluous." *Robertson v. Sea Pines*

9

*Real Est. Cos.*, 679 F.3d 278, 289 (4th Cir. 2012) (Wilkinson, J.). The association rules themselves are "direct evidence" of the challenged agreement, and "the concerted conduct is not a matter of inference or dispute." *Id.* at 289–90; *see also Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1180 n.30 (10th Cir. 2019) (distinguishing circumstantial evidence cases from cases based on "an explicit agreement, typically set out in an association rule or otherwise enforced by the association"). When association rules themselves are the restraint of trade, there is no requirement of a separate agreement among association members to implement them in any specific instance. *See Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 309 (2d Cir. 2023), *cert denied* 144 S. Ct. 1391 (2024).

Because the SAC plausibly alleges an agreement among WFA and the Advertiser Defendants that gave GARM the "power to order a group boycott" of Twitter (*Realty Multi-List*, 629 F.2d at 1360), the Court should find concerted action on the strength of these allegations alone. *See Associated Press*, 326 U.S. at 11–12 (bylaws of association in and of themselves were contract in restraint of trade). There is no requirement that GARM's Rules have specifically targeted Twitter, although this boycott did just that. In *Silver v. New York Stock Exchange*, 373 U.S. 341 (1963), for example, the plaintiff complained of a boycott worked by an association's rules passed before the plaintiff had applied for membership, which thus did not reference the plaintiff or his application. The Supreme Court squarely held that the boycott of the plaintiff effected by the association's rules was nevertheless the product of collective action under Section 1. *Id.* 373 U.S. at 348 n.5 ("The fact that the consensus underlying the collective action was arrived at when the members bound themselves to comply with Exchange directives upon being admitted to membership rather than when the specific issue of Silver's qualifications arose does not diminish the collective nature of the action.").

Defendants argue that GARM's Rules were not understood by GARM members as requiring a boycott of Twitter because not all GARM members stopped purchasing entirely and immediately after the WFA's invocation of the boycott. (MTD 14). This argument improperly ignores the well-pleaded allegations of the SAC and substitutes in their place allegations of the Defendants' own devising. The SAC never alleges that the GARM Rules required a total refusal to deal with Twitter or that the conspiracy included only firms that stopped purchasing entirely. Instead, the SAC

alleges that the GARM Rules required the members to "limit or discontinue" purchases from non-compliant platforms (SAC ¶ 75) and that the conspiracy formed by the Rules included (i) "at least" 18 GARM members that stopped purchasing entirely from Twitter (*id.* ¶ 137) and (ii) "dozens of non-defendant co-conspirators" (*id.* ¶ 2) that "substantially reduced their purchases of advertising from Twitter" (*id.* ¶ 137). *Per se* unlawful boycotts under Section 1 may be partial refusals rather than total refusals to deal, and X need not allege a conspiracy that included only those advertisers alleged to have refused to buy any advertising at all from Twitter. *See Nw. Pac. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 295 n.6 (1985); *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978, 987 (5th Cir. 1983).

Defendants' claim that widespread non-participation of GARM members in the boycott is shown because, of the 118 "**WFA** and GARM members" that responded to a GARM survey of their willingness to boycott Twitter (SAC ¶ 110 (emphasis added)), only 18 GARM members stopped purchasing entirely from Twitter (MTD 2, 9, 14), is an absurd reading of the SAC. It rests on the premise that all 118 of the boycott survey respondents were GARM members, which is both false and not an inference that the SAC compels or even supports. *See Molzan*, 112 F.4th at 333 (reversing dismissal when district court credited defendants' version of the facts over those actually alleged).[3] Indeed, WFA admits that "not every WFA member was a member of GARM and, conversely, not all GARM members were WFA members." (ECF 134 ¶ 20.) This argument also strains credulity beyond the breaking point given the SAC's clear allegations that GARM members would contact GARM inquiring about "boycotts" of media platforms. *See* SAC ¶¶ 88 (Coca-Cola contacting GARM about "boycotting Spotify from an advertising perspective"), 111 (Ørsted

---

[3] The SAC (at ¶ 68) alleges an undated GARM statement that it had "more than 60 of the world's biggest advertisers" as members. Even assuming that this statement was still accurate as of the time of the boycott, the allegation in Paragraph 137 that "dozens" of GARM member-advertisers joined the conspiracy by partially refusing to deal with Twitter in addition to the 18 that totally refused to deal with Twitter facially alleges widespread participation in the conspiracy of at least 70% of GARM-member advertisers. But even this limited conclusion, which would itself refute Defendants' unsupported claim of widespread non-participation in the conspiracy, requires the Court to find facts and weigh competing inferences, which on its own supports denying Defendants' motion.

contacting GARM regarding the "Twitter situation and a possible boycott from many companies"). GARM members clearly understood their "commitment" to the GARM Rules as foreseeably involving boycotts of media platforms as directed by GARM, and the Defendants' efforts to conceal these allegations through sleight-of-hand should be rejected.

Defendants' incomplete participation arguments also fail because they conflate the distinct issues of (a) the existence of a conspiracy and (b) its implementation. "The heart of a Section One violation is the agreement to restrain; no overt act, no actual implementation of the agreement is necessary to constitute an offense." *United States v. Flom*, 558 F.2d 1179, 1183 (5th Cir. 1977). A § 1 violation is established because the GARM Rules conferred on GARM the power to declare a boycott of Twitter, whether or not all GARM's members scrupulously or even largely adhered to the restraint. *Realty Multi-List*, 629 F.2d at 1375–76 ("[I]t is irrelevant that the restrictive practice may not be strictly enforced by its terms; it is the power to bring about the unjustified anticompetitive effect which the Sherman Act condemns."); *United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979) ("Since the agreement itself, not its performance, is the crime of conspiracy, the partial non-performance of [a defendant] does not preclude a finding that it joined the conspiracy.").

Defendants next argue that the boycott of Twitter can't be connected to the GARM rules because non-GARM members also boycotted Twitter. (MTD 13.) This ignores that the "Big Six" ad agencies—all of which were GARM members, and one of which was on its Steer Team—amplified the effects of the conspiracy by using their influence with their non-GARM member clients to convince them to curtail their advertising purchases. SAC ¶¶ 104–06, 140.[4] The broad impact of the conspiracy as amplified by the Big Six precludes any inferences from the parallel conduct of non-GARM members, at least at the pleading stage. The SAC alleges that many non-GARM member advertisers had their purchasing decisions altered by ad agencies that were GARM members and

---

[4] Defendants' claim that the SAC fails to allege that the recommendations issued by the Big Six advertising agencies were made collusively is false. *See* SAC ¶ 105 ("These recommendations of the GARM-member advertising agencies to refrain from advertising on Twitter were made in furtherance of the boycott plan described by WFA and by GARM on October 31, 2022.").

part of the conspiracy. *Id.* ¶¶ 139–40. The presence of ANA on the GARM Steer Team is another plausible mechanism by which the conspiracy spread beyond GARM's membership to reach ANA's nearly 1,100 member advertisers, particularly given ANA's key role in founding GARM and promoting membership in GARM and adherence to the GARM Rules. *Id.* ¶¶ 37, 58–61.

Defendants' third argument is that the GARM rules couldn't have required a boycott of Twitter to enforce the Brand Safety Standards because Twitter was a member of GARM. (MTD 13.) This argument ignores that (i) the Brand Safety Standards are in the economic interests of advertisers, and not those of GARM's social media platform members (SAC ¶¶ 41–47); and that (ii) social media platforms were coerced through boycotts into adhering to the Brand Safety Standards at GARM's formation (*id.* ¶ 85). There is nothing incongruous about GARM's Rules requiring a boycott of social media platforms that were coerced to join and compelled to implement Brand Safety Standards that primarily advanced advertisers' economic interests. *See Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 461–62 (1941) (boycott administered by manufacturers' guild included retailers that cooperated "only because constrained by threats that Guild members would not sell to retailers who failed to yield to their demands"). In effect, Defendants' argument is that because they had enough collective market power to pressure Twitter into joining GARM and comply with its standards, and into trying to appease GARM for two years to try to end the boycott, their conspiracy is lawful. Defendants' argument stands the Sherman Act on its head.

### 3.1.2. GARM's Acts and Practices are Themselves Concerted Action.

As shown above, the GARM Rules and the collective agreement to enforce them are a boycott agreement because they gave GARM the "power to order a group boycott." *Realty Multi-List*, 629 F.2d at 1360. GARM's acts and practices in ordering the boycott of Twitter provide an additional basis for finding concerted action of GARM members and are thus a second ground on which the Court should find concerted action plausibly alleged.

GARM was an association of competing advertisers and advertising agencies, directed by a board (the Steer Team) of competing advertisers and advertising agencies, and avowedly committed to furthering the economic interests of those competing advertisers and advertising agencies as

a group. SAC ¶¶ 36–47. The employees of GARM worked under the direction and supervision of the Steer Team. *Id.* ¶ 39. GARM was thus the concerted action of its members. *See N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 356 (5th Cir. 2008) ("When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members."); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010) ("[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity."); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) ("[T]rade and standard-setting associations [are] routinely treated as continuing conspiracies of their members."). It is irrelevant that the advertisers controlling GARM did not always compete in their downstream product markets. *N. Tex. Specialty Physicians*, 528 F.3d at 357 ("[T]he correct analysis is not whether the board members compete directly with one another but whether the organization is controlled by members with substantially similar economic interests.").

As a continuing conspiracy of its members, GARM's acts and practices in ordering the Twitter boycott are themselves the collective action of GARM members through GARM, their agent and instrumentality. These acts and practices (the "Conspiracy Communications") included: (i) written plans for conspiracy promulgated by GARM and WFA (SAC ¶¶ 94–103, 123); (ii) GARM's efforts to bargain collectively with Twitter on behalf of its members, leveraging the threat of a boycott (*id.* ¶¶ 107–08); (iii) the survey conducted by GARM of its members' willingness to boycott Twitter (*id.* ¶ 110); (iv) GARM's recommendations to boycott Twitter (*id.* ¶ 117); (v) the wide dissemination of the results of the boycott survey to GARM members (*id.* ¶ 125); and (vi) GARM's final and never-rescinded statement of Twitter's non-compliance with the Brand Safety Standards (*id.* ¶ 134). The Conspiracy Communications were issued under the supervision of the Steer Team and were thus the acts of the Steer Team on behalf of GARM's members. *Id.* ¶¶ 39 (alleging that communications to GARM members, and any enforcement efforts of GARM, were made under the supervision of the Steer Team), 89 (public statements made by GARM were on behalf of its members), 95 (same), 97 (same), 107 (boycott threats made on behalf of the Steer Team), 110

(boycott survey conducted by the Steer Team). The Conspiracy Communications are also directly attributable to GARM members through their assent to the GARM Rules, which ratified the foreseeable acts taken by GARM against Twitter with knowledge that other GARM members had done the same. *See N. Tex. Specialty Physicians*, 528 F.3d at 356–57 (finding that acts of association in organizing a conspiracy were the concerted action of association members when each member had authorized the association to engage in that conduct knowing that other members had done the same); *James Julian, Inc. v. Raytheon Co.*, 557 F. Supp. 1058, 1065 (D. Del. 1983) ("Knowing participation may occur when [association] members tacitly or expressly ratify the known illegal actions of the association or individual members.").

### 3.1.3.   The Advertiser Defendants Accepted GARM's Invitations to Boycott.

The Advertiser Defendants also knowingly participated in the conspiracy to boycott Twitter by eliminating their purchases from Twitter after receiving GARM's invitations and recommendations to boycott Twitter. *See Interstate Circuit*, 306 U.S. at 227 ("Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."); *FTC v. Cement Inst.*, 333 U.S. 683, 716 n.17 (1948) (agreement may be inferred "if there is evidence that persons, with knowledge that concerted action was contemplated and invited, give adherence to and then participate in a scheme"). This is a third basis to find concerted action plausibly alleged in the SAC.

The Advertiser Defendants are alleged to have conspired by joining the boycott of Twitter at GARM's invitation and urging, knowing from their prior agreement to the GARM Rules and from GARM's Conspiracy Communications that their competitors would also. SAC ¶¶ 117, 137. The SAC alleges that WFA and GARM issued at least four invitations to engage in collective action in boycotting Twitter: twice publicly on October 31, 2022 (*id.* ¶¶ 94–103); privately to its members sometime after November 8, 2022 (*id.* ¶ 117); and once through a member of the Steer Team on November 11, 2022 (*id.* ¶ 105). The Steer Team invitation to collude expressly referenced collective action through GARM, while the others came from WFA or GARM on behalf of their members as

contemplated by the GARM Rules and at the Steer Team's direction. GARM's survey of advertisers' willingness to boycott Twitter also at least impliedly suggested collective action, as the results were distributed to and discussed by GARM members collectively, and were used by GARM members as an input into their decision to buy advertising from Twitter. *Id.* ¶¶ 110, 116–18, 125.

As intended, these Conspiracy Communications proposed a common collective course of action. It is plausible to infer that each Advertiser Defendant received at least one Conspiracy Communication (all broadcast either publicly or widely among GARM's members to reach and influence their audience), and that each of the Advertiser Defendants thus engaged in collective action when they accepted GARM's invitations by curtailing, as requested, their purchases from Twitter, knowing because of these Communications that their competitors would do the same. SAC ¶¶ 117, 137. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022) (reversing dismissal of a group boycott claim; "All that [Plaintiff] must allege is that [Defendants] adhered to a common scheme."); *Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Penn.*, 815 F.2d 270, 272–73 (3d Cir. 1987) (associations' recommendation to boycott plaintiff and subsequent conforming conduct was "direct evidence" of a boycott agreement); *Gibson v. FTC*, 682 F.2d 554, 568 (5th Cir. 1982) (recommendation not to buy from supplier was "at the minimum, an invitation to boycott" that was accepted by performance of the requested act)[5]; *Gainesville Utils. Dep't v. Florida Power & Light Co.*, 573 F.2d 292, 300–02 (5th Cir. 1978) (agreement formed by refusals to deal preceded by communications of "hopeful, if not expected, reciprocity" in that course of conduct).

In *Gibson* and *Gainesville Utilities*, agreement was inferred merely from an invitation to boycott and the invitees' performance of the requested act, and absent evidence of the invitees' express manifestation of assent to the proposed terms of coordination. The facts alleged here are much

---

[5] In *Gibson* and *North Texas Specialty Physicians*, the Fifth Circuit reviewed orders of the Federal Trade Commission, which enforces the Sherman Act indirectly through Section 5 of the FTC Act. The Fifth Circuit's finding of a boycott agreement in *Gibson* was based on application of *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600 (1914), a Sherman Act case. *Gibson*, 682 F.2d at 568. The Fifth Circuit's finding of concerted action in *North Texas Specialty Physicians* was similarly based on Sherman Act cases. *N. Tex. Specialty Physicians*, 528 F.3d at 356–57.

stronger: Ørsted's written admission that it boycotted Twitter "[b]ased on your [GARM's] recommendations" (SAC ¶ 132) is direct evidence of agreement sufficient to withstand summary judgment, let alone a motion to dismiss. It is sufficient that the Advertiser Defendants accepted GARM's invitation to boycott Twitter through performance of the requested act, but Ørsted's written admission that it had done so based on GARM's recommendation is further strong, direct evidence of agreement. The statements by GARM-member advertising agencies (and in one instance, a Steer Team member) that they were acting with and through GARM in recommending a boycott (*id.* ¶¶ 105, 140) are also direct evidence of agreement among GARM members.

Bolstering the plausible inference that the Advertiser Defendants received and acted on GARM's recommendations to boycott Twitter, the SAC alleges facts specific to each Advertiser Defendant. For example, the SAC pleads specific facts showing their membership directly or through an affiliate in GARM, their participation in the boycott of Twitter, and for every Advertiser Defendant at least one other factual allegation that tends to show an awareness of either or both of the GARM Rules or the Conspiracy Communications, and for many multiple such allegations.[6]

---

[6] *See* SAC ¶¶ 18, 37, 58–61, 106, 138 (alleging **Abbott Laboratories'** membership in GARM, its participation on the ANA Growth Council that promoted GARM membership and adherence to the GARM Brand Safety Standards, its receipt of the recommendation to boycott Twitter issued by GARM Steer Team member GroupM, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 14, 39, 83, 85, 90, 95, 123, 138 (Alleging **Mars'** membership in GARM, its role on GARM's Steer Team in supervising the activities of GARM, its manifestations of adherence to GARM's Rules, its role in the 2020 boycotts at the formation of GARM, its role in the Spotify boycott threat, its approval of the October 2022 invitations to collude, its receipt of the GroupM recommendation, its participation in WFA-Twitter meetings, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 15, 37, 58–61, 80, 85, 138 (alleging **CVS Health's** membership in GARM, its participation on the ANA Growth Council that promoted GARM membership and adherence to the GARM Brand Safety Standards, its manifestations of adherence to GARM's Rules, its role in the 2020 boycotts, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 13, 83, 111–20, 129–34, 138, 145 (alleging **Ørsted's** membership in GARM, its communications with GARM and its manifestations of adherence to GARM's rules, its parallel conduct in boycotting Twitter, and the inferences to be drawn from its communications with GARM); *id.* ¶¶ 17, 37, 58–61, 83, 123, 138, 141 (alleging **Nestlé S.A.'s** membership in GARM and service on WFA's Executive Board, its participation on the ANA Growth Council that promoted GARM membership and adherence to the GARM Brand Safety Standards, its manifestation of adherence to GARM's Rules, its participation in WFA-Twitter meetings, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 17, 138 (alleging that **Nestle USA acted** at the instruction of its parent, its receipt of the GroupM recommendation, and its parallel conduct in

These factual allegations, coupled with the reasonable inference that all of the Advertiser Defendants were aware of GARM's Conspiracy Communications because of their (or their affiliate's) membership in GARM, and the well-pleaded allegations that each Advertiser Defendant (or an affiliate) agreed to the GARM Rules, comfortably allege knowing participation in the conspiracy to boycott Twitter. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47–48 (1st Cir. 2013) (reversing dismissal of group boycott claim premised on communications through a trade association followed by subsequent refusals to deal with plaintiff in conformity with those prior discussions). It is black letter law that knowing participation in a single conspiracy does not require a conspirator to participate in every aspect of the conspiracy. *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987) ("There is no requirement that every member must participate in every transaction to find a single conspiracy. Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy." (footnote omitted)). It is sufficient that each Advertiser Defendant individually and without reference to the actions of its corporate affiliates is alleged to have participated in the conspiracy by boycotting Twitter with knowledge through the "core conspirator" GARM that others would be doing the same.

As for the Advertiser Defendants whose knowing participation in the conspiracy is alleged in

---

boycotting Twitter); *id.* ¶¶ 19, 106, 138 (alleging **Colgate's** membership in GARM, its receipt of the GroupM recommendation, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 20, 37, 58–61, 138 (alleging **Lego A/S's** membership in GARM, its participation on the ANA Growth Council that promoted GARM membership and adherence to the GARM Brand Safety Standards, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 20, 138 (alleging that **Lego Retail USA a**cted at the instruction of its parent and its parallel conduct in boycotting Twitter); *id.* ¶¶ 21, 81, 138 (alleging **Pinterest's m**embership in GARM, its manifestation of assent to the GARM Rules, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 22, 106 (alleging **Tyson Food's** membership in GARM, its receipt of the GroupM recommendation, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 23, 106, 138 (alleging **Shell plc's** membership in GARM, its receipt of the GroupM recommendation, its parallel conduct in boycotting Twitter); *id.* ¶¶ 23, 37, 58–61, 106, 138 (alleging that **Shell Brands International AG** acted at the instruction of its parent, its participation on the ANA Growth Council that promoted GARM membership and adherence to the GARM Brand Safety Standards, its receipt of the GroupM recommendation, and its parallel conduct in boycotting Twitter); *id.* ¶¶ 23, 106 (alleging that **Shell USA** acted at the instruction of its parent, its receipt of the GroupM recommendation, and its parallel conduct in boycotting Twitter).

part based on the activities of their corporate affiliates (*i.e.*, the Lego, Nestlé and Shell defendants), the members of these corporate families are plausibly alleged to have acted as a single entity and with a common purpose, allowing for the imputation of the allegations against each of the corporate affiliates to the others. As the Tenth Circuit explained, addressing a claim under Section 2 of the Sherman Act, "in a single-enterprise situation, it is the affiliated corporations' collective conduct— *i.e.*, the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a [Section 2] claim." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1236 (10th Cir. 2017) (court's emphases); *see also Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631–32 (9th Cir. 2018) ("A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purpose of the single 'economic unit' of which it is a part."); *Chandler v. Phoenix Servs.*, No. 7:19-cv-00014-O, 2020 WL 1848047, at *13–14 (N.D. Tex. Apr. 13, 2020) (corporate affiliates operate as a single entity in antitrust conspiracies when each independently participates in the conspiracy). Although the allegations of the knowing participation of the individual Lego, Nestlé, and Shell Defendants in the boycott conspiracy are sufficient on their own, without reference to the actions of their corporate affiliates, the inference of those Defendants' knowing participation is even stronger once considered, as they must be, in connection with the actions of their commonly-controlled affiliates also named as Defendants and with whom they acted as a single enterprise.

Finally, because the conspiracy alleged in the SAC emanated from GARM, there is no requirement that each Advertiser Defendant separately exchanged "smoking gun" written assurances with one another, as a plausible transmission mechanism for the conspiracy is pled in the form of GARM itself and its Conspiracy Communications. *N. Tex. Specialty Physicians*, 528 F.3d at 357 (no requirement to show separate communications and agreement between association members when the conspiracy was organized and run through their association). It is damning enough that one GARM member, Ørsted, expressly communicated with GARM about a group boycott. It is not necessary, let alone at the motion to dismiss stage, for there to be similar "smoking gun" evidence as to every

Defendant. This Court has recognized that "conspiracies are rarely evidenced by explicit agreements," *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 534 n.9 (N.D. Tex. 2014) (cleaned up) ("*Hotel Booking*"), and that "Plaintiffs certainly may rely on circumstantial facts to establish the first element of their § 1 claims." *Id.* at 534.

### 3.1.4. The SAC Alleges Consciously Parallel Conduct and Further Factual Enhancement.

The boycott agreement is also plausibly alleged in a fourth way through an analysis of the consciously parallel conduct of the Advertising Defendants in boycotting Twitter and the so-called "plus factors" that make the inference of an agreement to engage in that conduct plausible.

#### *The SAC Alleges Consciously Parallel Conduct.*

Consciously parallel conduct occurs when "the defendants' behavior was parallel" and "the defendants were conscious of each other's conduct and … this awareness was an element in their decision-making processes[.]" *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993). All Advertiser Defendants acted in striking parallelism towards Twitter, ending their advertising purchases in a two-month period in late 2022 and continuing their boycott through the present. SAC ¶¶ 136–38. The information exchange organized by GARM relating to its members' willingness to boycott Twitter, and GARM's wide dissemination of the survey results, show that GARM members were acting not only in parallel, but also with awareness of what competing advertisers were doing. *Id.* ¶¶ 110, 116–20, 125. It is hard to envision a more textbook example of conscious parallelism than Ørsted's persistent requests for information about other GARM members' boycott activity as an input into its own decision making. *Id.* ¶¶ 111–20, 129–32.

Defendants' claim that the Advertiser Defendants are not alleged to have "acted in unison or followed some common instruction from GARM" (MTD 17), is false. The SAC specifically alleges that *all* Advertiser Defendants stopped buying from Twitter, either in the U.S. or worldwide, within two months of WFA's October 2022 invitation to collude. SAC ¶ 137 ("The Advertiser Defendants … discontinued or curtailed their purchases of advertising as a result of communications facilitated by and through WFA and knowing by virtue of those communications that other GARM-member

advertisers and advertising agencies would do the same.").

Defendants' claim that the alleged parallel conduct is not precise enough to support the inference of a preceding agreement is wrong. Parallel conduct supports the inference of a boycott agreement if the defendants "acted similarly." *Petruzzi's*, 998 F.2d at 1243. In *SD3, LLC. v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427–29 (4th Cir. 2015), the Fourth Circuit reversed dismissal of a group boycott claim premised on parallel conduct stretching over six months where the defendants variously refused to license the plaintiff's technology immediately, stopped but then restarted negotiations, and even made sham offers to license that were rejected. "[P]arallel conduct need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *Id.* at 429 (cleaned up). The "*key* parallel conduct allegation" is that the Advertiser Defendants all ceased dealing with Twitter (and later X) in the United States or worldwide over a two-month period. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) (court's emphasis) (reversing dismissal of group boycott claim despite the "variety of defendant's original reactions" to the plaintiff's changed business model); *SD3, LLC*, 801 F.3d at 427 (directing attention to uniformity in achieving the "ultimate alleged objective" of the conspiracy rather than variation in the way that objective is realized). Details in the timing or means by which the ultimate end was reached are immaterial at the pleading stage. *Crownalytics, LLC v. SPINS LLC*, No. 22-cv-01275-NYW-JPO, 2024 WL 2111570, at *6 (D. Colo. May 10, 2024) (denying motion to dismiss group boycott claim when, through a diversity of means, defendants ultimately refused to deal); *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017) (same).

Defendants' cases involving insufficient allegations of parallelism are easily distinguishable. The defendants in *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3rd Cir. 2011) chose to "decline, decrease, and even increase" their business with the plaintiff over a nine-month period, unlike the Advertiser Defendants who uniformly reduced their purchases from Twitter to zero or near zero over two months. In *Burtch*, unlike here, there was no uniformity among the alleged conspirators even regarding the ultimate alleged objective of the conspiracy. The conspiracy claim in *Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*, 714 F. Supp. 3d 209, 220–21 (W.D.N.Y. 2024), failed

21

because the plaintiff first did not plausibly allege that the defendants "ultimately achieved the same or a substantially similar end result" through their conduct (the standard from *SD3* and the other cases cited above), and then failed to rectify that deficiency in an amended complaint that once again disclosed that the defendants' policies were not "functionally equivalent" with one another. *Mosaic Health* shows that the standard for parallel conduct is a "functional[] equivalen[ce]" of the defendants' conduct, which does not require that conduct be "simultaneous or identical" (*id.* at 221), and under that standard, the SAC easily alleges parallelism.

Defendants attempt to find ambiguity in the allegations of parallel conduct by reimagining the SAC to allege a conspiracy beginning in December 2022 rather than on October 31, 2022. (MTD 8–9, 18.) They then fault X for alleging that the Advertiser Defendants began their lockstep reductions in purchases before a December 2022 meeting between WFA and X. (*Id.* at 18.) But the SAC alleges that the conspiracy began with WFA's twin invitations to collude in October (when Elon Musk closed on his acquisition of Twitter) and not in December (SAC ¶¶ 93–103) and thus alleges a timeline of conspiracy that is neither "vague" nor "contradictory," as Defendants contend. *See Baker*, 75 F.3d at 197 (reversing dismissal when "the trial court adopted portions of the defendants' claims as fact without acknowledging any contradiction with the complaint").

Finally, Defendants' contention that parallel conduct of the Advertiser Defendants has not been alleged because certain other GARM members not named as defendants reduced their purchases by lesser amounts or at later times (MTD 17) is a *non sequitur*. The relevant question is whether the Advertiser Defendants acted in a consciously parallel manner, not whether unnamed co-conspirators did. If anything, the fact that the Advertiser Defendants all acted alike and differently from certain other GARM members supports the inference of a conspiracy among the Advertiser Defendants, which is the only question before the Court on this motion.

Defendants fail to appreciate the syllogism embodied in the SAC and the methodology by which the Advertiser Defendants were selected. (1) Ørsted conspired; its email exchanges with GARM show an express, written acceptance of an offer to enter into a restraint of trade. (2) The other Advertiser Defendants contemporaneously mirrored Ørsted, taking their purchases to zero

22

along with Ørsted in a two-month period after the triggering event of the twin invitations to collude issued by WFA and GARM on October 31, 2022. The striking parallelism of the purchasing pattern of the other Advertiser Defendants with Ørsted's is strong circumstantial evidence of collusion supporting the inference that each of the other Advertiser Defendants acted at that time and in that way for the same reason that Ørsted did, namely because they had agreed with WFA to do so. That other GARM members did not precisely follow Ørsted's path while the Advertiser Defendants did distinguishes the Advertiser Defendants from other GARM members in a way plausibly suggesting the Advertiser Defendants' participation in a conspiracy.

### The SAC Alleges Further Factual Enhancement.

In addition to conscious parallelism, the SAC plausibly alleges eight "plus factors," or types of further factual enhancement, supporting the inference of agreement. *See In re Pool Prods. Distrib. Market Antitrust Litig.*, 988 F. Supp. 2d 696, 713 (E.D. La. 2013) ("[T]here is no finite or exhaustive list of plus factors …."). Defendants' claim to the contrary (MTD 18–20) misreads the SAC and the plausible inferences to which Plaintiff is entitled at this stage.

*First*, GARM and its members had a common economic motive to conspire to force Twitter to adhere to the GARM Brand Safety Standards. The SAC alleges that the Brand Safety Standards promote the economic interests of GARM-member advertisers and advertising agencies by forcing X and other social media platforms to bear certain costs that would otherwise be borne by the advertisers, thus increasing the advertisers' profits. SAC ¶¶ 43–44, 62–64, 67, 99. The SAC alleges that the boycott was motivated by concerns that Twitter would not adhere to the Brand Safety Standards and a desire to force Twitter to do so. *Id.* ¶¶ 93–98, 104–05, 108–09, 122–24, 126, 134. The SAC also alleges that GARM was motivated to boycott Twitter to send a message to other social media platforms about the costs and consequences of failing to adhere to the Brand Safety Standards. *Id.* ¶ 122. The SAC alleges that the conspirators understood that they could achieve these goals only through collective action. *Id.* ¶ 67. This is a motivation to conspire in the form of increased economic profit from the alleged conspiracy. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 287 (1968) (motive to conspire may be inferred where the parallel "action taken had

23

the effect of creating a likelihood of increased profits"); *SD3, LLC*, 801 F.3d at 431 (identifying conspirators' motive to reduce their costs of marketing their products by boycotting an input supplier as a "key circumstantial fact" in reversing grant of motion to dismiss).

Defendants argue that the SAC affirmatively discloses an "obvious alternative explanation" to the inference of a conspiracy to boycott Twitter because, Defendants claim, the SAC admits that Twitter was, for advertisers, a higher-cost advertising platform due to brand safety concerns driven by Twitter's actual non-compliance with the Brand Safety Standards. (MTD 15–16, 19–20.) The SAC alleges no such thing but instead only that the Defendants claimed that Twitter might deviate from the Standards and boycotted it to prevent Twitter and other platforms from doing so. The SAC alleges that Twitter (and later X) had brand safety policies during the boycott conspiracy that "meet or exceed those specified by the GARM Brand Safety Standards." SAC ¶ 141. To credit the Defendants' reimagination of the SAC over its actual well-pleaded factual allegations would misapply *Twombly*. *See Evergreen Partnering Grp.*, 720 F.3d at 50 & n.5 (reversing dismissal of boycott claim; declining to credit argument that plaintiff's "business plan stood to raise costs for the producer defendants and their consumers" when the complaint alleged instead that the plaintiff's product was "competitively priced"); *Anderson News, L.L.C.*, 680 F.3d at 192 (reversing dismissal of a group boycott claim when the district court credited defendants' arguments about the true cost of doing business with the plaintiff over the plaintiff's contrary allegations).

Defendants' argument that Twitter was in fact non-compliant with the Brand Safety Standards is drawn entirely from their own self-serving statements—made to further the conspiracy—as quoted in the SAC and from materials outside the four-corners of the SAC, neither of which compel or even allow the inferences that the Defendants ask the Court to draw from them.[7] That X cited those statements in the SAC to show the commercial motivation of the boycott does not mean

---

[7] As an example, Defendants cite Paragraph 121 of the SAC, which in turn cites a GARM documents listing as a topic for discussion with Twitter "slipping standards on controlling harmful content," for the proposition that X admits that Twitter's brand safety standards were, in fact, "slipping." This is false, as described in the main body text.

that X concedes the truth of Defendants' claims. To hold otherwise would deviate from the principle that a complaint's allegations must be construed in favor of the plaintiff. *See Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 441 (5th Cir. 2015) (declining to extend the presumption of truth on the pleadings to self-serving unilateral statements of defendants quoted in a complaint and offered for a purpose other than their truth) (citing cases). Here, X alleged what Defendants said, not that what they said was correct, let alone that Defendants' professed concern with the Safety Standards implies that they were acting unilaterally, and Defendants are not entitled to the inference that it was. To the contrary, as alleged in the SAC, Defendants greatly benefit from a group boycott to enforce joint safety standards rather than having to individually compete over whether to advertise on a platform with hundreds of millions of users. SAC ¶¶ 43–47, 67. Defendants' reliance (MTD 7) on allegations in a pleading made by Elon Musk in another case is similarly improper; no case cited by the Defendants allows the Court to consider those allegations for the truth of the matter asserted. Defendants claim that the fact that Mr. Musk met with advertisers in November 2022 to allay their concerns is evidence that Twitter "was becoming inhospitable" to advertisers (MTD 19) but the allegations read in context with preceding paragraphs of the SAC plausibly suggest that Mr. Musk was reacting to and trying to stave off the boycott threats issued by WFA and GARM days earlier, *i.e.*, the very conspiracy alleged in the SAC.

**Second**, the SAC alleges four separate invitations to collude issued by WFA. *See Gainesville Utils.*, 573 F.2d at 300–01 & n.13 (correspondence that "contemplated and invited" concerted action was circumstantial evidence of conspiracy); *Fishman v. Wirtz*, No. 74 C 2814, 1981 WL 2153, at *59 (N.D. Ill. Oct. 28, 1981) ("One of the strongest circumstantial indicators of a conspiracy is the existence of a common invitation or request to join into a concerted plan of action."). WFA published two identical plans for a boycott of Twitter on a single day, setting forth in detail the terms on which the boycott would be conducted and the terms on which it could end. SAC ¶¶ 93–103. These twin invitations to boycott set forth the plan for the conspiracy and followed GARM's past practice of enforcing the GARM Brand Safety Standards through boycotts triggered by public statements. *Id.* ¶¶ 89–90. In the third invitation to collude, GARM Steer Team member GroupM

amplified WFA's invitations to collude in its recommendation to clients not to buy advertising from Twitter, referencing collective action through GARM. *Id.* ¶¶ 105–06. In the fourth invitation to collude, GARM disseminated recommendations not to buy advertising from Twitter. *Id.* ¶ 117. After receiving these invitations to collude, GARM-member advertising agencies joined the conspiracy by acting in parallel to recommend that their clients (both GARM members and non-members) reduce their purchases of advertising from Twitter, sometimes referencing collective action through GARM, and those recommendations were widely followed. *Id.* ¶¶ 104–06, 140. The Advertising Defendants and other GARM members similarly accepted these invitations by promptly discontinuing their purchases from Twitter. *Id.* ¶¶ 137–38, 141.

Defendants argue that "a trade association's recommendations to avoid a plaintiff's products or services do not give rise to a Section 1 conspiracy claim." (MTD 16.) This false claim finds no support in their cases. The Fifth Circuit has held that an association's recommendation can violate the Sherman Act when the association through its recommendation "ha[d] influence over its members' purchasing decisions" (*Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 766 (5th Cir. 2002)) or the association was "constraining others to follow its recommendations" (*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 292 (5th Cir. 1988)), which the SAC alleges is true for GARM's recommendations to boycott Twitter by virtue of the GARM Rules. The case law is replete with non-binding "recommendations" promulgated by associations of competitors that were held unlawful even though association members could accept or reject those recommendations. *E.g.*, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781–83 (1975) ("[A] naked agreement was clearly shown" by the defendant bar association's fee schedule even though it was facially "advisory."); *Associated Press*, 326 U.S. at 4 (association rule that granted members an optional veto to block non-members was an unreasonable restraint of trade although exercise of the veto right was left to the discretion of individual members); *N. Tex. Specialty Physicians*, 528 F.3d at 357 (treating non-binding offers negotiated by an association as a price fixing agreement of the association's members).

**Third**, the boycott was contrary to the conspirators' economic self-interest absent an understanding that each would engage in substantially similar conduct. *Re/Max Int'l, Inc. v. Realty One,*

*Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) ("Ordinarily, an affirmative answer to [this factor] will consistently tend to exclude the likelihood of independent conduct."). All Advertiser Defendants are forgoing the opportunity to buy advertising from Twitter at lower prices than available from comparable platforms despite the competitive brand safety standards of Twitter (and now X). SAC ¶¶ 142–45. These well-pleaded allegations alone allege actions contrary to self-interest as to each Advertiser Defendant. But there are more. Ørsted's statements vividly demonstrate that its participation in the boycott was contrary to its unilateral economic self-interest: Twitter was an "important platform for us in the US market" (*id.* ¶ 111) and "an interesting platform for us to reach our audience" (*id.* ¶ 131). Because of this, Ørsted sought to confirm before boycotting Twitter that its competitors would also do so. *Id.* ¶ 115–20, 129, 131, 132. These are quintessential admissions of action contrary to economic self-interest absent membership in a conspiracy and its attendant knowledge that competitors will be engaging in the same conduct, and at the pleading stage the Court should infer that the Ørsted emails—"smoking gun" evidence rarely present at the motion to dismiss stage—are probative of the economic incentives of the other Advertiser Defendants who acted in the same way and at the same time.

**Fourth**, Defendants often communicated about the terms and implementation of the conspiracy, referencing boycotts or other coercive measures against Twitter. SAC ¶¶ 108, 111, 125, 132. *SD3, LLC*, 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire.").

**Fifth**, GARM organized an information exchange among its members about their willingness to deal with Twitter. SAC ¶¶ 110, 116–17, 120, 125. This information exchange is itself concerted action that may be tested for its reasonableness under the Sherman Act. *See* Section 3.4, *infra*. The information exchange is also a "plus factor" supporting the inference of a separate boycott agreement. *Re/Max Int'l, Inc.*, 173 F.3d at 1009–10. "Such exchanges may serve as practices facilitating collusion as they provide a basis for notifying alleged members of the conspiracy of the agreed-upon refusal to deal as well as to keep tabs on members." *Evergreen Partnering Grp.*, 720 F.3d at 49.

**Sixth**, the conduct of Defendants and their co-conspirators evinced "the sort of restricted

freedom of action and sense of obligation that one generally associates with agreement." *Twombly*, 550 U.S. at 556 n.4. Numerous GARM members stated publicly or privately their adherence to the GARM Rules. SAC ¶¶ 79–83. GARM members cited the perceived risk of Twitter's deviation from the Standards as a reason not to buy advertising from Twitter. *Id.* ¶ 104. Ørsted justified its refusal to buy advertising because "our foremost current focus revolves around the diligent adherence to the GARM Safety Framework through our presence on Twitter." *Id.* ¶ 135. At the pleading stage, X is entitled to the plausible inference that these statements show that the advertising purchases of these GARM members were constrained by the GARM Rules.

**Seventh**, boycott threats conveyed by GARM on behalf of its members to Twitter (*id.* ¶ 108) are a strong "plus factor" supporting the inference of an agreement to boycott.[8] These threats show that GARM was not only aware of discussions among its members to boycott Twitter, but also that, in communicating them to Twitter, GARM sought to bargain collectively on behalf of its members (*id.* ¶ 106), as in *North Texas Specialty Physicians*. Allegations of boycott threats delivered by trade associations impliedly on behalf of their members are a plus factor at the pleading stage. *Lease Am. Org. Inc. v. Rowe Int'l Corp.*, No. 13–40015–TSH, 2014 WL 1330928, at *2 (D. Mass. Mar. 31, 2014) (finding allegations that defendant association threatened a boycott on behalf of its members "more than make out a plausible claim of direct evidence of an illegal agreement").

**Eighth**, the conspiracy alleged in the SAC is under investigation by the House Judiciary Committee as part of its oversight of antitrust enforcement and by the Federal Trade Commission and the Texas Attorney General. *Hotel Booking*, 997 F. Supp. 2d at 540 ("[A] government investigation or finding of wrongdoing[] may constitute a factual enhancement where the investigation or related case involved violations of the same laws and/or the same conduct at issue in the § 1 claim."). The FTC filed a complaint against two advertising agencies relating to their participation in GARM.[9]

---

[8] Defendants claim that the communication cited in Paragraph 108 is not a boycott threat. (MTD 8, 15.) Plaintiff is entitled to the plausible inference that it was.

[9] *See In re Omnicom Grp. Inc. & The Interpublic Grp. of Cos., Inc.*, FTC File No. 251-0049 ( June 23, 2025).

### 3.2 *The Alleged Boycott Is an Unreasonable Restraint of Trade.*

Group boycotts may be unlawful either *per se* or under the rule of reason. *Tunica*, 496 F.3d at 412. Although *per se* illegal group boycotts often involve efforts to exclude competitors of the boycotting firms from the market, boycotts "designed to influence coercively the trade practices of boycott victims, rather than those of direct competitors[,]" have also been held *per se* illegal. *Yoder Bros. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1364–65 (5th Cir. 1976).

In *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, the Court identified a non-exhaustive list of attributes typically found in *per se* boycott cases, including whether the conspirators have a dominant position in the relevant market, whether they control access to an input necessary to compete, and whether there are plausible procompetitive justifications for the boycott, although none of those factors is necessary in every case. 472 U.S. 284, 294–95 (1985). In a case analogous to this one, the Fifth Circuit in *Tunica* sustained claims of a *per se* unlawful agreement among casinos to refuse to buy advertising from a single website and remanded for consideration of the *Northwest Wholesale Stationers* factors. *Tunica*, 496 F.3d at 412–15. In another analogous case, the Supreme Court applied the *per se* rule to a boycott among a trade association and its members aimed at enforcing adherence to a standard promulgated by the association. *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659–60 (1961).

X has plausibly alleged an unlawful agreement under either the *per se* rule or the rule of reason. Because the alleged conspiracy is a horizontal agreement among competing firms and the SAC alleges facts from which one or more of the *Northwest Wholesale Stationers* factors may be inferred, X has plausibly alleged a *per se* illegal conspiracy. And because X also alleges a relevant antitrust market (the plausibility of which Defendants do not contest) and anticompetitive effects of the conspiracy in that market, it has also pleaded sufficient facts to infer a violation of the rule of reason.

The alleged conspiracy is horizontal because the Advertising Defendants are "direct, head-to-head competitors" in the relevant market for digital advertising on social media platforms. SAC ¶¶ 146–53. These are well-pleaded allegations of fact entitled to the presumption of truth under *Twombly*. Rather than challenge the sufficiency of the alleged market or explain why the allegation

that they compete in that market is implausible, the Advertising Defendants simply assert that they don't compete with one another. But the SAC makes the factual allegation of direct competition between the Advertiser Defendants plausible by describing the sale of advertising inventory through an auction mechanism in which all purchasers are competing with one another. *Id.* ¶ 151. Even if the Court somehow finds implausible the allegation of direct, head-to-head competition among the Advertiser Defendants for specific advertising inventory sold by Twitter (and it should not), the relevant question under *Tunica* is only whether the conspirators "ordinarily compete with one another at the same level of the market," 496 F.3d at 412, so as purchasers of social media advertising their agreement would be a horizontal one under *Tunica* even absent direct competition for specific ad slots, because they participate in the market for purchasing such advertising generally. *See Acad. of Allergy & Asthma in Primary Care and United Biologics, LLC v. Superior Healthplan, Inc.*, No. SA-17-CA-1122-FB (HJB), 2022 WL 18076843, at *18 (W.D. Tex. July 14, 2022) (agreement between firms operating at the same market level but in different geographic markets was a horizontal agreement under *Tunica*), *R. & R. adopted sub nom. Acad. of Allergy & Asthma in Primary Care v. Superior Healthplan, Inc.*, No. SA-17-CA-1122-FB (HJB), 2022 WL 18034365 (W.D. Tex. Oct. 18, 2022). This makes perfect economic sense, because Defendants' collective boycott of advertising on Twitter as a platform depresses the price of Twitter's advertising inventory generally (SAC ¶ 142), regardless of whether individual Defendants compete for a specific ad slot.

The SAC also alleges facts sufficient to establish both (i) one or more of the *Northwest Wholesale Stationers* factors or (ii) a violation under the rule of reason. The SAC adequately alleges Defendants' market power (or, more precisely, monopsony power, since this is a buyers' cartel case) in the relevant market, in the form of both direct and circumstantial indicia of power. Direct evidence of market power is pled through the allegation that the conspiracy "substantially" suppressed Twitter's prices (*id.*), an actual anticompetitive effect that would not be possible if the conspiracy did not affect much of the relevant market. *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001) (recognizing that actual anticompetitive effects suffice to also show market power in a boycott case under the rule of reason). Although Defendants

complain that a market-wide reduction in advertising prices was not alleged, that is not the effect that would be expected or needs to be shown in a case targeting a single firm for a buyer-side boycott and was not required by the Fifth Circuit in the similar *Tunica* case. Defendants' argument is like saying that if Coke and Pepsi colluded to boycott H-E-B, there would be no antitrust violation if prices to Whole Foods stayed the same. That makes no sense, and the SAC alleges facts from which a reduction in market-wide output could be inferred, as competing social media platforms are alleged to be selling advertising at higher prices (due to the lack of competition from X because of the boycott), which shows market-wide anticompetitive effects. SAC ¶¶ 142–43.[10]

The SAC also alleges circumstantial evidence of market power in the dominant collective market share held by the members of WFA in the relevant market and the collective market power of GARM members. *Id.* ¶¶ 40, 153. *See Spectators' Commc'n Network, Inc.*, 253 F.3d at 225 (explaining that "the reason for looking at market power is to determine whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market"). The market share of WFA's members is the right metric for measuring power in this case based on WFA's role in the conspiracy and the fact that GARM solicited the involvement of WFA members in the conspiracy. *Id.* ¶ 110. But the Court could also rely on the well-pleaded allegations of the collective market power of GARM members due to the membership of the Big Six advertising agencies in GARM and their influence throughout the advertising market. *Id.* ¶¶ 35, 40, 106, 139–40. GARM itself marketed its members' "collective power" and successfully used that "collective power" to advance its members' interests in negotiations with social media platforms. *Id.* ¶¶ 43–47. For example, in negotiations with another social media platform, GARM used its members' collective power as "a big stick" to effect changes in that platform's operations that GARM

---

[10] Defendants complain that allegations of higher prices charged by non-boycotted social media platforms are counterintuitive (MTD 31), but there is nothing counterintuitive about it. The straightforward implication is that boycotting advertisers shifted their dollars away from X to other social media platforms, increasing demand for the latter's advertising inventory and, thereby, increasing their prices. Indeed, this is what the FTC alleged in an enforcement action relating to two advertising agencies' roles in GARM. *See* Compl. ¶ 21, *In re Omnicom Grp. Inc. & The Interpublic Grp. of Cos., Inc.*, FTC File No. 251-0049 (June 23, 2025).

celebrated "as a significant win we forced." *Id.* ¶ 47. These allegations and others in the SAC plausibly suggest that GARM members had monopsony power, or the "power to force a [seller] to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (cleaned up).

The SAC plausibly alleges that the Defendants substantially foreclosed X's access to a critical input—advertising revenue—necessary to compete effectively in the social media market where X competes. *Id.* ¶¶ 91, 128, 155. Defendants argue that the boycott did not entirely foreclose Plaintiff's access to advertising revenue, but this is not the test. *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 295 n.6 (Group boycotts can be *per se* illegal even if plaintiff "has not been wholly excluded from access" to the relevant input.); *PLS.Com*, 32 F.4th at 835 (reversing dismissal on the pleadings of a group boycott claim that did "not completely cut off [plaintiff's] access to the inputs it needs"). And although the Defendants claim that there are legitimate justifications for the GARM Brand Safety Standards, they articulate no justification for the conspiracy actually challenged in the SAC, which is the boycott of Twitter to enforce adherence to the Brand Safety Standards. *See Allied Tube*, 486 U.S. at 501 n.6 ("Concerted efforts to enforce (rather than just agree upon) private product standards face more rigorous antitrust scrutiny.").

### 3.3    *The First Amendment Does Not Bar X's Boycott Claim.*

Defendants' First Amendment argument fails because it is aimed at a conspiracy not alleged in the SAC. Although Defendants claim that their conspiracy was motivated by politics, the SAC alleges a purely economic motivation for both the GARM Brand Safety Standards and for the boycott of X to enforce adherence to those standards. SAC ¶¶ 7, 62–64, 67. Unable to identify any allegation that the boycott was motivated by political or expressive ends rather than commercial ones, Defendants rely instead on a document outside the four corners of the SAC: the House Judiciary Committee report exposing their conspiracy. But X's citation to that Report, which is not attached as an exhibit to the SAC or to the Defendants' motion to dismiss, does not incorporate that document by reference, let alone the uncited portions of the Report, into the SAC. *Eller v. KBR, Inc.*, No. H-08-3495, 2009 WL 10714747, at *2 & n.1 (S.D. Tex. May 15, 2009) ("[A] plaintiff

may choose to incorporate by reference specific parts of a document, rather than the entire document.”). Unlike *the evidence* made public in that Report, which Plaintiff has relied on in support of its claims, *opinions* expressed by the Judiciary Committee—that is, *inferences* that the Committee drew from that evidence—are not central to X's antitrust claims and therefore may not be properly considered on a motion to dismiss. *See, e.g.*, *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) (“Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs' complaint *and* are central to her claim.”) (emphasis added). On a motion to dismiss the Court cannot choose the Defendants' preferred inferences (even if adopted from a third party) over the Plaintiff's. *Wood v. Bexar Cnty., Texas*, No. 22-50888, 2023 WL 3563012, at *1 (5th Cir. May 19, 2023) (“[E]ven when looking to such documents, a court is still bound to draw all inferences in favor of the plaintiff.”).

In any event, the First Amendment does not protect commercially motivated group boycotts that otherwise violate the Sherman Act, even those with an expressive component. *See FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 414, 430–31 (1990) (“*SCTLA*”). This is so because “a boycott (as with any mode of expression) designed to secure an unlawful objective is not protected by the First Amendment.” *Jews for Jesus Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 297 (2d Cir. 1992) (citing *SCTLA*). The cases cited by Defendants did not involve commercial restraints of trade. *See Nat'l Org. for Women v. Scheidler*, 968 F.2d 612, 621–23 (7th Cir. 1992) (Defendants were not “business competitors … making restraining arrangements for their own economic advantage.”), *rev'd on other grounds*, 510 U.S. 249 (1994); *Missouri v. Nat'l Org. for Women, Inc.*, 620 F.2d 1301, 1315 (8th Cir. 1980) (“[U]sing a boycott in a non-competitive political arena for the purpose of influencing legislation is not proscribed by the Sherman Act.”). Defendants' discussion of *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), is misleading. Contrary to Defendants' claim that the “Supreme Court rejected antitrust claims” in that case, the only claim before the Court was for a violent tort, and the Court's holding was that “peaceful political activity” was constitutionally protected. *Id.* at 913. *Claiborne Hardware* itself recognized that boycotts intended to “destroy legitimate competition” were outside the scope of that holding, and the

Supreme Court has subsequently distinguished *Claiborne Hardware* in antitrust cases on that same ground. *See SCTLA*, 493 U.S. at 425–28; *Allied Tube*, 486 U.S. at 508–09.

Any argument that the First Amendment immunizes even politically motivated boycotts from the antitrust laws is foreclosed by *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ("*FAIR*"). *FAIR* involved an association of law schools that sought to restrict on-campus military recruiting because they opposed military policy. *Id.* at 51. But they couldn't because a federal statute conditioned federal funding on access to military recruiters. The schools argued that the statute violated the First Amendment. The Court unanimously disagreed, holding that the statute "regulates conduct, not speech. It affects what law schools must *do*—afford access to military recruiters—not what they may say or may not *say*." *Id.* at 60 (court's emphasis). It emphasized that the First Amendment protects only "inherently expressive" conduct. *Id.* at 66. Barring military recruiters from law school campuses did not satisfy that test because the law schools' actions "were expressive only because [they] accompanied their conduct with speech explaining it." *Id.* The need for such explanatory speech took the conduct outside the "inherently expressive" category because "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

Just as defendants can't claim a First Amendment exemption from other laws of general application governing their conduct—*e.g.*, laws against race discrimination—they can't claim such an exemption from the antitrust laws. The Sherman Act, like the statute in *FAIR*, regulates conduct, not speech. It bars horizontal competitors from agreeing to, as in this case, refuse to do business with a supplier. Such a boycott—a refusal to *act*—has no expressive content of its own. It could be undertaken for many reasons; only the accompanying, explanatory speech would have expressive content and be protected under the First Amendment. But the boycott *qua* boycott would not. *See* Eugene Volokh, *The First Amendment and Refusals to Deal*, 54 U. Pac. L. Rev. 732 (2023).

Defendants' suggestion that X's claims would, if accepted, result in compelled commercial speech by the Advertising Defendants is specious. The Prayer for Relief seeks an injunction prohibiting (and damages because of) concerted action boycotting X, not an order mandating any

individual Defendant to buy advertising. Each Defendant was free not to advertise on X; they are prohibited by the Sherman Act from agreeing with their competitors not to do so.

### 3.4    X has Plausibly Alleged an Unlawful Information Exchange Agreement.

In addition to their agreement to boycott Twitter, Defendants separately violated § 1 by agreeing to exchange information through GARM relating to that and other boycotts. Although information exchanges are sometimes used as evidence of another, typically *per se* unlawful, agreement, "[t]here is a closely related but analytically distinct type of claim, also based on § 1 of the Sherman Act, where the violation lies in the information exchange itself[.]" *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001). Agreements to exchange information are evaluated under the rule of reason. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).

The information exchange claim relates to GARM's surveys conducted of its members' willingness to boycott social media platforms. The SAC alleges three such surveys intended to facilitate a boycott. SAC ¶¶ 78, 85, 110.[11] For example, during the period immediately after WFA triggered the boycott of Twitter in 2022, GARM surveyed WFA and GARM members of their willingness to buy advertising from Twitter, and widely disseminated the results, with the purpose and effect of facilitating the boycott of Twitter. *Id.* ¶¶ 110, 125, 163.

GARM's surveys constitute concerted action, an agreement to exchange information. Competitors engage in concerted action through the reciprocal act of sharing material information. *United States v. Container Corp. of Am.*, 393 U.S. 333, 335 (1969). Surveys of competitors, even when conducted by a third party, have commonly been treated as agreements among the parties to the survey under Section 1. *Todd*, 275 F.3d at 198–99; *Greenhaw v. Lubbock Cnty. Beverage Ass'n*, 721 F.2d 1019, 1031 (5th Cir. 1983) ("Of course, active exchange of information establishes participation in an agreement or conspiracy."), *overruled on other grounds by Int'l Woodworkers of Am., AFL-*

---

[11] Just as the threatened boycott of Spotify in 2022 and its commonalities with the boycott of Twitter that followed later that year shows that GARM would commonly use, or threaten to use, public statements to trigger boycotts of non-compliant media platforms, its frequent use of member surveys to facilitate boycotts once GARM had issued its interdict is another idiosyncratic aspect of its distinctive *modus operandi* detailed in the SAC.

*CIO & Its Loc. No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174, 1181 n.8 (5th Cir. 1986).

The SAC plausibly alleges that the Defendants' information exchanges harmed competition in the relevant market by facilitating a boycott of Twitter by competing purchasers in that market. Specifically, the SAC alleges that the Advertiser Defendants were constrained by competitive uncertainty about one another's decision making regarding their purchases of advertising from Twitter, and that their exchanges of information ameliorated this uncertainty, giving the Advertiser Defendants confidence to engage in the anticompetitive conduct that injured X. SAC ¶ 163. The well-pleaded factual allegations of the SAC make this plausible. Ørsted contacted GARM on November 4, 2022, just five days after WFA and GARM triggered the boycott with their October 31 public invitations to boycott Twitter, asking GARM about "a possible boycott from many companies." *Id.* ¶ 111. GARM responded that it was conducting a "a survey to some of our members to gauge their perceptions on the issue." *Id.* ¶ 116. Ørsted then asked twice more for the survey results, explaining to GARM that it needed the results to make a recommendation to Ørsted's management about joining the boycott. *Id.* ¶¶ 117–18. The survey results were then discussed on a widely attended conference call among GARM members held on December 8, 2022, attended by senior executives of GARM members with responsibility for buying advertising. *Id.* ¶¶ 120, 125. That same month the Advertiser Defendants completed their lockstep elimination of purchases from Twitter. *Id.* ¶ 138.

These allegations, coupled with the allegations that GARM had used similar surveys to facilitate boycotts in the past, all against the backdrop of the well-pleaded allegations that GARM's core mission was to organize such boycotts to promote its members' collective economic interests, comfortably support the inference that the survey relating to Twitter in 2002 was intended to facilitate a boycott of Twitter and that the boycott survey did so. These allegations of actual anticompetitive effects from the boycott survey, coupled with the SAC's allegations of the collective market power of the Defendants acting through GARM, are more than enough to plausibly allege that the boycott survey was an unreasonable restraint under Section 1. *See Spectators' Commc'n Network, Inc.*, 253 F.3d at 225 & n.4 (recognizing that proof of actual anticompetitive effects creates a triable rule of

reason boycott claim).

Although Defendants argue that the SAC does not allege the specifics of the information exchange or how the information was used by individual GARM members to facilitate a boycott of Twitter (MTD 38), a survey taken to facilitate a boycott need involve only the exchange of the participants' willingness to refuse to deal with the boycott target, which is what the SAC alleges. SAC ¶¶ 110, 116. *See SourceOne Dental, Inc. v Patterson Cos., Inc.*, 310 F. Supp. 3d 346, 364-65 (E.D.N.Y. 2018) (denying summary judgment on claim that exchange of information relating to plans to attend a trade show facilitated a group boycott of that trade show). The survey was conducted and its results disseminated during the two-month period in late 2022 when the Advertiser Defendants eliminated their purchases of advertising from Twitter worldwide or in the U.S. SAC ¶¶ 137–38. While Defendants argue that the survey occurred too late to influence the purchasing decisions of GARM members, Ørsted's repeated, urgent requests for the survey results in November because it needed them to make a recommendation to management suggests that no decision had been made at least by Ørsted as of that date. *Id.* ¶¶ 117–18. Nor is there any basis to infer that the survey results were shared with GARM members for the first time on December 8, as the SAC alleges that the survey was complete by November 14, 2022, and it is plausible to infer that the survey results could have been shared with Ørsted (and other Advertiser Defendants) as early as November 17, 2022, on an undocumented phone call apparently held that day. *Id.* ¶¶ 110, 117. It is also irrelevant when each participant in the information exchange first made the decision to boycott Twitter; what matters is that the information exchange gave them increased confidence in making that decision or if, having made it, sticking to it. *See PLS.Com*, 32 F.4th at 842-43; *SourceOne Dental*, 310 F. Supp. 3d at 364-65. These factual disputes cannot be resolved against X on the pleadings.

Defendants claim that X does not allege "what information was sought or provided, whether any survey results were circulated or to whom, or what anyone did with any survey data." (MTD 38.) Each one of these statements is false. The SAC alleges what information was sought, namely "information relating to the plans that these competing advertisers had with respect to purchasing advertising from Twitter in light of [Elon] Musk's acquisition of the company." SAC ¶ 110. The

SAC alleges that the survey results were circulated no later than December 8, 2022, on a widely attended call of GARM members represented by senior executives with responsibility for buying advertising, precisely the participants that would be required in an information exchange intended to facilitate a boycott. *Id.* ¶¶ 120, 125. And the SAC alleges that Ørsted at least wanted the survey results so that it could make a management recommendation as to joining the "boycott of many companies" (*id.* ¶ 110) that it seemed to think GARM had ordered just days earlier, that GARM identified the boycott survey as being relevant for this purpose (*id.* ¶ 116), and that Ørsted then boycotted Twitter in parallel with the other Advertiser Defendants. It is plausible to infer from this that the survey results were used to facilitate a boycott.

While X has not had any discovery into which Defendants contributed to the survey or received its results, the allegations in the SAC show that GARM, Ørsted, and other GARM members all thought the survey results were an important consideration in the decision of GARM-member advertisers to join the boycott. SAC ¶¶ 111–20, 125. "The courts have recognized that the nature of conspiracies often makes it impossible to provide details at the pleading stage and that the pleader should be allowed to resort to the discovery process and not be subjected to a dismissal of his complaint.'" *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 632 (5th Cir. 1999) (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1233, at 257 (Supp. 1999)).[12] It is sufficient at the pleading stage that the SAC alleges facts that support the plausible inference from Ørsted's emails to GARM and otherwise that Ørsted and other boycott participants were willing to boycott Twitter as instructed by GARM but needed assurance that a critical mass of GARM members would be doing the same, and that the survey was intended to and did give participants that confidence. This states a claim for an unlawful information exchange agreement.

### 3.5    *X has Standing Under the Clayton Act.*

Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, provide a private right of action for

---

[12] The current version of Wright & Miller makes the same point. 5 Fed. Prac. & Proc. Civ. § 1233 (4th ed.) ("The federal courts have recognized that the nature of conspiracies often makes it impossible for the plaintiff to provide details at the pleading stage and that the pleader should be allowed to resort to the discovery process and not be subjected to a dismissal of his complaint.").

damages and injunctive relief for violations of the Sherman Act. Antitrust standing under Section 4 of the Clayton Act requires that the plaintiff suffer (i) an injury in fact and (ii) an antitrust injury and (iii) be an efficient enforcer of the antitrust laws. *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). Defendants contest only antitrust injury.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Doctor's Hosp. of Jefferson, Inc.*, 123 F.3d at 305 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). In analyzing antitrust injury, the Fifth Circuit assumes that an antitrust violation has occurred and then asks whether the plaintiff's injury in fact from that assumed violation would be an antitrust injury. *Id.* at 306. Under this approach, there is no requirement to show harm to competition under the anti-trust injury prong of antitrust standing; that showing is required, if at all, only as a component of substantive liability. *Id.* at 305–06 ("[T]he antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing.").

The group boycott of X easily constitutes antitrust injury. *Id.* (Group boycott claims "fall easily within the conceptual bounds of antitrust injury[.]"); *see also IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 60, 64–65 (2d Cir. 2019) (finding that a plaintiff "is entitled to conduct its business in a market that is not infected with an anticompetitive distortion [such as a group boycott]" and that "this is the type of injury the antitrust laws were designed to prevent"); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) (Plaintiffs "suffer an antitrust injury as the direct targets of the boycott."); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 751–53 (10th Cir. 1999) (victim of group boycott among competing purchasers suffers an antitrust injury). Because the effects on X of the information exchange claim are the same as those of the group boycott claim, X has suffered an antitrust injury from the information exchange as well.

### 3.6    *The SAC Does Not Rely on Group Pleading.*

Like most of Defendants' arguments, their group pleading arguments ignore the actual allega-tions of the SAC, which allege with specificity each Defendant's involvement in the conspiracy and the overt acts taken by each to further the conspiracy. *See supra* note 6. The SAC refers to the

39

collective "Defendants" or "Advertiser Defendants" only as appropriate and for expositional clarity. *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018) ("Because the Amended Complaint alleges each Defendant's participation separately, it is not impermissible group pleading to refer to their collective actions in furtherance of the conspiracy using a more general phrase such as 'the Prime Broker Defendants.'"). Grouping related corporate affiliates (*e.g.*, Lego A/S and Lego Brand Retail) under a more generic cognomen (*e.g.*, Lego) is similarly proper when the actions of each corporate affiliate are separately identified, as they are here. *Id.* Defendants complain that the SAC does not specify the members of the GARM Working Groups that promulgated the GARM Brand Safety Standards, but setting aside that information is in the Defendants' possession, it also misses the point, since the conspiracy that X alleges violated the Sherman Act is not the promulgation of standards but the boycotting of Twitter.

## CONCLUSION

The Defendants' motions to dismiss for failure to state a claim should be denied. Were the Court to disagree, which X respectfully submits it should not, X respectfully requests leave to replead substantively for the first time with the benefit of the Court's guidance.


Dated: July 28, 2025

                                  Respectfully submitted,


                                   */s/ John C. Sullivan*
                                   John C. Sullivan
                                     Texas Bar No. 24083920
                                     john.sullivan@the-sl-lawfirm.com
                                   Jace R. Yarbrough
                                     Texas Bar No. 24110560
                                   jace.yarbrough@the-sl-lawfirm.com
                                   S|L Law PLLC
                                   610 Uptown Boulevard, Suite 2000
                                   Cedar Hill, TX 75104
                                   Phone: (469) 523-1351

                                   Christopher G. Renner (*pro hac vice*)
                                   D.C. Bar No. 1025699

cgrenner@dhillonlaw.com
Jonathan M. Shaw (*pro hac vice*)
  Virginia Bar No. 98497
  jshaw@dhillonlaw.com
Andrew K. Mann (*pro hac vice*)
  Virginia Bar No. 77021
  akmann@dhillonlaw.com
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

*Attorneys for Plaintiff X Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

*/s/ John C. Sullivan*
John C. Sullivan