UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| X CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 7:24-CV-0114-B |
| | § | |
| WORLD FEDERATION OF | § | |
| ADVERTISERS; MARS, | § | |
| INCORPORATED; CVS HEALTH | § | |
| CORPORATION; ØRSTED A/S; | § | |
| TWITCH INTERACTIVE, INC.; NESTLÉ | § | |
| S.A.; NESTLE USA, INC.; ABBOTT | § | |
| LABORATORIES; COLGATE- | § | |
| PALMOLIVE COMPANY; LEGO A/S; | § | |
| LEGO BRAND RETAIL, INC.; | § | |
| PINTEREST, INC.; TYSON FOODS, | § | |
| INC.; SHELL PLC; SHELL USA, INC.; | § | |
| and SHELL BRANDS INTERNATIONAL | § | |
| AG, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Three categories of motions are before the Court. First are five motions to dismiss for lack of personal jurisdiction and/or venue filed by the World Federation of Advertisers ("WFA") (Doc. 132), Shell Brands International AG ("Shell International") (Doc. 142), Lego A/S (Doc. 145), Nestlé S.A. (Doc. 163), and Ørsted Services A/S (Doc. 210). Plaintiff X Corp. filed a consolidated response to most of these motions (Doc. 194) and a separate response to Ørsted Services's motion (Doc. 215). The movants have each filed separate replies (Docs. 216, 217, 218, 224, and 230). Relevant to these motions is X's contingent motion for jurisdictional discovery (Doc. 200) and a response (Doc. 214) and reply (Doc. 226) thereto. The Court **DENIES** the motion to dismiss filed by WFA (Doc. 132).

The Court **GRANTS** the motions to dismiss filed by Shell International (Doc. 142), Lego A/S (Doc. 145), Nestlé S.A. (Doc. 163), and Ørsted Services (Doc. 210). The Court **DISMISSES** the case as to Shell International, Lego A/S, Nestlé S.A., and Ørsted Services without prejudice. The Court **DENIES** X's contingent motion for jurisdictional discovery (Doc. 200).

The second category of motions includes a motion to transfer (Doc. 178) and a conditional motion to sever some of the defendants prior to transfer (Doc. 190). The motion to transfer was filed by Abbott Laboratories ("Abott"), CVS Health Corporation ("CVS"), Colgate-Palmolive Company ("Colgate"), Lego Brand Retail, Inc. ("Lego Brand"), Mars, Inc., Nestle USA, Inc., and Pinterest, Inc. X has filed a response (Doc. 197), and the movants have filed a reply (Doc. 221). X has also filed a sur-reply (Doc. 241), to which the movants responded (Doc. 247). Related to the motion to transfer, X also sought leave to file additional supplemental evidence (Doc. 244). The motion to sever (Doc. 190) was filed by Lego A/S, Nestlé S.A., and Shell International. The motion to transfer (Doc. 178) is **DENIED**. The motion to sever (Doc. 190) and the motion for leave to file supplemental evidence (Doc. 244) are **DENIED AS MOOT**.

The final category is just one motion: a motion to dismiss for failure to state a claim filed by all Defendants (Doc. 160). X has responded (Doc. 196), and Defendants have replied (Doc. 223). Defendants also submitted supplemental authority (Doc. 242), to which X has responded (Doc. 243). The Court **GRANTS** the motion to dismiss for failure to state a claim (Doc. 160) as to all defendants not already dismissed for lack of jurisdiction. X's case as to those remaining defendants is **DISMISSED WITH PREJUDICE**. A final judgment will follow.

# I.

# BACKGROUND

X operates the social media platform formerly known as Twitter. Defendants include foreign and domestic companies that advertise their products online, as well as a global non-profit organization through which marketers pursue their collective interests. This case is about Defendants' alleged conspiracy to boycott advertising on X's platform through an initiative called the Global Alliance for Responsible Media ("GARM").

## A.    *The Parties*

X is a Nevada corporation with its principal place of business in Bastrop, Texas. Doc. 77, Second Am. Compl. ¶ 10. X merged with Twitter, Inc. in April 2023 and is Twitter's successor in interest. *Id.* After some additions and subtractions, the case now involves the below fourteen defendants—five are foreign, and nine are domestic.

### 1.    The Five Foreign Defendants

The first foreign defendant is WFA, which is an international non-profit organization "representing the common interests of marketers" worldwide. *See id.* ¶¶ 11–12. WFA is "dominated and controlled by competing advertisers and is dedicated to promoting their collective economic interests." *Id.* ¶ 12. WFA is organized under the Belgian Companies Code and has its headquarters in Belgium. *Id.* ¶ 11. It also has an office in New York City. *Id.* GARM was a WFA initiative that reported to WFA's Executive Committee. *Id.* The senior WFA executive who co-founded and led GARM (Rob Rakowitz), WFA's President, and its Deputy President all live and work in the United States. *Id.*

Second, Shell International is "responsible for development and licensing of the Shell trademark and is incorporated and headquartered in Switzerland." *Id.* ¶ 23. Shell International is a wholly owned subsidiary of parent company Shell plc, which is an English oil and gas company. *Id.* Shell plc (but not Shell International) was a founding member of GARM. *See id.* Shell International is a WFA member and pays its annual subscription fee to WFA's Belgian bank account. *See* Doc. 144, App. Shell PLC's Mot. Dismiss, Ex. B, Aragon Decl. ¶ 3. In 2020, Shell International paid one invoice for GARM's operating budget to WFA's Belgian bank account. *See id.* ¶ 4. Shell International was also a leader on the Association of National Advertisers Global CMO Growth Council (the "ANA Council"), which co-founded GARM with WFA. *See* Doc. 77, Second Am. Compl. ¶ 37. Shell International has no employment contracts with anyone in the United States, has no offices in the United States, has no bank accounts in the United States, and owns no tangible assets in the United States. *See* Doc. 143, Shell Int'l's Br. Mot. Dismiss, 2–3 (citing declarations provided in appendix).

Third, Lego A/S is a toy and game manufacturer that is incorporated and headquartered in Denmark. Doc. 77, Second Am. Compl. ¶ 20. Lego A/S allegedly directed the anticompetitive conduct of its co-defendant and "indirect, wholly owned subsidiary" Lego Brand. *Id.* An unknown Lego entity became a GARM member no later than June 2022. *Id.* (identifying Lego A/S as GARM member); *see* Doc. 194, Consol. Resp., 5 (citing appendix) (presenting evidence that unknown Lego entity was GARM member); Doc. 147, App. Lego A/S's Mot. Dismiss, Ex. 2, Soriano Decl. ¶ 3 (denying Lego A/S's involvement in WFA or GARM). An unknown Lego entity was also a leader on the ANA Council. Doc. 77, Second Am. Compl. ¶ 37. Lego A/S does not conduct business or

have offices, employees, or any physical presence in the United States. *See* Doc. 146, Lego A/S's Br. Mot. Dismiss, 2 (citing declaration in appendix).

Fourth, Nestlé S.A. manufactures consumer products and is incorporated and headquartered in Switzerland. Doc. 77, Second Am. Compl. ¶ 17. Nestlé S.A. allegedly directed the anticompetitive conduct of its co-defendant and "indirect, wholly owned subsidiary" Nestle USA. *Id.* An unknown Nestle entity was a founding member of GARM, and an employee for an unknown Nestle entity sat on WFA's Executive Board. *See id.*; Doc. 195, App. Consol. Resp., Ex. A, Renner Decl. ¶¶ 5–6. Nestle USA (but not Nestlé S.A.) had an employee on the ANA Council. Doc. 195, App. Consol. Resp., Ex. A, Renner Decl. ¶ 8. An unknown global Nestle entity recommended to its corporate affiliates (including Nestle USA) that X, as a "high-risk platform," was "presumptively unsuitable for the purchase of advertising." *See* Doc. 77, Second Am. Compl. ¶ 141 (alleging Nestlé S.A. was the responsible entity); Doc. 195, App. Consol. Resp., Ex. I, Tenreiro-Braschi Decl. ¶¶ 3– 4 (describing meeting with unknown Nestle entity's employee who oversees "global brand safety efforts"); Doc. 225, Jampen Decl. ¶¶ 3, 5 (denying that employee who met with X was officer or employee of Nestlé S.A.). Nestlé S.A. does not have offices or employees in the United States and does not directly advertise, market, contract, manufacture, or sell anything in the United States. *See* Doc. 164, Nestlé S.A.'s Br. Mot. Dismiss, 2 (first citing declaration provided in appendix; then citing *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 502 (D. Del. 2017)).

Fifth, Ørsted Services is a Danish corporation with its principal place of business in Denmark. Doc. 211, Ørsted Servs.'s Br. Mot. Dismiss, 2.[1] Ørsted Services does not transact any business in Texas. *See id.* at 3. Ørsted Services has conceded that it is subject to the personal jurisdiction of New York state courts because its employees sent emails to WFA employees there. *See id.* at 11–12.

Unlike Ørsted Services, the other four foreign defendants have not identified any U.S. state in which they would be subject to personal jurisdiction.

2.    The Nine Domestic Defendants

The first domestic defendant is Abbott, which "manufactures and sells pharmaceutical and other health care products." Doc. 77, Second Am. Compl. ¶ 18. Abbott is incorporated and headquartered in Illinois and became a GARM member no later than June 2022. *Id.*

Second, CVS "provides health services, including health insurance, pharmacy, and clinical services." *Id.* ¶ 15. CVS is incorporated in Delaware and headquartered in Rhode Island, and it became a GARM member no later than June 2022. *Id.*

Third, Colgate "manufactures and sells consumer products including toothpaste and soap." *Id.* ¶ 19. Colgate is incorporated in Delaware and headquartered in New York, and it became a GARM member no later than June 2022. *Id.*

Fourth, Lego Brand—co-defendant Lego A/S's indirect, wholly owned subsidiary—is incorporated and headquartered in Connecticut. *Id.* ¶ 20.

---

[1] The Second Amended Complaint originally named Ørsted Services's parent company, Ørsted A/S, as a defendant. *See* Doc. 77, Second Am. Compl. ¶ 13. While briefing for the motions to dismiss was underway, X and the Ørsted entities jointly moved to substitute Ørsted A/S with Ørsted Services. *See* Doc. 193, Joint Mot. The Court granted the motion and gave Ørsted Services its own briefing schedule for Rule 12 motions. *See* Doc. 203, Order, 1.

Fifth, Mars sells consumer products and services, and it is incorporated in Delaware and headquartered in Virginia. *Id.* ¶ 14. Mars was a founding member of GARM, sat on GARM's "Steer Team," and is represented on WFA's Executive Board. *Id.*

Sixth, Nestle USA—co-defendant Nestlé S.A.'s indirect, wholly owned subsidiary—is incorporated in Delaware and headquartered in Virginia. *Id.* ¶ 17.

Seventh, Pinterest operates its own social media platform whereon it sells advertising space. *Id.* ¶ 21. Pinterest also advertises its platform on other social media platforms. *Id.* Pinterest is headquartered in California and incorporated in Delaware, and it became a GARM member in October 2020. *Id.*

The above seven domestic defendants have moved to transfer the case. The last two domestic defendants, Shell USA, Inc. and Tyson Foods, Inc. ("Tyson"), have not moved for transfer but do not oppose it. *See* Doc. 179, Br. Mot. Transfer, 1 n.1. Shell USA—an affiliate and co-defendant of Shell International—is incorporated in Delaware and headquartered in Houston, Texas. Doc. 77, Second Am. Compl. ¶ 23. Tyson "produces and sells food products"; is headquartered in Arkansas and incorporated in Delaware; and became a GARM member no later than June 2022. *Id.* ¶ 22.

B.    *Social Media, Advertising, and GARM*

Like many social media platforms, X's platform is free to use for consumers. *See id.* ¶ 91. Consumers use X's platform to publish posts containing text, photos, and videos and/or to view and interact with others' posts. *Id.* ¶ 33. X distinguishes itself from its competitors "in the degree to which consumers use its platform to keep up to date with news, live events, issues of public policy, and other current affairs." *Id.* ¶ 34.

Though they might log into X for updates on current events, X's consumers also occasionally see paid advertisements in their feed of sequential posts. *Id.* ¶ 33. Those advertisements are how social media companies like X generate substantial portions of their revenue. *See id.* ¶ 91. X sells digital display advertising space directly to advertisers and also to agencies that purchase advertising space for clients. *Id.* ¶ 35. Like other social media companies, X auctions its advertising inventory to advertisers, who compete to be able to display their ads to particular users. *Id.* ¶ 151.

Online advertisers, because their advertisements appear sequentially with other content, care about the standards used by social media companies to moderate content. *See id.* ¶ 63. At first, an advertiser would negotiate individually with each social media company to "customize the reach of its ads and to avoid unwanted content." *Id.* But "[s]ome . . . advertisers found these individualized negotiations to be unsatisfying and costly." *Id.* "[A]cting unilaterally and in uncoordinated rivalry with one another," the advertisers were unable to force social media platforms to adopt their desired outcomes for advertisement-adjacent content. *Id.* ¶ 44.

Confronting this collective action problem, WFA (along with some of its members and the ANA Council) founded the GARM initiative. *Id.* ¶¶ 36–37. GARM's purpose was "to leverage the collective market power of its advertiser members to advance their economic interests by forcing changes to the business operations of digital media and social media platforms that sell advertising inventory to GARM members or to their clients." *Id.* ¶ 43. To further advertisers' economic interests, GARM's central aim was "to remove harmful content from advertiser-supported media." *Id.* ¶ 45.

Although GARM included social media platforms, it was "dominated and controlled by advertisers, who used it to advance their collective economic interests." *Id.* ¶ 41. GARM was governed by its Steer Team, which "included and represented the world's largest advertisers." *Id.*

¶ 39. To "avoid conflicts of interest," social media platforms were excluded from the Steer Team. *Id.* ¶ 41.

Rob Rakowitz, who co-founded GARM, works in WFA's New York office. *Id.* ¶ 38. As GARM's "Initiative Lead," Rakowitz "was part of every significant decision made by GARM." *Id.* Rakowitz was supervised by the Steer Team and would consult the Steer Team before "'hav[ing] a conversation around policy and enforcement and consistency' with a GARM member." *Id.* ¶ 39.

C.     *GARM's Brand Safety Standards and Enforcement*

As part of its work, GARM promulgated "brand safety standards" that would provide a common framework for all social media platforms to follow. *See id.* ¶¶ 48–65. Developed by GARM-member working groups, the standards categorized objectionable social media content as either completely unsuitable for appearing next to advertisements or as suitable for appearing next to advertisements only with advertiser consent. *See id.* ¶¶ 50, 53. GARM also established a system for monitoring social media platforms' adherence to its standards and reporting noncompliance. *See id.* ¶ 54.

The ANA Council and its members endorsed the brand safety standards and promoted their wide adoption and enforcement. *Id.* ¶¶ 58–61. GARM and the ANA Council would exchange information with each other regarding their efforts to "forc[e] social media platforms to adopt, implement, and adhere to" the brand safety standards. *Id.* ¶ 61. Forcing these changes shifted costs from advertisers—which previously had to individually negotiate where their advertisements would be placed on social media—to social media platforms in a way that was not necessarily in the platforms' or their users' best interests. *Id.* ¶¶ 63–64.

Adopting and enforcing the standards was stated as a requirement of GARM membership. *Id.* ¶ 66. In its published response to the "frequently asked question" "Who can join GARM?," GARM conveyed that "[a]ny advertiser, media agency, and media platform" could join so long as it was "willing to align with our charter" and "agree to adopt GARM solutions to improve business operations." *Id.* ¶ 68. GARM membership applications explained that members "must 'agree to work with industry partners and category peers in a collaborative, non-competitive way, actively support GARM's charter, and agreement [*sic*] to make commensurate changes to business operations in pursuit of GARM's goals.'" *Id.* ¶ 73. Once advertisers became members, GARM instructed them to consider a platform's compliance with the brand safety standards and urged them to purchase more advertising from compliant platforms. *Id.* ¶ 76.

The GARM advertiser members that signaled their agreement to follow these exhortations did so in different ways. CVS publicly announced that it would only pay to place advertisements on platforms that comply with the brand safety standards. *Id.* ¶ 80. Pinterest allowed GARM to tell its members that the standards had received Pinterest's "Executive Endorsement." *See id.* ¶ 81. Mars, an unidentified Nestle entity, Ørsted Services, and other GARM members told X that compliance with the brand safety standards and GARM's internal processes "are conditions precedent to [their] purchase of advertising from X." *Id.* ¶ 83.

GARM members also "would, from time to time, bring suspected deviations" by advertising platforms to GARM's attention for it to investigate. *Id.* ¶ 84. In some conversations with platforms, GARM would "threaten to communicate to its advertiser and advertising agency members that the media platform is not complying with the Brand Safety Standards." *Id.* ¶ 87. Advertiser members

commonly looked to GARM's determinations of compliance to decide whether to reduce or discontinue purchasing from a platform. *Id.* ¶ 86.

X's Second Amended Complaint provides three examples of GARM's pressure on platforms. First, when Meta (another social media company) announced changes to its manner of reporting to advertisers where on the platform advertisements were appearing, Rakowitz celebrated the "significant win we forced." *Id.* ¶¶ 46–47.

Second, GARM members including CVS and Mars boycotted Meta and Twitter until the two social media companies "agreed in discussions with the GARM Steer Team to adhere to the Brand Safety Standards." *Id.* ¶ 85. "WFA facilitated this boycott by surveying WFA members about their willingness to boycott these social media platforms and disseminating the results of this survey to its members." *Id.*

Third, Coca-Cola contacted GARM to ask its views on "a possible boycott of Spotify" (an audio streaming service that sells advertising space) due to Spotify publishing a podcast promoting supposed misinformation. *Id.* ¶ 88; *see* Doc. 77-2, Second Am. Compl. Ex. B, at App. 83. In a back-and-forth email chain with Spotify, Rakowitz wrote that GARM was "gravely concerned about the lack of fundamental policies and decision making at your platform," that GARM had "held back on press commentary on this incident out of deference," but that GARM would eventually "comment with what we're able to glean." Doc. 77, Second Am. Compl. ¶ 90; *see* Doc. 77-3, Second Am. Compl. Ex. C, at App. 39–40.

D.      *The Alleged Conspiracy to Boycott X*

After Elon Musk acquired Twitter in 2022, WFA—concerned that the platform would no longer follow the brand safety standards—issued a public letter to Musk. Doc. 77, Second Am.

Compl. ¶¶ 93, 96. In the letter, WFA wrote that it expected Twitter to "uphold its previous commitments to GARM and continue to engage with GARM." *Id.* ¶ 96. The letter also said:

> We are monitoring Twitter's actions, such as setting up a content moderation review panel, and assessing their design, governance, and potential to improve implementation of digital media safety best practice. We will share these views with members, as we have with previous events.
>
> GARM members will continue to leverage such insights as part of their own independent assessments and decision-making processes.

*Id.* The same day, Rakowitz posted on Twitter, addressing Musk with a similar message made "on behalf of" GARM. *Id.* ¶ 97. According to X, WFA's letter and Rakowitz's post were implicit signals to begin the boycott. *See id.* ¶¶ 99–103.

WFA's and Rakowitz's public statements touched off a flurry of GARM-member advertising agencies recommending that their clients suspend paid advertising on Twitter. *Id.* ¶ 104. Abbott, Colgate, Mars, Nestle USA, at least one Shell entity, and Tyson received one such recommendation from their GARM-member advertising agency and refrained from purchasing advertising on Twitter. *Id.* ¶ 106.

Shortly after the public statements, Rakowitz and GARM started investigating Twitter and advertisers' willingness to advertise on it. Rakowitz emailed Twitter questions about brand safety from GARM's Steer Team and hinted at "calls for boycotts and counter-boycott." *Id.* ¶ 108. GARM's Steer Team developed an assessment of Twitter that noted concerns with adherence to the brand safety standards. *Id.* ¶ 109. GARM's Steer Team also surveyed WFA- and GARM-member advertisers and advertising agencies to assess their plans to purchase advertising from Twitter. *Id.* ¶ 110. Rakowitz shared the survey results with WFA Executive Committee members and widely among GARM members. *Id.*

While the investigation was ongoing, Ørsted Services employees reached out to GARM for its views on boycotting Twitter and signaled readiness to act according to GARM's recommendation, so long as other advertisers would be doing the same. *See id.* ¶¶ 111–20. A WFA employee assisted in fielding Ørsted Services's request for information. *See id.* ¶ 119.

Twitter, GARM, and WFA met in December 2022 to attempt to reconcile their differences at a meeting that was also attended by representatives from Mars and a Nestle entity. *Id.* ¶ 123. Before the meeting, WFA "prepared to expel Twitter from GARM if its demands were not met in a timeframe acceptable to GARM." *Id.* ¶ 122. Those demands included responding to requests within three days, demonstrably supporting the brand safety standards, and regularly participating in working groups. *Id.* After the meeting, WFA issued a public statement signaling cooperation between GARM's Steer Team and Twitter, followed by another public statement summarizing the steps Twitter had agreed to take to implement the brand safety standards. *Id.* ¶ 124, 126.

But that seemingly positive meeting did not end the boycott. *See id.* ¶ 124. Rather, the boycott exists to this day because "GARM never rescinded its recommendation to GARM-member advertisers and advertising agencies to refrain from purchasing advertising on Twitter, now X." *Id.* ¶ 141.

Since the boycott began, Abbott, Mars, Tyson, Colgate, Pinterest, and CVS substantially decreased or eliminated their advertising purchases from Twitter/X. *Id.* ¶ 138. The Shell entities, Nestle entities, and Lego entities purchased little or no advertising from X's platform after the boycott began. *Id.* Ørsted Services was interested in continuing advertising on Twitter; reached out to GARM for its latest recommendation, noting GARM's prior "recommendations" not to advertise

on Twitter; and ultimately cited concerns with adherence to GARM's brand safety standards when it decided not to resume advertising. *See id.* ¶¶ 131–35.

Instead of buying from X, "GARM-member advertisers and advertising agencies are paying above competitive levels for advertising inventory purchased from social media platforms deemed by GARM to be adhering to the GARM Brand Safety Standards, including from Defendant Pinterest." *Id.* ¶ 143.

As a result of the boycott, X's existing customers "ceased or curtailed their purchases of advertising from X, and new customers were deterred or restrained from purchasing from X, leading to lost revenue and profit for X and diminishing its equity value and goodwill." *Id.* ¶ 154. The price remaining customers (who are unaffiliated with GARM) are willing to pay for advertisements has also declined. *Id.* X "has become a less effective competitor to other social media companies in the sale of digital advertising and in competing for user engagement on its platform." *Id.* ¶ 155. Because it has less revenue, X also is unable to "invest in new or improved functionality, thus harming the consumers who use X's platform." *Id.*

To remedy this harm, X filed this case asserting two claims for group boycott of its platform and information exchange to further the boycott conspiracy, both in violation of the Sherman Act, 15 U.S.C. § 1. *See id.* ¶¶ 156–65.

## II.

## LEGAL STANDARDS

A.      *Personal Jurisdiction and Venue*

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss an action for lack of personal jurisdiction. In the face of a Rule 12(b)(2) challenge, the plaintiff bears the

burden to establish that personal jurisdiction is proper. *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014) (citation omitted). When a court rules on a 12(b)(2) motion without an evidentiary hearing, the party invoking the court's jurisdiction can satisfy its burden with "sufficient facts as to make out only a *prima facie* case supporting jurisdiction." *Nunes v. NBCUniversal Media, LLC*, 582 F. Supp. 3d 387, 394 (E.D. Tex. 2022) (quoting *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000)). The Court considers "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery" and resolves any factual conflict contained in the parties' submissions in the plaintiff's favor. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citation omitted); *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).

Under Federal Rule of Civil Procedure 12(b)(3), a defendant may move to dismiss an action for improper venue. As with a 12(b)(2) motion, the plaintiff bears the burden to prove that the chosen venue is proper and "may carry its burden by presenting facts that, taken as true, would establish venue." *See TGM Wind Servs., LLC v. Bartusek*, No. 3:16-CV-01007-N, 2016 WL 9527980, at *1 (N.D. Tex. Sept. 22, 2016) (Godbey, J.) (citation omitted).

B.    *Transfer*

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). To transfer a case, the movant must show "good cause," which includes that it "satisfy the statutory requirements" and "clearly demonstrate" that transfer promotes convenience and justice. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008). Before comparing forums, the threshold statutory requirement

is that the lawsuit "might have been brought" in the proposed transferee forum. *Maxell, Ltd. v. Coretronic Corp.*, No. 5:24-CV-00088-RWS-JBB, 2025 WL 1674398, at *1 (E.D. Tex. Mar. 26, 2025) (citation omitted). Because it is a statutory requirement, "[t]he burden to prove that a case could have been brought in the transferee forum falls on the party seeking transfer." *Id.* (citing *Volkswagen*, 545 F.3d at 315); *accord Ill. Union Ins. Co. v. Tri Core Inc.*, 191 F. Supp. 2d 794, 797 (N.D. Tex. 2002) (Lynn, J.) (citation omitted).

C.      *Stating a Claim*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 12(b)(6) authorizes motions to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion to dismiss, a "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet

this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (citing FED. R. CIV. P. 8(a)(2)) (citation modified).

## III.

## ANALYSIS

The Court first addresses the motions to dismiss for lack of personal jurisdiction and/or improper venue, then the motion to transfer, and finally the motion to dismiss for failure to state a claim. In the first section, the Court holds that it has personal jurisdiction over WFA under Federal Rule of Civil Procedure 4(k)(2) and venue is proper under 28 U.S.C. § 1391(c)(3) but that it lacks personal jurisdiction over Shell International, Lego A/S, Nestlé S.A., and Ørsted Services. In the second section, the Court denies the motion to transfer. Finally, for the defendants that were not dismissed for lack of jurisdiction, the Court rules that X failed to state a claim under 15 U.S.C. § 1.

A.    *Personal Jurisdiction Exists and Venue is Proper for WFA, but Personal Jurisdiction Does Not Exist for Shell International, Lego A/S, Nestlé S.A., and Ørsted Services.*

"A 'court must have . . . power over the parties before it (personal jurisdiction) before it can resolve a case.'" *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 11 (2025) (quoting *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017)). The only constitutional limit on a federal court's exercise of personal jurisdiction flows from the Fifth Amendment's Due Process Clause. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Limits on a federal court's personal jurisdictional reach may otherwise be imposed by Congress, incidental to Congress's constitutional power to create lower federal courts. *See Palmore v. United States*, 411 U.S. 389, 401 (1973). Congress delegated to the Supreme Court the role of writing uniform procedural rules for the federal courts. *See Berk v. Choy*, 607 U.S. __, __, 146 S. Ct. 546, 552 (2026) (citing 28 U.S.C. § 2072(a)) (other citation omitted). Pursuant to this delegated authority, the Supreme Court adopted Federal Rule of Civil Procedure

4(k), which governs lower courts' exercise of personal jurisdiction. *See id.*; *Hardy v. Scandinavian Airlines Sys.*,117 F.4th 252, 263 (5th Cir. 2024).

Three methods of establishing personal jurisdiction under Rule 4(k) are relevant to this case. First is Rule 4(k)(1)(A), which authorizes personal jurisdiction to the extent consistent with the reach of the state in which the federal court sits. A state's jurisdictional reach is limited by the Fourteenth Amendment's Due Process Clause, which is the subject of most case law on personal jurisdiction. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." (citing Rule 4(k)(1)(A)). That case law involves the familiar categories of "general jurisdiction" and "specific jurisdiction," whereby a state can exercise jurisdiction over a defendant only if it is domiciled there or has sufficient "minimum contacts" to have "purposefully availed" itself of the state's legal protections. *See Fuld*, 606 U.S. at 12–13. Those Fourteenth Amendment standards derive from interstate federalism concerns to "ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 14–15 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

The second relevant Rule 4(k) provision is Rule 4(k)(1)(C), which allows personal jurisdiction when authorized by a jurisdiction-granting federal statute. The statute invoked for personal jurisdiction here is the Clayton Act, 15 U.S.C. § 22. If that statute's requirements are satisfied and if consistent with the Fifth Amendment's Due Process Clause, the Court can exercise jurisdiction. *See Fuld*, 606 U.S. at 25.

The final relevant Rule 4(k) provision is Rule 4(k)(2), which states:

For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not

subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

In cases where Rule 4(k)(2)'s requirements are met, a federal court can exercise personal jurisdiction to the fullest extent allowed by the Fifth Amendment's Due Process Clause. *See Hardy*, 117 F.4th at 264–65 (citation omitted).

Turning now to X's assertion of personal jurisdiction, its lead jurisdictional theory is Rule 4(k)(2) for WFA, Shell International, Lego A/S, and Nestlé S.A. The Court rules that it has jurisdiction over WFA under Rule 4(k)(2) but lacks jurisdiction over Shell International, Lego A/S, and Nestlé S.A. The latter conclusion, because it hinges on Fifth Amendment due process considerations, obviates the need to separately analyze jurisdiction under any other theory. The Court therefore denies WFA's motion to dismiss and grants the motions to dismiss filed by Shell International, Lego A/S, and Nestlé S.A. Concomitantly with granting those three motions to dismiss, the Court denies X's request for jurisdictional discovery related to Shell International, Lego A/S, and Nestlé S.A.

Finally, for Ørsted Services, X invokes only Rule 4(k)(1)(C) and the Clayton Act's jurisdiction-granting provision. X has failed to establish jurisdiction under this route, so the Court grants Ørsted Services's motion to dismiss.

1.    The Court Has Personal Jurisdiction Over WFA Under Rule 4(k)(2) But Not Over Shell International, Lego A/S, or Nestlé S.A.

Rule 4(k)(2) authorizes personal jurisdiction over foreign defendants if (1) the claims arise under federal law, (2) the defendant is not subject to personal jurisdiction in any State, and (3) exercising jurisdiction does not violate the Fifth Amendment Due Process Clause. The first requirement is easily satisfied: X's two claims arise under a federal statute, the Sherman Act. On the

second requirement, "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004) (citation omitted). WFA, Shell International, Lego A/S, and Nestlé S.A. have not conceded that they are subject to any State's personal jurisdiction, so the second requirement is satisfied. That leaves the third requirement: whether exercising personal jurisdiction comports with Fifth Amendment Due Process.

In the following five subsections, the Court first lays out the Fifth Amendment due process standard for personal jurisdiction then assesses whether exercising personal jurisdiction comports with that standard for WFA, for Shell International, for Lego A/S, and finally for Nestlé S.A.

      i.        *The Fifth Amendment does not impose strict geographical limitations on a federal court's exercise of personal jurisdiction but nevertheless requires establishing that a defendant engaged in jurisdiction-triggering conduct.*

What exact limits, if any, are imposed by the Fifth Amendment's Due Process Clause is an open question. Before the Supreme Court decided *Fuld* last year, the Fifth Circuit employed the exact same "minimum contacts" analysis under the Fifth Amendment as is used under the Fourteenth Amendment—the only difference being that the Fifth Amendment analysis looked at contacts with the United States as a whole, rather than any individual State. *See Hardy*, 117 F.4th at 265 & n.27. But *Fuld* held that the Fifth Amendment's Due Process Clause "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." 606 U.S. at 16. Although it held the two standards are different, the Supreme Court did not "delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts." *Id.* at 18.

Parts of the *Fuld* opinion suggest the Fifth Amendment imposes no limit on federal courts' exercise of extraterritorial authority: The "interstate federalism concerns" that drive the Fourteenth Amendment analysis "do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts." *Id.* at 15. In other words, the Fifth Amendment contains no geography-based limitations:

> While "the limitations of the Constitution are barriers bordering the States and preventing them from transcending the limits of their authority," there is no equivalent "ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty."

*Id.* (quoting *United States v. Bennett*, 232 U.S. 299, 306 (1914)).[2]

Nevertheless, the Supreme Court engaged in a basic test to check that the exercise of personal jurisdiction under a jurisdiction-granting statute was "tie[d] . . . to conduct closely related to the United States" even if the conduct occurred abroad. *See id.* at 18. *Fuld* involved a federal statute deeming two specific organizations as having consented to personal jurisdiction if they engaged in specified conduct supporting terrorism anywhere in the world and if they had any presence in the United States. *See id.* at 8–9. The Supreme Court found the jurisdiction-granting statute suitably limited to Congress's goal of combating terrorism because it did not put the defendants "at broad risk of being haled into U.S. courts for myriad civil liability actions." *Id.* at 20. Jurisdiction was tied to "specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in respondents' relationships with the United States." *Id.* at 21. The statute targeted only two specific

---

[2] Justice Thomas (joined by Justice Gorsuch) was more explicit: "The Fifth Amendment's Due Process Clause imposes no limits on the Federal Government's power to extend federal jurisdiction beyond the Nation's borders." *Id.* at 44 (Thomas, J., concurring in the judgment).

foreign entities with "decades of meaningful contacts, ties, and relations with the United States." *Id.* at 22 (citation modified).

The Supreme Court also suggested that the Fifth Amendment analysis "might entail a similar 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case'" as exists under a Fourteenth Amendment "minimum contacts" analysis. *Id.* at 23 (quoting *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 115 (1987)). The possible factors included in such a reasonableness inquiry are "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Id.* at 24 (quoting *Asahi*, 480 U.S. at 113).

As to burden on the defendant, the Supreme Court was attentive to the fact that the international defendants were "'sophisticated international organizations' that operate 'billion dollar-budgets'" and had long maintained their presence worldwide and in the United States. *Id.* (citations omitted). The Supreme Court also noted that being haled into U.S. courts could not "have come as much of a surprise" to the defendants who had litigated in the United States for decades and were given clear notice of potential lawsuits through the jurisdiction-granting statute. *Id.* at 24–25.

For the latter two parts of the reasonableness inquiry, the Supreme Court applied similar reasoning to assess the interests of the United States as the forum and a U.S. plaintiff's interest in obtaining relief in federal court. *See id.* at 24. Exercising jurisdiction was reasonable under the Fifth Amendment because of the United States's "exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable." *Id.* at 24.

Ultimately, the reasonableness test boils down to whether exercising personal jurisdiction could be deemed so "gravely difficult and inconvenient . . . as to render the exercise of personal jurisdiction unreasonable and unfair." *Id.* at 25 (first quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985); then quoting *Asahi*, 480 U.S. at 116) (internal quotation marks omitted). Even Justice Thomas, despite concluding that the Fifth Amendment imposes "no limits," suggested that due process entails "notice and an opportunity to be heard," which includes proper service and that it is feasible for the defendant to defend itself in American courts. *Id.* at 44 & n.4 (Thomas, J., concurring in the judgment).

Although the Fourteenth Amendment's "minimum contacts" test no longer applies to the Fifth Amendment, the old test's principle of analyzing each defendant individually remains intact. Under the "minimum contacts" test, "plaintiffs may not aggregate defendants' forum contacts and may not establish personal jurisdiction without specifying who did what." *Pearson v. Shriners Hosps. for Child., Inc.*, 133 F.4th 433, 442 (5th Cir. 2025). The Supreme Court in *Fuld* excised from the Fifth Amendment analysis any limitation that would require assessing only contacts with the geographic territory of the United States, but it did not abrogate the principle that the plaintiff must demonstrate personal jurisdiction over each defendant individually. If using a jurisdiction-granting statute as in *Fuld*, that means establishing that the defendant performed the jurisdiction-triggering conduct that Congress specified. *See* 606 U.S. at 9–10 (describing how plaintiffs alleged and district courts found that defendants had engaged in jurisdiction-triggering conduct).

The jurisdiction-triggering conduct when using Rule 4(k)(2) is the conduct leading to the plaintiff's injury. Under the old "minimum contacts" test, a court would assess whether the case before it "arises out of or results from" geographic contacts with the United States. *See Hardy*, 117

F.4th at 266–67. The essential difference between that analysis and the analysis employed in *Fuld* is that geographic contacts, while still relevant, are not all that is relevant. To determine whether the exercise of personal jurisdiction under Rule 4(k)(2) comports with Fifth Amendment due process, courts should now ask a more general question: Is the conduct giving rise to this case or controversy closely connected with the United States? Exercising jurisdiction over conduct closely connected to the United States can comport with the Fifth Amendment regardless of whether the conduct occurred here, in another country, on the open sea, in outer space, or completely on the internet.

      *ii.*      *WFA is subject to personal jurisdiction under Rule 4(k)(2).*

Under *Fuld*'s basic test for conduct closely connected to the United States, the Court has personal jurisdiction over WFA under Rule 4(k)(2). To support jurisdiction, X points to its allegations that GARM was WFA's initiative that operated out of U.S. offices and that the WFA executive Rakowitz held meetings, sent emails, and published statements as part of his work for GARM from within the United States. *See* Doc. 194, Consol. Resp., 11. Moreover, as part of the alleged boycott of Twitter/X, WFA signaled that it would monitor the practices of an American company (*see* Doc. 77, Second Am. Compl. ¶ 96), which led to American advertisers refraining from purchasing from the American company (*see id.* ¶ 106). WFA also helped GARM survey advertisers' willingness to join a boycott of Twitter (*see id.* ¶ 110) and met with Twitter to negotiate terms regulating Twitter's business practices (*see id.* ¶ 123). Even if these activities occurred entirely on the internet and not physically on U.S. territory, the conduct is closely connected with the United States

and has an impact on U.S. commerce. Requiring WFA to respond to this lawsuit does not risk haling it into U.S. courts for "myriad civil liability reasons." *See Fuld*, 606 U.S. at 20.[3]

Exercising personal jurisdiction over WFA also satisfies the reasonableness inquiry. On the inquiry's first part, the burden placed on WFA to litigate in this country is minimal because it is a sophisticated organization with international and U.S. presence, as opposed to an entity or individual that only operates outside of this country with localized impact. As WFA points out, it indeed differs from the defendants in *Fuld* due to its general lack of involvement in U.S. litigation. *Contrast* Doc. 217, WFA's Reply Mot. Dismiss, 1 & n.1 (indicating WFA has never been sued in the United States apart from this case and one related case), *with Fuld*, 606 U.S. at 24–25 (noting that litigating in United States "could not have come as much of a surprise" in part due to decades of involvement in U.S. litigation). Also unlike the defendants in *Fuld*, WFA did not receive "clear notice" through a congressional enactment targeting its activities. *See* 606 U.S. at 25. But those differences are not so great as to make it surprising that WFA's continued involvement and activity in U.S. commerce could open it up to personal jurisdiction. Nor do they make it—under the reasonableness inquiry's ultimate distillation—"gravely difficult and inconvenient" for the internationally present WFA to appear in federal court. *Id.* at 25 (citation omitted).

The other two parts of the reasonableness inquiry—the forum's and plaintiff's interests—also support exercising jurisdiction. Like the statute addressing U.S. antiterrorism interests in *Fuld*, antitrust law is designed to address foreign conduct causing domestic antitrust injury: "[O]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is

---

[3] This analysis depends squarely on WFA's—not any other entity's—conduct that is part of the alleged boycott against X. Thus, the analysis is unaffected by WFA's argument that its members' or GARM's activities cannot be imputed to WFA. *See* Doc. 217, WFA's Reply Mot. Dismiss, 3.

nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004) (citations omitted). Although *F. Hoffman-La Roche* dealt with the scope of conduct covered by the statute rather than personal jurisdiction, it elucidates why a U.S. antitrust plaintiff can expect to obtain relief in its home country and the United States's interest in providing that relief. WFA protests that the plaintiff and forum should not be grouped together when assessing the interests of each. *See* Doc. 217, WFA's Reply Mot. Dismiss, 8. But *Fuld* essentially grouped the two together when it said both forum and plaintiff had strong interests for "similar reasons." 606 U.S. at 24. The Court sees no reason to decouple X's interest in obtaining relief and the United States's interest in providing a forum to seek it. Considering the backdrop of U.S. antitrust law, both forum and plaintiff have strong interests supporting the exercise of personal jurisdiction here.

WFA finally advances two procedural arguments, both of which are unavailing. First, WFA argues that X must establish all elements of Rule 4(k)(2), including Rule 4(k)(2)(A)'s requirement that WFA is not subject to personal jurisdiction in any state. *See* Doc. 217, WFA's Reply Mot. Dismiss, 7. But the Fifth Circuit has advised that, to invoke Rule 4(k)(2), a plaintiff need not engage in a piecemeal analysis of all fifty states to disconfirm jurisdiction everywhere. *See Adams*, 364 F.3d at 651. "If . . . the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Id.* (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).

WFA then asserts that X needed to have specifically referenced Rule 4(k)(2) in its complaint for WFA to address that jurisdictional theory, but WFA cites no authority in support of such a

requirement. *See* Doc. 217, WFA's Reply Mot. Dismiss, 8 & n.10. Although a plaintiff must plead the facts necessary to support jurisdiction, the Court is not aware of authority stating that a plaintiff must specify the jurisdictional theory in its complaint. In any event, WFA did not concede that it is subject to personal jurisdiction elsewhere, even after X explained its jurisdictional theory. *See id.* Thus, the Court finds that X has established personal jurisdiction over WFA under Rule 4(k)(2).

WFA has also moved to dismiss for improper venue but acknowledges that if personal jurisdiction exists over WFA, venue is proper under 28 U.S.C. § 1391(c)(3). *See id.* at 10. The Court therefore denies the entirety of WFA's motion to dismiss for lack of personal jurisdiction and improper venue.

  iii.  *Shell International is not subject to personal jurisdiction.*

X has not demonstrated a prima facie case for exercising personal jurisdiction over Shell International under Rule 4(k)(2) because X has not adequately alleged that Shell International engaged in conduct closely connected with the United States. To begin, the factual allegations specific to Shell International relate generally to its affiliations with WFA and the ANA Council. *See* Doc. 77, Second Am. Compl. ¶¶ 23, 37. But Shell International's conduct with respect to those affiliations occurred entirely abroad with no tangible U.S. impact. *See* Doc. 144, App. Shell PLC's Mot. Dismiss, Ex. B, Aragon Decl. ¶¶ 3–4 (describing Shell International's payments to WFA's Belgian bank account). Moreover, the evidence before the Court shows that Shell International does not perform any conduct in the United States. *See* Doc. 143, Shell Int'l's Br. Mot. Dismiss, 2–3 (citing declarations provided in appendix).

Shell International's affiliation with WFA and the ANA Council is also steps removed from the controversy presented in this case. Alleging that Shell International paid dues to WFA, was a

leader of the ANA Council, or paid a GARM invoice does not tell the Court what Shell International did to monitor X's activities, answer surveys about willingness to stop advertising on X, or boycott X. Involvement in GARM could mean a wide range of things: besides the alleged X boycott, GARM's activities included consulting the industry to establish agreeable standards and pursuing collective action against other digital media companies.

GARM membership or affiliation does not equate to boycotting X, despite GARM's stated requirement of adherence to and enforcement of the brand safety standards. *See* Doc. 77, Second Am. Compl. ¶¶ 66, 68, 73, 76. The Second Amended Complaint contains several examples where fewer than all GARM members joined in boycotting other platforms (*e.g.*, *id.* ¶ 85), where Rakowitz threatened a boycott prior to consulting GARM members (*e.g.*, *id.* ¶¶ 108, 110), and where advertisers boycotted in response to an intervening communication from their advertising agency (*e.g.*, *id.* ¶ 106). Based on those allegations, the Court cannot equate those that boycotted X with anyone who affiliated with the boycotters.

Because boycotting X was not GARM's raison d'être, X does not have standing to challenge GARM's existence but only to seek relief for injuries inflicted upon X. As a result, a connection to GARM, even a less attenuated one than Shell International's, does not sweep a defendant into X's lawsuit. To exercise personal jurisdiction under Rule 4(k)(2), X must allege that Shell International engaged in jurisdiction-triggering conduct. Here, the jurisdiction-triggering conduct is the boycott and information-sharing conspiracy leading to X's injury.

Under that rubric, X alleges that "Shell"—a collective reference to Shell plc, Shell International, and Shell USA—refrained from purchasing advertising on X after the boycott began. *See* Doc. 77, Second Am. Compl. ¶¶ 106, 138. X also asserts that Shell International "acted in a

unity of purpose with Shell USA regarding the conduct of Shell USA." Doc. 194, Consol. Resp., 5. According to X, the Court should impute the actions of other Shell entities to Shell International under a single-enterprise theory recognized in other circuits. *See id.* at 6 n.2.

X's single-enterprise theory fails to establish personal jurisdiction for two reasons. First, even if it applies to this case, the theory concerns antitrust liability, not personal jurisdiction. *See Chandler v. Phx. Servs.*, No. 7:19-cv-00014-O, 2020 WL 1848047, at *14–15 (N.D. Tex. Apr. 13, 2020) (O'Connor, J.) (explaining theory as method for parent company "[t]o be liable for its subsidiary's conduct"). "Liability and personal jurisdiction are two separate questions in law, and the former does not establish the latter." *Robert Yaquinto Print'g Co. v. Fleer Skybox Int'l, L.P.*, No. 3:05-CV-1412-N, 2005 WL 8158550, at *2 (N.D. Tex. Dec. 20, 2005) (Godbey, J.). Second, "courts do not lightly or routinely pierce the corporate veil." *USHealth Grp., Inc. v. South*, 636 F. App'x 194, 202 (5th Cir. 2015) (per curiam) (citation omitted). To impute a subsidiary's conduct to the parent corporation, "the corporation must have exercised such control over the subsidiary that it is clear the two entities have abandoned their separate corporate identities." *Id.* (citations omitted). X has not articulated facts supporting its assertion that Shell International is answerable for activities by other Shell entities. At bottom, grouping together all Shell entities does not answer the question "who did what." To exercise jurisdiction over Shell International, the Court needs to know what Shell International—not Shell plc or Shell USA—did. Without more, X's allegation that the three acted in "unity of purpose" is a mere conclusion unsupported by alleged facts.

Similar to how X argues that a corporate family should be treated as one, X argues that all defendants can be treated as part of one boycott conspiracy over which jurisdiction exists. In support of this conspiracy jurisdiction theory, X points to several cases from other circuits accepting the

theory that one conspirator's minimum contacts with a forum can support jurisdiction over out-of-forum co-conspirators. *See* Doc. 194, Consol. Resp., 18 (collecting cases). X acknowledges that an unpublished Fifth Circuit case rejected conspiracy jurisdiction. *See id.* at 22 (quoting *Delta Brands Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004)). But X says that an earlier Fifth Circuit case, which is published, endorsed the theory in dicta. *See id.* at 20–22 (discussing *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999)). X therefore asks that the Court not propagate the "non-binding error" of the later unpublished Fifth Circuit case. *Id.* at 22–25.

Supposing without deciding that the conspiracy jurisdiction theory is valid, X still has not established jurisdiction because it has not sufficiently tied Shell International to the boycott conspiracy. To successfully invoke conspiracy jurisdiction, a plaintiff must adequately allege that "a conspiracy existed" and that "the defendant participated in the conspiracy." *In re Platinum & Palladium Antitr. Litig.*, 61 F.4th 242, 270 (2d Cir. 2023) (citation omitted); *see Guidry*, 188 F.3d at 631–32 (explaining that conspiracy jurisdiction requires adequately pleading a conspiracy exists under Federal Rule of Civil Procedure 8 standards). For instance, in *Platinum & Palladium*, the plaintiffs adequately alleged that the defendants were part of the conspiracy through their participation in "interfirm communications" where co-conspirators discussed price information and coordinated market activity. *See* 61 F.4th at 270–71. In this way, conspiracy jurisdiction does not ease the "who did what" requirement for personal jurisdiction; it instead modifies the "what" to require adequately alleging participation in the conspiracy. A plaintiff cannot allege a worldwide conspiracy, list several organizations as defendants, assert without adequate supporting facts that they were all part of the conspiracy, and thereby force every international defendant to answer a lawsuit in a forum where one conspirator's conduct occurred. Here, as explained above, X has alleged

facts connecting Shell International to other organizations but not showing how Shell International participated in the alleged boycott. Therefore, even if conspiracy jurisdiction is operable in this circuit, it fails here.

Finally, as jurisdiction fails under Rule 4(k)(2) for noncompliance with the Fifth Amendment Due Process Clause, jurisdiction necessarily fails under any other possible theory. The Court therefore grants Shell International's motion to dismiss.

    *iv.      Lego A/S is not subject to personal jurisdiction.*

The attempt to assert personal jurisdiction under Rule 4(k)(2) over Lego A/S fails for essentially the same reasons as applicable to Shell International. As with the Shell entities, X groups the Lego entities together without asserting facts to support its conclusion that Lego A/S broke its formal corporate separateness to direct the conduct of subsidiary Lego Brand. *See* Doc. 77, Second Am. Compl. ¶¶ 20, 37, 138. Even assuming that Lego A/S was a GARM member and leader on the ANA Council, X fails to specify how Lego A/S participated in the boycott against X, rather than GARM at large. With no connection between Lego A/S and the United States germane to the controversy at hand, the Court cannot exercise personal jurisdiction over Lego A/S under Rule 4(k)(2) or any other theory.

    *v.      Nestlé S.A. is not subject to personal jurisdiction.*

The Court lacks personal jurisdiction over Nestlé S.A. under Rule 4(k)(2) as well. X once again impermissibly groups together Nestle entities without supporting facts. *See id.* ¶ 17. Even if Nestlé S.A. was a founding member of GARM and had an employee on WFA's Executive Board, those facts do not connect Nestlé S.A. to the boycott conspiracy against X. In a conspicuous counterexample to its group pleading, X alleges that Nestle USA—not Nestlé S.A.—received and acted

on an advertising agency's "recommendation to refrain from purchasing advertising from Twitter." *Id.* ¶ 106. That allegation connects Nestlé S.A.'s subsidiary to the controversy, but it does not show how Nestlé S.A. directed the conduct, monitored X's activities, or participated in the boycott itself.

X does allege one fact that, if attributable to Nestlé S.A., would connect it to the boycott conspiracy. X alleges in the Second Amended Complaint that "Nestlé S.A. instructs its subsidiaries, including Nestle USA, to presumptively refrain from purchasing advertising from Twitter, now X, as a 'high-risk' platform." *Id.* ¶ 141. X's "Global Lead for Brand Safety" has since clarified that the "high-risk" comment was made by an unknown Nestle entity's employee who "oversees Nestlé's global brand safety efforts." *See* Doc. 195, App. Consol. Resp., Ex. I, Tenreiro-Braschi Decl. ¶¶ 3–4. That individual's LinkedIn page says that she has served since January 2023 as the "Global Programmatic & Brand Safety Lead" at "Nestlé" based in Barcelona, Spain, and that she is personally based in the United Kingdom. *See id.*, Ex. H, at App. 056. X speculates that the context of this employee's comment "is consistent with the entity that did these things being Nestlé S.A." and that Nestlé S.A. is "play[ing] a corporate shell game." Doc. 194, Consol. Resp., 6 n.2.

Nestlé S.A. responded with its corporate general counsel's affidavit that the individual whom X alleges made the "high-risk" comment has never been an officer or employee of Nestlé S.A. *See* Doc. 225, Jampen Decl. ¶¶ 3, 5. Moreover, X has not factually contested Nestlé S.A.'s declaration-supported assertion that, as the ultimate parent of all Nestle entities, it does not "have direct control or managerial responsibilities over the activities of its subsidiaries." Doc. 164, Nestlé S.A.'s Br. Mot. Dismiss, 2 (first citing Doc. 165, App. Nestlé S.A.'s Mot. Dismiss, Jampen Decl. ¶¶ 5–6; then citing *P & L Dev., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 454 (E.D.N.Y. 2024)).

Taking all evidence in the light most favorable to X, the Court need not give speculation greater weight than a sworn declaration. Here, the employee does not even work or live in Switzerland where Nestlé S.A. is headquartered. Further, X does not present evidence that Nestlé S.A. has otherwise directed the advertising activities of its subsidiaries. X's challenge to Nestlé S.A.'s sworn declaration, absent countervailing evidence, amounts to mere speculation that Nestlé S.A. is lying. Having no substantive reason to reject the clearly stated facts in Nestlé S.A.'s declarations, the Court accepts them as true and rules that it lacks personal jurisdiction over Nestlé S.A. under Rule 4(k)(2) or any other jurisdictional theory.

Finally, because the Court dismisses Shell International, Lego A/S, and Nestlé S.A. from the lawsuit, their motion to sever is denied as moot.

2.    The Court Denies X's Motion for Jurisdictional Discovery.

Jurisdictional discovery motions are committed to a district court's discretion, *see Monkton*, 768 F.3d at 434, and should be granted when a plaintiff "presents factual allegations that suggest with reasonable particularity the possible existence of" facts to support jurisdiction. *Getagadget, L.L.C. v. Jet Creations Inc.*, No. 19-51019, 2022 WL 964204, at *5 (5th Cir. Mar. 30, 2022) (citations omitted). "Discovery on matters of personal jurisdiction need not be permitted unless the motion to dismiss raises issues of fact. . . . When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted." *Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (citation modified). Jurisdictional discovery should be denied if it seeks to understand which entity in a corporate family is responsible, rather than whether the Court has personal jurisdiction over a named defendant. *See DDC Tech., LLC v. Structural Graphics, LLC*, No. 3:22-CV-1263-B, 2022 WL 17813705, at *7 (N.D. Tex. Dec. 19, 2022) (Boyle, J.).

-33-

For the reasons explained in Sections III.A.1.iii–v above, X has failed to present "factual allegations that suggest with reasonable particularity" that the Court has personal jurisdiction over Shell International, Lego A/S, and Nestlé S.A. *See Getagadget*, 2022 WL 964204, at \*5. X contends that these defendants have not rebutted a series of allegations in its Second Amended Complaint that would meet this required showing. *See* Doc. 226, Reply Mot. Disc., 4–5. Half of these allegations are affiliations with GARM, WFA, or the ANA Council, which as the Court explained above are not sufficient to suggest that the specific defendant monitored X's activities, refrained from purchasing advertisements, or otherwise participated in the boycott. The other half of the supposedly unrebutted allegations are factually unsupported conclusions that the defendants participated in the boycott or acted in unity of purpose with a subsidiary. The only potential factual discrepancy could have been the Nestle employee who made the "high-risk platform" comment, but X does not present facts (as opposed to speculation) controverting a sworn affidavit that the employee did not work for Nestlé S.A. Accordingly, X has not met its initial burden under *Getagadget*.

X nevertheless advances two arguments for jurisdictional discovery, both of which fail to persuade the Court. First, X argues that it is entitled to test the factual assertions regarding the defendants' corporate structure and relationships with alleged co-conspirators. *See* Doc. 201, Br. Mot. Disc., 4–8. In support, X principally points to *In re Gasoline Spot Litigation*, where the court allowed jurisdictional discovery because the plaintiffs objected to the defendant's declaration as "lacking in foundation and hearsay." No. 20-cv-03131-JSC, 2020 WL 7431843, at \*8 (N.D. Cal. Dec. 18, 2020). That court also based its decision to allow jurisdictional discovery on the plaintiff's assertion of facts that the international corporate parent's executives met with its subsidiary's co-conspirator; that the parent hired and managed its subsidiary's senior trading employee; and that

the parent supervised, reviewed, and approved its subsidiary's trading activities with the co-conspirator. *Id.* Here, X does not assert that the relevant affiants do not have sufficient knowledge as to the facts in their declarations, nor that they might say something different if deposed. And X has not presented sufficient facts to support its conclusion that Shell International, Lego A/S, and Nestlé S.A. are lying about their non-involvement in their subsidiaries' advertising decisions.

Second, X argues that jurisdictional discovery should be permitted because Shell International, Lego A/S, and Nestlé S.A. "all played key roles in the founding, running, and unlawful activities of GARM and the ANA, whose Global CMO Growth Council proselytized for GARM and adherence to its rules, and which was a member of GARM's Steer Team." Doc. 201, Br. Mot. Disc., 9. Again, however, mere affiliation with GARM and its wide-ranging activities does not support a connection to the boycott against X. These allegations do not, for example, suggest that these defendants (not their corporate affiliates) ever purchased advertising from X or that they participated in GARM's negotiations of advertising practices with X. In contrast, X does not rely on group pleading to allege that other entities (including Nestle USA) changed their advertising habits after receiving a boycott-related communication. *See* Doc. 77, Second Am. Compl. ¶ 106. X has not persuaded the Court that a dispute exists over asserted facts that, if true, would support jurisdiction; X simply has not alleged facts supporting the conclusions it wishes to draw.

At bottom, X's jurisdictional discovery requests are difficult to perceive as anything other than a fishing expedition. X seeks communications between and among the defendants and "any of their subsidiaries" regarding "WFA/GARM or the boycott of X," their "membership and roles in WFA or GARM," and their "business activities . . . in the U.S." Doc. 201, Br. Mot. Disc., 10. These requests are aimed at the impermissible inquiry of figuring out who in the corporate family was

involved, rather than figuring out specifically whether the Court has jurisdiction over named defendants. *See DDC Tech.*, 2022 WL 17813705, at *7. More troublingly, prior to establishing that the Court has personal jurisdiction, the requests seek sprawling information from international defendants about GARM and their involvement in it generally, rather than specific to the boycott against X. Because X has not satisfied its burden to establish that any discovery—let alone its broad requests—is warranted, the motion for jurisdictional discovery is denied.

3.    Ørsted Services is Not Subject to Personal Jurisdiction Under Rule 4(k)(1)(C).

Unlike the other foreign defendants, Ørsted Services concedes that it is subject to personal jurisdiction in New York, which precludes application of Rule 4(k)(2). *See* Doc. 211, Ørsted Servs.'s Br. Mot. Dismiss, 12. Thus, to establish personal jurisdiction over Ørsted Services, X leans entirely on Rule 4(k)(1)(C) and jurisdiction under the Clayton Act, 15 U.S.C. § 22. That statute has two clauses separated by a semi-colon:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

§ 22.

This Court recently analyzed the statute in *Rumble, Inc. v. World Federation of Advertisers*, No. 7:24-CV-0115-B, 2025 WL 2345076 (N.D. Tex. Aug. 13, 2025) (Boyle, J.). The clause preceding the semicolon is a "'special' venue provision, which provides additional methods for a plaintiff to demonstrate that venue is proper in antitrust cases." *Id.* at *5 (citation omitted). "The second clause is a personal jurisdiction provision authorizing 'worldwide service of process'" and allowing any federal district court in the country to exercise personal jurisdiction over an antitrust defendant. *See id.* (citation omitted).

In *Rumble*, the Court recognized that a circuit split exists as to whether the two clauses are "independent" or "integrated." *See id.* at *6. If they are independent, the personal jurisdiction clause always applies irrespective of whether the special venue clause is satisfied. *Id.* If they are integrated, the personal jurisdiction clause is only activated if the special venue provision is satisfied. *Id.* For Ørsted Services, interpreting the clauses as independent makes it subject to personal jurisdiction in this District regardless of whether it inhabits, is found, or transacts business here. Under the integrated interpretation, Ørsted Services would only be subject to personal jurisdiction under § 22 if it inhabits, is found, or transacts business here.

After discerning that the Fifth Circuit had not taken a side on the matter, the Court in *Rumble* concluded that the two clauses are integrated. *See id.* at *5–9. To reach this conclusion, the Court assessed the text and structure of the statute and surveyed the approaches taken by other circuits. *See id.*

X asks the Court to revisit its previous analysis and hold that the two provisions are independent. In support, X argues that the Alien Venue Statute (28 U.S.C. § 1391(c)(3)) overrides the Clayton Act's special venue provision, parses decisions of the Courts of Appeals that this Court previously scrutinized in *Rumble*, and objects to the Court's previous analysis of the statutory text and structure. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 5–21. The Court is unconvinced by X's three lines of argument.

i.    *The Alien Venue Statute does not impact the operation of § 22's two clauses together.*

First, X argues that "the Alien Venue Statute trumps the Clayton Act's special venue provision and authorizes the Court to exercise jurisdiction over an alien defendant . . . without regard to whether the Clayton Act's venue provision is satisfied." *Id.* at 7. X's lead support is *Brunette*

*Machine Works, Ltd. v. Kockum Industries*, where the Supreme Court decided the applicability of the patent venue statute to alien defendants. 406 U.S. 706 (1972). The patent venue statute makes venue proper for patent infringement cases in the district either (a) where a defendant resides or (b) where the infringement occurred and the defendant has a regular and established place of business. *See id.* at 706–07. The Alien Venue Statute at the time said: "an alien may be sued in any judicial district." *Id.* at 706 (citation modified).

The Supreme Court held that, in patent infringement cases against aliens, plaintiffs were not limited to establishing proper venue through the patent venue statute. *See id.* at 714. Instead, plaintiffs could establish proper venue against an alien in any case using the Alien Venue Statute, which codified "the long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special." *Id.* Four decades later, according to X, Congress "reaffirmed and bolstered the *Brunette* rule" by changing § 1391(c)'s introductory language from "For purposes of venue under this chapter" to "For all venue purposes." *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 7.

The principle that venue is proper over nonresidents anywhere is correct, yet it is uninformative of how § 22's two clauses operate together. Under *Brunette*, a plaintiff can establish proper venue in a patent case using the Alien Venue Statute, notwithstanding the patent statute's special venue provision. *See* 406 U.S. at 714. So too in this antitrust case: X can establish proper venue using § 1391(c)(3).[4] But in neither patent cases nor antitrust cases does establishing venue obviate the need to establish personal jurisdiction. A plaintiff can do so using any of the Rule 4(k) methods, and if using Rule 4(k)(1)(C), the plaintiff must meet the requirements of the chosen

---

[4] For an example, see the last paragraph of Section III.A.1.ii above dealing with venue for WFA.

jurisdiction-granting statute. The question is whether, to use § 22's jurisdiction-granting provision, a plaintiff needs to have satisfied its special venue provision. The principle that a plaintiff can use other methods to establish venue has no bearing on that question.

      *ii.*        *The Court continues to reject the Third and Ninth Circuits' approach.*

X's second argument asks the Court to take another look at cases it rejected from the Third Circuit and Ninth Circuit interpreting § 22's two clauses as independent only for aliens. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 10–11. In *Rumble*, the Court disagreed with those courts' holdings because they relied on the purpose of the statute, rather than its text, and because they treated foreign and domestic corporations differently under the same text. *See* 2025 WL 2345076, at *8–9. The Ninth Circuit case, which was decided first, identified § 22's "main contribution to be its expansion of the bounds of venue" and decided in light of that purpose that a lawsuit against an alien corporation should not be restricted by the special venue provision. *See Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1410–13 (9th Cir. 1989) (citations omitted). The Third Circuit followed *Go-Video*'s logic and added on that "[t]he principle that an alien may be sued in any district is simply too deeply rooted to assume otherwise." *In re Auto. Refinishing Paint Antitr. Litig.*, 358 F.3d 288, 295–97 (3d Cir. 2004) (citations omitted).

These cases are correct that § 22 broadens venue and personal jurisdiction but wrong that it broadens personal jurisdiction in ways untethered to the text and structure of the statute. Without § 22, an antitrust plaintiff (if unable to use Rule 4(k)(2)) would need to sue the defendant under Rule 4(k)(1)(A) where it is at home or in a place where it has minimum contacts out of which the antitrust case arises. With § 22, an antitrust plaintiff can sue corporate defendants anywhere they "transact business," whether or not the case arises out of that business. In that way, § 22

simultaneously broadens venue and personal jurisdiction by allowing both to exist without case-related contacts. But recognizing this broadening aspect does not mean that, when faced with a choice between a broad interpretation and a narrow one, a court should choose the broader one based on the provision's general purpose of broadening. If the statute has the effect of broadening, it is only as a result of its text, not the statute's "purpose" and not "background principles" that are not stated in the text.

        *iii.*       *X's textual and structural arguments do not compel an independent interpretation.*

Last in X's entreaty to reassess *Rumble* are two textual and structural arguments. First, X criticizes *Rumble*'s conclusion that "such cases" in § 22's second clause refers to the entire first clause, and X argues instead that "such cases" means "antitrust cases" generally. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 11–12. At a granular level, X is correct that "such cases" could mean antitrust cases generally because the first clause says where cases "may be brought," rather than adjectivally describing where they "are" brought. *See id.* at 12–13.

But proper textual analysis does not miss the forest for the trees. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Chamber of Com. v. U.S. Dep't of Lab.*, 885 F.3d 360, 372 (5th Cir. 2018) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). A related "cardinal principle of statutory construction" is "that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *United States v. Lauderdale Cnty.*, 914 F.3d 960, 966 (5th Cir. 2019) (citation modified). In context, reading "such cases" in § 22's second clause as referring to antitrust cases generally

renders the venue provision "disposable." *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 729 (7th Cir. 2013) (citations omitted).

The independent interpretation renders the venue provision disposable because § 22—titled "District in which to sue corporation"—applies only to corporations. If personal jurisdiction in an antitrust case is proper against a corporation everywhere, then the corporation is a resident everywhere for purposes of venue in that case under the general venue statute. *See* 28 U.S.C. § 1391(c)(2). A defendant's residence in a district makes venue proper there for that defendant. *See* § 1391(b)(1). As a result, an antitrust plaintiff would never need to use § 22's special venue provision under an independent interpretation of the statute, and Congress would have written the special venue provision to have no effect.

X criticizes this conclusion regarding superfluity as incorrect because an antitrust plaintiff could sue corporations and noncorporations in one lawsuit, but its argument does not explain when § 22's special venue provision would ever need to be used under an independent interpretation. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 14–15. If suing corporations and non-corporations, the fact that venue is proper for corporations everywhere does not make venue for the case overall proper because § 1391(b)(1) requires that "all defendants are residents of the State in which the district is located." The antitrust plaintiff would then need to figure out a different way to establish that venue is proper for the non-corporate defendants. Its first option for doing so is filing in the forum where the non-corporate defendant resides, which poses no issue for the corporate defendant who—under the independent interpretation of § 22, plus operation of § 1391(c)(2)—resides there too. Its second option is filing where "a substantial part of the events or omissions giving rise to the claim occurred," § 1391(b)(2)—again obviating any need for use of § 22's special venue provision.

The fallback option—"if there is no district in which an action may otherwise be brought," § 1391(b)(3)—likewise does not require use of § 22's special venue provision. Thus, X's critique does not elucidate any use of § 22's special venue provision if the statute's clauses are deemed independent.

Second, X argues that the semicolon between § 22's two clauses suggests that they operate independently. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 13–14. *Contra Rumble*, 2025 WL 2345076, at *7 ("The venue and personal jurisdiction provisions are part of the same sentence and are only separated by a semicolon, which suggests that Congress intended for them to operate together." (citation omitted)). But the case X cites for this proposition, despite stating that clauses separated by semicolons are presumed independent, advises that "punctuation alone is not 'a reliable guide for discovery of a statute's meaning.'" *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 718 F.3d 488, 494–95 (5th Cir. 2013) (citations omitted). Moreover, the regulatory guideline at issue in *Elgin* involved two different criteria for evaluating one outcome of whether eggs were prepared safely. *See id.* at 494. Here, § 22's two clauses do not refer to two different ways to establish venue or two different ways to establish personal jurisdiction that might be seen as alternate options. X's argument about semicolons therefore has little applicability here.

Returning to Ørsted Services, X has made no effort to establish that the Court has jurisdiction under an integrated interpretation of § 22 by showing, for example, that Ørsted Services transacts business in this District. Nor has X made any effort to establish that Ørsted Services had case-related minimum contacts with Texas that would give rise to personal jurisdiction. Thus, the Court dismisses all claims against Ørsted Services without prejudice.

X requests interlocutory appeal if the Court disagrees with X's interpretation of § 22. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 21. Because this opinion disposes of all claims against all parties, the Court will issue a final judgment that allows X to appeal any purported error leading to that final order. Thus, X's request for certification of interlocutory appeal is denied as moot.

B.      *The Court Denies Transfer.*

The first step of the transfer analysis is assessing whether the case "might have been brought" in the proposed transferee forum. *See* 28 U.S.C. § 1404(a). Often, this issue is undisputed and therefore not scrutinized. *See, e.g.*, *Volkswagen*, 545 F.3d at 312 ("All agree that this civil action originally could have been filed in the Dallas Division."); *In re TikTok*, 85 F.4th 352, 357 n.5 (5th Cir. 2023) (similar).

But where, as here, the issue is disputed, the burden falls on the movants to prove that the transferee forum "has subject-matter jurisdiction, personal jurisdiction, and proper venue." *See Maxell*, 2025 WL 1674398, at *2. That burden is not satisfied by a defendant conceding jurisdiction in the transferee forum. *See Blitz USA, Inc. v. Liberty Surplus Ins. Corp.*, No. 3:11–CV–0034–G, 2011 WL 1602718, at *3 (noting that transferee forum must be proper "independently of the wishes of the defendant" (citation omitted)). Instead, meeting the burden requires an affirmative demonstration, just the same as a plaintiff must demonstrate when it opposes a jurisdictional challenge. *Compare Ill. Union*, 191 F. Supp. 2d at 797 (explaining transfer movants' burden to establish personal jurisdiction in transferee forum as to each defendant) (citation omitted), *with Monkton*, 768 F.3d at 431 (explaining plaintiff's burden in face of personal jurisdiction challenge).

As to their proposed transfer to the U.S. District Court for the Southern District of New York ("SDNY"), the movants have failed to meet the threshold burden to show that the defendants

-43-

would be subject to personal jurisdiction there.[5] On their alternative request for intra-district transfer to Dallas, transferring would have no impact given the Court's conclusion on the merits, so the Court denies intra-district transfer.

    1.    <u>The movants do not meet their burden to show SDNY has personal jurisdiction.</u>

The movants cite two parts of the Clayton Act to argue that the action could be transferred to SDNY. *See* Doc. 179, Br. Mot. Transfer, 8. First, they cite 15 U.S.C. § 15(a), which says that private antitrust lawsuits may be brought in "any district court of the United States in the district in which the defendant resides or is found or has an agent." This provision concerns venue only, which means that the movants would need a separate basis for personal jurisdiction. *See* 14D *Wright & Miller's Federal Practice and Procedure* § 3818 (4th ed. 2025).

Second, they cite 15 U.S.C. § 22, which allows personal jurisdiction anywhere only if its special venue clause is satisfied. *See Rumble*, 2025 WL 2345076, at *6 (other citations omitted) (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 422 (2d Cir. 2005)) (explaining that the Second Circuit follows integrated reading of § 22). Thus, SDNY would have personal jurisdiction over a defendant that inhabits, is found, or transacts business in that district. *See Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 711 F. Supp. 730, 732 (S.D.N.Y. 1989) (citing § 22). "Inhabit" means to be incorporated somewhere, and "found" means to do business there. *Id.* at 732–33 (citation omitted). "Transact business" is a looser standard meant to expand the forums in which antitrust cases can be brought, *see id.* at 733 (citation omitted), and the standard is satisfied if a defendant does "practical, everyday business . . . of any substantial character." *Daniel*, 428 F.3d at 428 (citations omitted).

---

[5] For this inquiry, the Court need not consider dismissed defendants. *See, e.g., QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650, 668 (E.D. Tex. 2007) (transferring case as to two defendants after dismissing others). Thus, the parties' arguments regarding personal jurisdiction in SDNY over Shell International, Lego A/S, Nestlé S.A., and Ørsted Services are mooted by those defendants' dismissal from the lawsuit.

Critically, whichever route you take to satisfy § 22's venue clause, contact with the state as a whole is irrelevant. *See id.* at 430. Only a showing of contact with the specific judicial district will satisfy the venue clause. *Id.* (citations omitted).

The evidence provided by the movants is insufficient to show that they do any business in SDNY to satisfy § 22's venue clause and activate its personal jurisdiction clause. For six defendants, the movants provided New York business registrations. *See* Doc. 179, Mot. Transfer, 4. But registrations to do business in the state of New York do not establish that those defendants do business in SDNY specifically. Two defendants—Mars and CVS—provide declarations from their executives stating, "I understand that [Mars/CVS] transacts business in New York, NY." Doc. 179-1, App. Mot. Transfer, Ex. 17, Stephenson Decl. ¶ 14; *id.*, Ex. 18, Vaccarezza Decl. ¶ 5. Those statements do not demonstrate anything, they merely state a conclusion. *Cf. Expoconsul*, 711 F. Supp. at 733–34 (assessing sales figures and breadth of business contacts with district to determine "transacting business" standard was satisfied). Just as it would not work for a plaintiff to beat a jurisdictional challenge with only a conclusory statement in support, a conclusory statement cannot be sufficient when the burden is on the defendant here. Moreover, the statements do not necessarily connect the purported business to SDNY because parts of New York City are in the Eastern District of New York. *See* 28 U.S.C. § 112(c). Only one defendant, Pinterest, says it has an office in New York City. Doc. 179-1, App. Mot. Transfer, Ex. 15, Myvett Decl. ¶ 4. But Pinterest fails to specify in which borough (or in which federal judicial district) its office is located.

The movants may wonder why the Court cannot just presume that the remaining defendants—some of the world's largest corporations—do business in the global commerce hub of Manhattan, which is in SDNY. The answer is that, although § 1404 allows judicial discretion in

weighing convenience, the statute does not permit judicial guesswork that the transferee forum could entertain the case. X raised this issue in its response brief, *see* Doc. 197, Resp. Mot. Transfer, 15–16, and the movants in their reply did not provide facts or analysis to meet their burden, *see* Doc. 221, Reply Mot. Transfer, 8. The Court will not research each defendant to figure out the street addresses of its retail locations, where its products are shipped, or the quantity of those business activities in SDNY. That burden rests on the movants, and they have failed to carry it.

Unprompted judicial research into these defendants, while in some instances seemingly simple, opens its own can of worms. A court may, under Federal Rule of Evidence 201, take unprompted judicial notice of adjudicative facts that are "generally known" within its territorial jurisdiction or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Judicial notice might be appropriate for "jurisdictional facts drawn from public records." *See PNC Bank, N.A. v. 2013 Travis Oak Creek, L.P.*, 136 F.4th 568, 574 (5th Cir. 2025) (collecting examples). A Google search might reveal that Pinterest's New York office is in fact in Manhattan, but is Google—like an official government record—a source "whose accuracy cannot reasonably be questioned"? Suppose the answer is yes, what you see on the internet is unquestionably reliable for such purposes. Now, if the Court uses Google to locate CVS pharmacies and Shell gas stations in Manhattan, how does the Court know that those retail locations are owned or operated by the defendants here, rather than by formally separate corporate subsidiaries? Even if Google can (reliably or not) answer some questions, for other defendants who sell products but do not have public-facing business locations, a Google search might not do the trick at all. And at bottom, doing all this work for big corporate defendants relieves them of a burden that the Court would not relieve if an ordinary individual wished to transfer a case. Due to the inherent complications and unfairness,

-46-

the Court declines to look outside the record to determine how much business each defendant does in SDNY.

Alternatively, the movants could have attempted to show that SDNY has personal jurisdiction under Rule 4(k)(1)(A) because the defendants are subject to New York state courts' personal jurisdiction. "General jurisdiction" would not exist in New York over most of the defendants because they are not "at home" in New York since their headquarters and places of incorporation are in other states. *See* Doc. 77, Second Am. Compl. ¶¶ 14–15, 17–18, 20–23; *Daimler*, 571 U.S. at 137. The movants have not conducted a "minimum contacts" analysis to show that the defendants are subject to "specific jurisdiction" in New York. Some defendants' declarations state their advertising agencies and GARM contacts are only in New York, but other defendants do not say anything about New York. *Contrast* Doc. 179-1, App. Mot. Transfer, Ex. 17, Stephenson Decl. ¶¶ 7, 11 (advertising agency and GARM contacts in New York), *and id.*, Ex. 18, Vaccarezza Decl. ¶¶ 9, 11 (similar), *with id.*, Ex. 19, Crawford Decl. (no mention of New York). Other defendants did not provide any declaration regarding the location of their case-related contacts. In any event, the Court will not extrapolate facts from the complaint or elsewhere when the movants have not done their work.

SDNY could clearly entertain the case only as to two defendants: WFA and Colgate. Any federal court would have subject-matter jurisdiction since this case arises under federal law. *See* 28 U.S.C. § 1331. WFA is subject to personal jurisdiction anywhere in the United States under Rule 4(k)(2), and venue is proper as to WFA wherever it is subject to personal jurisdiction under 28 U.S.C. § 1391(c)(3). Colgate, which is headquartered in New York, is subject to general personal jurisdiction in New York state courts and therefore subject to SDNY's personal jurisdiction under

Rule 4(k)(1)(A). Venue would also be proper as to Colgate because it is deemed to reside for venue purposes in any district where it is subject to personal jurisdiction. *See* § 1391(b)(1), (c)(2).

If only a partial transfer is possible, the movants ask that the Court transfer the defendants that can be transferred and retain the remaining defendants here. *See* Doc. 179, Br. Mot. Transfer, 9 n.12. "[I]n most multidefendant cases . . . severance and transfer makes sense only where the administration of justice would be materially advanced and a defendant in one district is not 'so involved' in the transferred controversy that the same issues would have to be litigated twice." *Def. Distributed v. Bruck*, 30 F.4th 414, 429 (5th Cir. 2022) (footnote omitted). Here, it is unclear how transferring only WFA and Colgate would materially advance the administration of justice or how the partial transfer could avoid having to litigate the same issues twice.[6] Thus, the request for partial transfer to SDNY is denied.

Because the Court denies transfer to SDNY due to the movants' failure to establish that the case "might have been brought" there, the Court does not opine on the impact of X's terms of service and denies as moot X's motion for leave to file supplemental evidence regarding those terms.

2.     The Court declines to transfer to the Dallas Division.

The above transfer analysis was necessary because, if the Court were to have transferred the case to SDNY, it would have deferred deciding the merits of this case to the transferee court. *See Tel. Sci. Corp. v. Harris & Harris Ltd.*, No. 3:25-CV-1239-B, 2026 WL 657600, at *1 & n.1 (N.D. Tex. Mar. 9, 2026) (Boyle, S.J.) (citation omitted). In contrast, transferring to the Dallas Division would

---

[6] Even if the Court provided a little boost from *sua sponte* internet searches to determine that additional defendants could be transferred, that help could not be provided to all defendants. That means that any transfer would inevitably be partial, and it is unclear how a transfer that applies to any fewer than all defendants would materially advance the administration of justice or avoid having to litigate the same issues twice.

not change the presiding judge, so the Court can defer deciding the alternate request for intra-district transfer until after it has examined the merits of X's claim. In the next section, the Court explains that X has failed to state a claim and dismisses the case. Therefore, the case will not proceed further in this Court, and no convenience is gained by transfer. If, after an appeal, it becomes necessary to revisit the issue, a renewed motion for intra-district transfer may be filed.

C.     *X Failed to State a Claim Under 15 U.S.C. § 1 Because X Has Not Suffered Antitrust Injury.*

To state a claim under 15 U.S.C. § 1, a plaintiff must establish that it has suffered antitrust injury. *See Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) (citation omitted). This requirement is distinct from the Article III jurisdictional question whether the plaintiff has suffered an injury in fact that is caused by the defendant and redressable by favorable judicial decision. *See Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 443–44 & n.4 (5th Cir. 2026) (citations omitted). Instead, the "requirement is inferred from section 4 of the Clayton Act, which affords a remedy to any person injured in his business or property 'by reason of' an antitrust violation." *Dr.'s Hosp.*, 123 F.3d at 305 (citing 15 U.S.C. § 15(a)). Antitrust injury, as a component of statutory standing, is a "useful filter at an early stage of litigation" for weeding out faux antitrust lawsuits that merely state ordinary tort or contract claims. *See id.* at 306.

The Fifth Circuit recently summarized antitrust injury in the following way:

> The Supreme Court has distilled antitrust injury as being "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." . . . "The antitrust laws . . . were enacted for 'the protection of competition not competitors.'" . . . "Typical" antitrust injury thus "include[s] increased prices and decreased output." . . . "This circuit has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition." . . . "Loss from competition itself—that is, loss in the form of customers[] choosing the competitor's goods and services over the plaintiff's—does not constitute an antitrust injury." . . . In short, the question underlying antitrust injury is whether *consumers*—not *competitors*—have been harmed.

*Rx Sols.*, 164 F.4th at 444 (citations omitted).

Illegal group boycotts are "joint efforts by a firm or firms to disadvantage competitors by either directly denying or *persuading or coercing suppliers or customers to deny relationships* the competitors need in the competitive struggle." *Spectators Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) (internal quotation marks omitted) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294 (1985)). Although they often involve conspirators with "no direct motive to restrain trade," illegal group boycotts must involve a competitor at some level who seeks to restrain competition against an outsider to the agreement. *See id.*; *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015) ("[A] group boycott . . . [is] often[] a concerted agreement among competitors to refuse to deal with a manufacturer unless the manufacturer refuses to deal with an additional (typically new) competitor." (citation omitted)).

X suggests that it need not satisfy the antitrust injury requirement because the alleged boycott is a "*per se* illegal collusion" that necessarily states antitrust injury. *See* Doc. 243, Resp. Suppl. Auth., 1. But even a boycott claim falling under the *per se* approach must involve "joint efforts by a firm or firms to disadvantage competitors" either directly or by pressuring others. *See Nw. Wholesale*, 472 U.S. at 294 (citations omitted). If the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury.

X has not stated an antitrust injury. To recap, X is in the market of selling space on its social media platform where advertisements will be viewed by X's users. *See* Doc. 77, Second Am. Compl. ¶ 151. As alleged, WFA and its GARM initiative organized an advertiser boycott of X's platform. *See id.* ¶¶ 96, 104, 106, 124, 138, 141. Advertisers continue to buy advertising space from other social media companies and pay higher prices for that space. *See id.* ¶ 143. The harm to X has included

reduced revenue and reduced prices that advertisers are willing to pay to advertise on its platform. *See id.* ¶¶ 154–55.

To understand why these allegations do not amount to an antitrust claim, think of X's injury in two ways: First, consider that the conspiracy benefits other social media companies that no longer must compete with X. Second, consider that the conspiracy benefits the advertisers who no longer compete with each other to buy X's advertising space. Either way, no antitrust injury exists.

1.      If the conspiracy was meant to benefit competing social media companies, X has not alleged that Defendants' activities allowed those competitors to corner the supply against consumer interests.

A group of competitors who refuse to buy from an upstream supplier can cause antitrust injury if the refusal to deal is meant to allow another upstream supplier to corner the supply market. For example, in *Doctor's Hospital*, a preferred provider network contracted with various hospitals to provide services that the network could package into deals for group purchasers of healthcare coverage. *See* 123 F.3d at 303. An individual consumer whose healthcare plan participated in the network could go to an in-network hospital for a lower price than an out-of-network hospital. *See id.* In this setup, think of the hospitals as suppliers of healthcare and the network as an intermediary that buys from the hospitals to sell to the ultimate consumer, the patient.

The antitrust conspiracy arose when two hospitals—one large and one small—that were located immediately next door to each other both wanted to join the network. *See id.* The small hospital, rejected from the network, filed an antitrust lawsuit against both the network and the larger hospital that was allowed to join. *See id.* at 304. The large hospital had "condition[ed] its entrance" into the network on the exclusion of the small hospital, and the network obliged so that it could secure the large hospital's larger supply of services. *See id.* As a result, the network's consumers in

that area had reduced options and higher costs than they would have had if the small hospital was able to compete freely with the large hospital. *See id.* The Fifth Circuit held that the small hospital's "alleged losses and competitive disadvantage because of its exclusion from [the network] fall easily within the conceptual bounds of antitrust injury." *Id.* at 305.

In contrast to the facts of *Doctor's Hospital*, X has not alleged that the boycott against it allows or is intended to allow a competing social media company to corner the supply market for online advertising space. X alleges that the boycott against it benefits social media companies whom GARM deemed to have complied with the brand safety standards and that those companies are able to charge higher prices than X because they do not have to compete with X. *See* Doc. 77, Second Am. Compl. ¶ 143. Pinterest is one of the favored competitors. *See id.* But X has not alleged that the advertisers chose to do business with Pinterest—or any other social media company—as part of an agreement not to do business with X. Unlike the large hospital in *Doctor's Hospital*, Pinterest is not alleged to be X's competitor that wanted to exclude X from the market so that it could charge higher prices. In turn, unlike the network in *Doctor's Hospital*, the advertisers did not decide to boycott X at Pinterest's—or any other X competitor's—behest to secure the competitor's business. Instead, X alleges a conspiracy driven by advertisers not to further X-competitor social media companies' interests but to pursue their own collective interests as to where they place their advertisements. *See id.* ¶ 41.

Two cases that X cites in its brief as "easily constitut[ing] antitrust injury" likewise describe a combination with upstream competitors. *See* Doc. 196, Resp. Joint Mot. Dismiss, 39. First, in *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, the Second Circuit found antitrust injury where large on-the-ground dental-supply distributors pressured dental practices to not do business with the plaintiff, a

competing online distributor. *See* 924 F.3d 57, 60–61, 63–64 (2d Cir. 2019). Second, in *Full Draw Productions v. Easton Sports, Inc.*, the Tenth Circuit found antitrust injury where large manufacturers of archery equipment collectively refused to purchase rental space at the plaintiff's archery trade show because they wanted to force the plaintiff out of business and start their own trade show. *See* 182 F.3d 745, 748, 751 (10th Cir. 1999).

In both *IQ Dental* and *Full Draw*, an upstream supplier—either for dental products or for space at archery trade shows—is involved. The dental practices in *IQ Dental* were participants with "no direct motive to restrain trade" but were pressured into doing so by upstream competitors, and the manufacturers in *Full Draw* restrained trade so that they could occupy the upstream supplier position themselves. *See Spectators' Commc'n*, 253 F.3d at 221.

Here, X has not alleged that an advertising space supplier (*i.e.*, one of X's competitors) directed the Defendants' boycott. Nor has X alleged that advertisers, WFA, or GARM sought to become the supplier (a new social media company) themselves. Thus, a construction of X's antitrust claim as one restraining it from competing with fellow social media companies is not "injury of the type the antitrust laws were intended to prevent." *Rx Sols.*, 164 F.4th at 444.

2. <u>If the conspiracy was meant to eliminate competition at the advertiser level, X has not alleged that Defendants' boycott restrained X from selling to its downstream customers.</u>

A group of competitors who refuse to buy from an upstream supplier can also cause antitrust injury if the refusal to deal is meant to cut off the supplier's direct access to other downstream customers. For example, in *Eastern States Retail Lumber Dealers' Ass'n v. United States*, an association of retailers wanted to maintain the system where they bought lumber from regional wholesalers and sold it to local consumers. *See* 234 U.S. 600, 606–07 (1914). To do so, if a wholesaler tried to sell directly to consumers, the wholesaler's name went on a "blacklist" circulated to all retailers. *See id.*

at 607–08. When retailers saw a wholesaler's name on the blacklist, they understood it as a call to "withhold patronage" from that wholesaler. *See id.* at 608–09. Thus, the retailers collectively imposed on the wholesalers a condition to avoid competing for local customers anywhere, on pain of retailers everywhere boycotting the offending wholesaler and putting it out of business. *See id.* at 611. The Supreme Court held that the retailers violated antitrust law by collectively restraining the wholesalers' ability to compete for end consumers. *See id.* at 614. In figurative terms, think of the retailers' collective signal to the wholesalers as saying, "do not dare go around us to access our customers."

The advertisers here imposed no "do not dare go around us" restriction. The key difference between *Eastern States* and this case is what the respective conspirators sought when they combined forces: In *Eastern States*, the retailers sought to restrict the wholesalers from competing for the retailers' customer base. The conspiring advertisers here did not attempt to force X to advertise with only GARM advertisers so that they could control the social media advertising market or any other market. They merely decided that they would not buy from X for their own advertising needs, notwithstanding if X sold advertising space to anyone else.

To be sure, GARM allegedly imposed a "do not dare go around us" restriction by gatekeeping X's access to advertisers. *See* Doc. 77, Second Am. Compl. ¶ 63 (explaining that GARM's collective action shifted the cost of monitoring content from individual advertisers to social media companies). But GARM is not an economic intermediary like the retailers in *Eastern States*. GARM did not buy advertising space from X to sell to advertisers nor did it, in such an arrangement, tell X not to sell directly to GARM's customers. Rather, GARM was organized by advertisers and reflected their "avowed commitment to furthering [their] economic interests . . . as a group." Doc. 196, Resp. Joint

Mot. Dismiss, 13–14 (citing Doc. 77, Second Am. Compl. ¶¶ 36–47). Thus, if GARM is the obstacle to X reaching its advertiser-customers directly, then it is the equivalent of the advertiser-customers themselves deciding not to deal.

The last of the cases X cited in its brief to support antitrust injury is, like *Eastern States*, a "do not dare go around us" case. *See id.* at 39. That case, *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, involved a group of ski resorts that sold discount ski tickets to lodging referral services and did not want the lodging referral services to refer anyone to competing ski resorts outside of the group. *See* 182 F.3d 1096, 1099–1100 (9th Cir. 1999). With the aim to prevent the group's competitors from competing, a group boycott restricting the referral services from doing business with outsiders was a *per se* antitrust violation. *See id.* at 1103. Unlike the conspiring ski resorts in *Big Bear*, the defendant advertisers here are not telling X to only do business with them and not with other advertisers. The only harm X has asserted is that its customers collectively chose X's competitors over X. That "[l]oss from competition itself . . . does not constitute an antitrust injury." *Rx Sols.*, 164 F.4th at 444 (citation omitted). Therefore, although a group boycott is alleged, there is no antitrust violation here.

Because X does not allege that Defendants acted to restrain competition, it has failed to state either of its claims under the Sherman Act. Its claims against the remaining Defendants (all besides Shell International, Lego A/S, Nestlé S.A., and Ørsted Services) are therefore dismissed.

The Court finally denies X's request for an opportunity to replead. *See* Doc. 196, Resp. Joint Mot. Dismiss, 40. "Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015). "Denial of leave to amend is appropriate where there is no indication that amendment would cure the defects in a complaint."

*Id.* The 165-paragraph Second Amended Complaint contains no dearth of detail: if facts existed that GARM operated at an X competitor's behest to put X out of business or that GARM advertisers sought to unfairly exclude competing advertisers from doing business, X would have pleaded those facts. The very nature of the alleged conspiracy does not state an antitrust claim, and the Court therefore has no qualm dismissing with prejudice.

## IV.

## CONCLUSION

For the foregoing reasons, the motions are disposed as follows: The Court **DENIES** the motion to dismiss filed by WFA (Doc. 132). The Court **GRANTS** the motions to dismiss filed by Shell International (Doc. 142), Lego A/S (Doc. 145), Nestlé S.A. (Doc. 163), and Ørsted Services (Doc. 210), and **DISMISSES** all claims as to those defendants **WITHOUT PREJUDICE**. The Court **DENIES** X's contingent motion for jurisdictional discovery (Doc. 200). The motion to transfer (Doc. 178) is **DENIED**. The motion to sever (Doc. 190) and the motion for leave to file supplemental evidence (Doc. 244) are **DENIED AS MOOT**. The Court **GRANTS** the motion to dismiss for failure to state a claim (Doc. 160) as to all defendants not already dismissed for lack of jurisdiction. X's case as to those remaining defendants is **DISMISSED WITH PREJUDICE**. A final judgment will follow.

SO ORDERED.

SIGNED: March 26, 2026.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE